IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>KURT F. JOHNSON and DALE SCOTT HEINEMAN,<br><br>Defendants.<br>_____ / | No. CR 05-0611 WHA<br><br>**ORDER DENYING MOTION FOR JUDGMENT OF ACQUITTAL AND MOTION FOR GRAND JURY TESTIMONY** |

**INTRODUCTION**

In this criminal mortgage-fraud action, a jury found defendants Kurt Johnson and Dale Heineman guilty of conspiracy and over thirty counts of mail fraud. Defendants now move for a judgment of acquittal. They also separately move for service of subpoenas to the government for grand jury transcripts. For the reasons stated below, their motions are **DENIED**.

**STATEMENT**

Since this will be the last order in the district court, a review of the procedural history may assist the court of appeals. In brief, defendants promoted an Internet scam aimed at home mortgages. Defendants claimed to be able to eliminate mortgages altogether. After collecting a fee from a homeowner in distress, defendants recorded a phony land record purporting to reconvey the home free and clear of the loan. This was part of a series of steps promoted as the Dorean Process. The reconveyance was recorded without the consent or knowledge of the

lender. This was the principal fraud and occurred as to every count. Thrilled to have their homes free and clear, many borrowers ceased payments. Foreclosures were initiated, some taken to completion. Lenders eventually discovered the falsification in the land records. Before this discovery, however, defendants tried to compound the fraud, seeking to borrow yet more money from a new and unsuspecting lender, using the free and clear status of the home as collateral. Defendants told the homeowners that the new loan would be eliminated in the same way. As to some counts, defendants succeeded in obtaining additional loan proceeds. Defendants and their confederates kept seventy-five percent of the new loan proceeds and the homeowners received twenty-five percent. Defendants wired large sums to a bank in Latvia that have never been recovered. In no case did the scheme succeed in eliminating a mortgage, although considerable consternation and effort were required to undo the confusion. The details now follow.

### 1. THE DOREAN SCHEME.

Defendants were the founders and principals of the Dorean Group, an unincorporated, unlicensed entity that promoted a "debt-elimination" program. The scheme ran from 2004 to 2005. With the aid of brokers and the Internet, defendants and the Dorean Group advertised to borrowers that they could eliminate debt on the borrowers' homes and earn a profit in the process. Client borrowers were homeowners with loans obtained from lenders and secured by their home properties. To be a part of the debt-elimination program, client borrowers had to pay a one- to three-thousand dollar fee to the Dorean Group.

The property of the client borrowers was placed into "family trusts," with defendants as the trustees, who would then mail "presentment packets" to lenders. These "presentment packets" were thick and full of "gobbledygook," as one lender testified. Among many other things, the packet demanded that the lender prove the validity of its loan within ten days ("to the unilateral satisfaction of the Dorean Group"), or else, it was said, defendants would automatically become trustees for the lender. When the lender ignored or rejected the "presentment packet," defendants would file a substitution-of-trustee form at the county recorder's office. The lender was not given notice of the filing. This was fraudulent, of course,

for the lender had not authorized defendants to act as its agents. The lender was not given notice of the filing.

Now as self-proclaimed agents for the lender, defendants further filed a full reconveyance of the property back to the family trust, reciting that the loan had been paid in full. This was the centerpiece of the fraud. Defendants wrongfully stated that the original lender had been paid in full and therefore had no further interest in the property. Defendants also claimed to have the authority to act for the lender even though no such authority had ever been given. The lender, of course, had no knowledge that its collateral had been "reconveyed" and continued to presume that its security was tidily in place. Borrowers, however, were shown the reconveyance and reacted with relief and joy.

Many client borrowers stopped making mortgage payments. Unaware of the fraudulent scheme, lenders gave notices of default. Some borrowers got cold feet and paid their mortgage payments. Others continued with the "Dorean Process" — they declined to pay and eventually had their properties foreclosed on, losing all their arguments when the matter reached court. Although the lenders were the main victims of the scheme, many of the homeowners were also victims and lost their homes in foreclosure, in addition to paying the up-front Dorean fee. In a few cases, defendants went so far as to convince their client borrowers to obtain a new loan from a separate and unwitting lender. The new loans were secured by the borrowers' purportedly now-unencumbered properties. Defendants kept most of the loan proceeds, giving twenty-five percent to the homeowners. Millions of dollars were wired by defendants to a bank in Latvia, none of which has been recovered. Many hundreds paid the fee and went through the sad story told by the evidence, although only thirty-six examples were selected as counts in the indictment.

### 2. PROCEDURAL HISTORY.

Defendants first appeared in this district as plaintiffs in a civil suit. *See The Frances Kenny Family Trust v. World Savings Bank FSB*, C 04-03724 WHA. Frances Kenny was a borrower victim, a client of the Dorean Group. World Savings Bank was a lender victim, threatening to foreclose. By this stage, many foreclosures were imminent. Defendants

3

launched the litigation, evidently as a lulling step to show borrower clients that they were defending the Dorean Process. In a thirty-four page pleading filed in September 2004, plaintiffs sought, among other things, "a judicial declaration that World Savings Bank FSB did not make a loan of lawful United States money on or about July 18, 2002, to Frances Kenny," and "a judicial declaration that any alleged loans, mortgages and notes secured by the trust deeds on the property . . . are void ab initio and of no force or effect" (Compl. ¶¶ 172, 174). The pleading was brimming with incomprehensible blather and riddled with ornate flubdubs. Attorney Thomas Spielbauer, later a trial witness, submitted the complaint.

On a motion to dismiss, counsel for World Savings Bank pierced through the mumbo-jumbo of the pleading and cut to the heart of the matter: "Heineman and Johnson, along with their attorney Thomas Spielbauer have apparently developed an internet cottage industry whereby they scam defaulted debtors into conveying rights and property interests to them in exchange for a bogus claim that the debtors will be relieved from debt by the presentment to the lender of fraudulent and illegal 'bonds' and other fictitious instruments" (Dkt. 11, C 04-03724 WHA). In November 2004, four other cases were related to the *Frances Kenny* case, as it had become clear that defendants and Attorney Spielbauer had filed numerous similar civil complaints.

After hearing and considerable effort to pull the essence of the matter from calculated confusion, the *Frances Kenny* complaint was dismissed with prejudice and Attorney Spielbauer was ordered to show cause why he should not be sanctioned for filing a fraudulent pleading. After hearing, Spielbauer was sanctioned, ordered to pay ten thousand dollars, and referred to the state bar. The order, dated January 19, 2005, described the elaborate Internet scam orchestrated by plaintiffs Scott Heineman and Kurt Johnson. The order further noted that fifteen such "vapor money" cases had been filed.[1] The matter was referred to the United States

---

[1] The other civil cases were as follows: *The Case Family Trust v. Ameriquest Mortgage Co.*, C 04-04559 WHA; *The James J. Shylock, Jr. Family Trust v. America's Wholesale Lender*, C 04-04487 WHA; *The Shakvirovich Family Trust v. WMC Mortgage Co.*, C 04-04486 WHA; *The Beard Family Trust v. Washington Mutual Bank*, C 04-04466 WHA; *The Pafundi Family Trust v. Wells Fargo Bank N.A.*, C 04-04465 WHA; *The Mitchell Family Trust v. Keybank Nat'l Ass'n*, C 04-04285 WHA; *The Edward A. & Janice L. Costa Family Trust v. Capital Commerce Mortgage Co.*, C 04-04246 WHA; *The Heineman Family Trust v. Freedom*

4

Attorney's Office. The order stated, "Given the serious and disturbing nature of the allegations set forth above, including the possibility of mail and wire fraud to further an Internet scam upon distressed and vulnerable citizens about to lose their homes, not to mention the lenders, the Clerk shall send a copy of this order to [the United States Attorney's Office]. The Court makes no recommendation as to how the United States Attorney should deal with the instant matter" (Dkt. 59, C 04-3724 WHA). It turned out that the FBI had already been investigating defendants' scheme.

In July 2005, the government filed a civil action against defendants and the Dorean Group. *See United States v. Heineman, et al.*, C 05-02730 WHA. The government sought an injunction "permanently enjoining defendants, their agents, brokers, employees, and all persons acting in concert and participation with them, from engaging in their mortgage elimination scheme" (Compl. ¶ 26, C 05-02730 WHA). The government also sought a temporary restraining order with similar terms. The requests for a temporary restraining order and preliminary injunction were granted. Defendants returned a copy of the injunction to the Court, with a notice entitled, "Notice of Return for Cause without Dishonor" (Dkt. 23, C 05-02730 WHA). Since then, the preliminary injunction has been modified numerous times for the limited purpose of reconveying back to homeowners the property that had been transferred to defendants or their "business" entities. There have been dozens of these reconveyances.

A grand jury indicted defendants (and others who had acted as brokers) in September 2005. At that point, defendants were already in state custody in Salt Lake County, Utah, on related charges. A superseding federal indictment filed on February 16, 2006, charged defendants with one count of conspiracy in violation of 18 U.S.C. 1349, thirty-six counts of mail fraud in violation of 18 U.S.C. 1341, twenty-six counts of bank fraud in violation of 18 U.S.C. 1344, two counts of criminal contempt in violation of 18 U.S.C. 401(3), and three counts

---

*Mortgage Corp.*, C 04-04185; *The Elisa's Hope Trust v. Fieldstone Mortgage Co.*, C 04-4014 WHA; *The Komes Family Trust v. World Savings Bank*, C 04-04013 WHA; *The Margery Naomi Johnson Family Trust v. Homecoming Financial Network, Inc.*, C 04-04012 WHA; *The Williamson Family Trust v. CIT Group/Consumer Finance, Inc.*, C 04-03898 WHA; *The Magoon Family Trust v. Green point Mortgage Funding*, C 04-03897 WHA; *The Raymond J. Gaudreau Family Trust v. Ameriquest Mortgage Co.*, C 04-03776 WHA; and *The Frances Kenny Family Trust v. World Savings Bank FSB*, C 04-03724 WHA.

5

of forfeiture in violation of 28 U.S.C. 2461 (Dkt. 14, CR 05-0611 WHA). Utah elected to recede in light of the federal charges and Heineman and Johnson were transferred to the Northern District of California. Another accused was apprehended on the run in Panama and extradited to the United States. To streamline the case, the government eventually dropped the bank fraud counts. The forfeiture counts were severed for a subsequent trial. At the close of the evidence, the government moved to dismiss the contempt counts. All accused pled guilty except for defendants Heineman and Johnson.

Defendants Heineman and Johnson refused counsel. A *Faretta* hearing began in March 2006. Resources were provided to assist defendants in evaluating their request to represent themselves and the risks inherent in doing so. Before completing the *Faretta* hearing, the Court conducted an inquiry into the mental capacity of defendants to understand and to intelligently waive their right to counsel as well as to stand trial. This was prompted, in part, by a show of bizarre behavior that might suggest incompetence. The examination order stated, "[D]efendants Heineman and Johnson, who have refused counsel thus far, have made multiple statements that give reason to believe that they may suffer from a mental disease or defect that renders them mentally incompetent . . . or at least the record might suggest incompetence to an appellate court" (Dkt. 41, CR 05-0611 WHA). For example, defendants had stated that they were in contact with Jesus and "that he had told them he was burning down three judge's homes" (*ibid.*). Defendants then filed notices of "refusal for cause without dishonor" to submit to mental examinations.

On May 11, 2006, Dr. James Missett, appointed to conduct the mental examination, testified. He said that defendants had been usually uncooperative when interviewed. He also observed that defendants had appeared to be animated and "jocular with each other." They had provided a writing to Dr. Missett stating, "The notice says it all." Defendants had refused to cooperate with the exam. Defendants had been interviewed separately. Heineman frequently had repeated, "The notice says it all." Their notice had been replete with more mumbo-jumbo. Dr. Missett had difficulty making observations but stated that "to have two individuals who are independently suffering from a major mental illness really like close friends is not consistent

6

with a major mental illness." The doctor called their antics a "real Mutt and Jeff kind of presentation" (Dkt. 198, CR 05-0611 WHA).

Significantly, at the hearing itself, Johnson rose to cross-examine Dr. Missett. Johnson performed competently and asked rational questions, organized into cognizable themes. As a result of the cross-examination, Dr. Missett stated, "I have absolutely no doubt at all after listening to you today that you are completely competent to understand the nature of the proceedings being taken against you, and you are completely competent to assist in your own defense" (*ibid.*). Dr. Missett found Heineman similarly competent after being cross-examined by Heineman. The undersigned saw and heard the cross-examinations by Johnson and Heineman. For laymen, they did an excellent job and presented themselves with sober clarity, rationality, and organization. Based on all the foregoing including Dr. Missett's finding, the Court found Heineman and Johnson competent (Dkt. 67, CR 05-0611 WHA).

Having found defendants competent, the *Faretta* hearing continued on May 16, 2006. After a lengthy colloquy, both defendants knowingly and intelligently waived their right to appointed counsel (Dkt. 86, CR 05-0611WHA). It is worth adding that both defendants were adamant in rejecting counsel. At many points in the pretrial (right up to the eve of trial), the Court re-opened the issue and urged defendants to accept counsel, each to have his own at no expense, but they refused at every opportunity. Nonetheless, the Court appointed Attorney Richard Tamor to serve as a resource to both defendants on *procedural* issues. An experienced paralegal was appointed to assist defendants. The Court called in prison officials and obtained their cooperation in providing computers, printers, a law library, and access to all electronic discovery. Both defendants were housed in the same facility to aid their collaboration. The Court decided not to appoint standby counsel since two would be needed, if any were eventually activated, and since an undue risk existed that defendants would abuse any such appointment.

In June 2006, defendants filed a "Writ of Mandamus and Prohibition," which the undersigned treated as a motion to recuse. Defendants wrote that "Respondent Alsup is conflicted and precluded from being a non-biased trier of fact" (Dkt. 113, CR 05-0611 WHA).

7

The motion was referred to the reassignment committee and heard by the Honorable Susan Illston. Defendants based their recusal motion on comments made by the undersigned in an order dismissing defendants' claim against banks — such as calling their operation an "elaborate Internet scam." Judge Illston found that these remarks were not hostile, nor was the referral of the case to the United States Attorney's Office. She found that the case had been referred to the federal prosecutor's office "out of concern, based upon defendants' own statements, that a crime may have been committed." She denied the motion to recuse (Dkt. 216, CR 05-0611 WHA).

Defendants' imagination has not slept in inventing ways to frustrate and abuse the judicial process. Two examples will suffice. As stated, the Court arranged for defendants to be provided with laptop computers to aid their trial preparation. To arrange this required several hearings with prison officials, the United States Attorney, and the court-appointed paralegal. Defendants quickly abused the privilege, however. They used the computer and printer to prepare a phony court order calling for their release. It appeared with the unauthorized signature of the undersigned. The "order" stated (Dkt. 144, CR 05-0611 WHA):

> The men held as defendants DALE SCOTT HEINEMAN, and KURT F. JOHNSON have proven that they are men entitled to the common law; claimants have supplied no evidence to the contrary. They have also proven that the defendants are Cestui Que Trust/beneficiaries created for commerce by unknown settlers in conjunction with parents and that the men are the paramount creditors. Consistent with my Oath of Office to defend the common law I hereby order this case dismissed for failing to state a claim to which relief can be granted at law. The claims are statutory in nature and without personam jurisdiction to the natural men. It has been proven that good faith tender was made in honor and that this court lacked any subject matter jurisdiction absent a controversy. I have authorized Kurt F: [sic] Johnson as agent by contractual agreement to sign on my behalf this order of dismissal. The clerk is hereby ordered to prepare the necessary paperwork for the immediate release of KURT F. JOHNSON 13177-081 and DALE SCOTT HEINEMAN 12152-081 from the Board of Prisons facility in Dublin and to supply it to the Marshals for execution. This case is hereby dismissed.

To pause over one more example, defendants fabricated a phony 1099 United States IRS Form. Under "PAYER'S name, street address, city, state, ZIP code, and telephone no.," defendants wrote: "KURT F. JOHNSON, 125 E. SUNNYOAKS AVE. #207, CAMPBELL CA 95008."

8

They wrote "SETTLEMENT BOND FOR FIDUCIARIES" under "description." The "original issue discount for 2007" was stated at ten million dollars. Such "1099s" were mailed out for several judges on our bench, including the undersigned.

The Court is convinced and found on the record several times that defendants' antics were simply part of a calculated and concerted effort to confuse the record and to leave the impression that they were either not competent or were being treated unfairly. Without question, defendants were and are sane and able, and their affectations are just that — affectations. Despite the roguery, the Court went to considerable lengths to ensure a fair proceeding.

\* \* \*

The trial finally began in October 2007. The Court ordered the marshals to provide each defendant with two sets of civilian clothes to wear during trial. Both defendants refused and insisted on wearing jail garb, as was their right under appellate law. Insisting on representing themselves, defendants examined witnesses, called witnesses (including an expert witness), and argued their own cases. The Court went to reasonable lengths to ensure witnesses and subpoenaed documents were made available for the defense. The trial lasted approximately a month. At least two charging conferences were held on the Court's proposed instructions. Defendants made precious few objections to the instructions. A jury found defendants guilty on all counts. Sentencing will occur in eight weeks. After the verdict, the Court recommended that defendants allow counsel to be appointed for post-trial proceedings, but they both refused.

Still pro se, defendants now move for a judgment of acquittal. They claim that: (i) the district court lacked jurisdiction; (ii) the jury instructions were improper; (iii) the mail-fraud statute was unconstitutionally vague; (iii) there was insufficient evidence to sustain their conviction; and (iv) there was impermissible constructive amendment. In a separate motion, defendants also request that an order be issued to the government for the production of grand jury transcripts. After hearing, this order rejects these arguments and sustains the convictions.

9

**ANALYSIS**

**1. SUBJECT-MATTER JURISDICTION.**

Defendants contend that the district court lacked subject-matter jurisdiction on several grounds: the grand jury would not have indicted defendants had it been presented with sufficient evidence; the government erroneously based federal jurisdiction on the financial institutions (lenders) being victims; and the undersigned, jury, and victims did not reside in the United States. None of these arguments has any merit.

*First*, defendants provide no evidence to support their proposition that the grand jury would not have returned an indictment had it been in full possession of the facts. "[A]s a general matter, a district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254 (1988).[2] Here, defendants merely make conclusory allegations. Their argument has a tautological quality: they claim that, although they have no evidence that the grand jury made a mistake, the fact that an indictment was returned showed that there must have been a mistake. The evidence of guilt at trial was compelling.

*Second*, defendants argue that "[t]he financial institutions were the jurisdictional hook for the federal government's access to the defendants." The lenders were deemed to be the victims of the scheme to defraud. There was, however, a lack of any "proven fact of a financial institution" (Br. 6). Furthermore, "[i]t is the financial institution's covering contract with the FDIC [Federal Deposit Insurance Corporation] that gives the federal government standing as a party or what is known as jurisdiction . . . [but] not one FDIC certificate of any alleged victim was entered into evidence and no testimony was obtained" (*ibid.*). This order interprets defendants' argument to mean that subject-matter jurisdiction was absent because there was no evidence showing that the lenders to be valid entities or that they were federally insured. These claims have little merit. The "jurisdictional hook" was the mail-fraud statute, 18 U.S.C. 1341, and the alleged mailings. To charge and try violations of the mail-fraud statute, the government was not required to prove financial institution were involved or that the victim lenders were

---

[2] Unless indicated otherwise, internal citations are omitted from all cites.

10

federally insured. No particular type of victim is required for conviction of mail fraud. *United States v. Coachman*, 727 F.2d 1293, 234 (D.C. Cir. 1984). Federal insurance is not an element of the federal mail-fraud statute. *See* 18 U.S.C. 1341.

It is true that the mail-fraud statute provides that if "the violation affects a financial institution," then a stiffer sentence may be imposed but, at most, that presents a sentencing issue. Generic federal mail fraud does not require that a financial institution be involved. It is also true that the indictment pled parallel bank-fraud counts. Those, however, were dismissed by the government to streamline the trial. There was no need to prove them. The remaining mail-fraud and conspiracy counts were proven.

*Third*, defendants claim that none of the participants in the criminal action resides in the United States. They state (Br. 12–13):

> [T]he court pretends to be an Article III court, with territories, enclaves, and ceded properties within the scope of the defendants [sic] activities, with a judge who has taken the federal employees oath of office and not the judicial one required by Congress to take the office. This court is an administrative, executive, debt collector of the bankrupted UNITED STATES claiming it does not exist and insisting it doesn't strangely enough by its very existence. Neither the judge nor the jury resided within the territories of the UNITED STATES as required by law, and neither did any of the victims. No jurisdiction could or ever have been relevant.

Defendants' assertion is completely unfounded. The lenders and client borrowers and virtually all acts in evidence were in the United States.

### 2. JURY INSTRUCTIONS.

The jury instructions constituted an abuse of discretion, defendants claim. (The final version appears at Dkt. 519.) Defendants say: "[The Court and the government] did not instruct according to the statutes charged, mis-characterized the evidence presented, were vague as to specific requirements like the 'lenders' being financial institutions as defined in Title 18 § 20 being necessary for jurisdiction and conviction, and silent on the issue of money which was essential to the accurate deciphering of the factual dispute between the parties" (Br. 7). Defendants essentially argue that the Court failed to instruct the jury in a way consistent with their own understanding of lending and money. This order disagrees with defendants' characterization of the law.

11

In particular, defendants now object to Instruction No. 18, which stated in part, "Within regulatory reserve requirements, banks are allowed to receive deposits from customers and then to use those deposits to make loans to borrowers; banks are also allowed to borrow money from the Federal Reserve Bank and then to use those funds to make loans to borrowers; and banks are free to use their own equity to make loans to borrowers." Defendants also object to the instruction that, "[u]nder no circumstances can the borrower simply eliminate the loan, recover the collateral, and keep the money from the loan." This is incorrect, defendants claim; the instructions misstated the law and provided an inaccurate definition of money. For example, banks essentially "create[] the money [*i.e.*, promissory notes] on the spot in a lending transaction." Banks benefit from these promissory notes in that "[t]he banks using the promissory note to fund their liability instrument are getting a free loan that they simply get to eliminate without return of the collateral with the assistance now of a federal judge" (Br. 8–9). Defendants argue that there is nothing, however, to support the validity of these promissory notes — no books and records, proof of consideration, material statements, or accounting experts.

This order disagrees. *First*, defendants already waived their right to object to the instructions when they agreed to the statement of the law during the charging conferences. *Second*, defendants retained their objection regarding "money" and how it should have been explained. Defendants' voodoo notion of money made no sense whatsoever then — or now. They have provided no authority to support it.

"When reviewing a claim of error relating to jury instructions, the instructions must be viewed as a whole. Moreover, the adequacy of the entire charge must be evaluated in the context of the whole trial. A trial judge is given substantial latitude in tailoring the instructions so long as they fairly and adequately cover the issues presented. Finally, although a criminal defendant is entitled to an instruction regarding his theory of the case, challenges which merely pertain to the trial judge's language or formulation of the charge are reversible only for an abuse of discretion." *United States v. Marabelles*, 724 F.2d 1374, 1382–83 (9th Cir. 1984) (emphasis added). Here, the instructions gave an explanation of the basic law relating to notes,

deeds of trust, and the rights and duties of borrowers and lenders. The Court had the discretion to omit defendants' definition of money and lending practices, especially because no legal authority or real-world banking practices supported their claims that banks create money — or promissory notes — out of thin air. The jury instructions were proper.

### 3. CLARITY OF THE MAIL-FRAUD STATUTE.

Defendants claim that the federal mail-fraud statute is unconstitutionally vague. The mail-fraud statute provides (18 U.S.C. 1341):

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

Defendants' arguments are unavailing. "'It is well established that vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand.' The standard used in examining a statute for unconstitutional vagueness is whether a person of average intelligence would reasonably understand that his conduct is proscribed." *United States v. Bohonus*, 628 F.2d 1167, 1174 (9th Cir. 1980). The Ninth Circuit has upheld the application of the mail-fraud statute against a vagueness challenge. *See id.* at 1174–75; *United States v. Frega*, 179 F.3d 793, 802–03 (9th Cir. 1999).

### 4. SUFFICIENCY OF THE EVIDENCE.

In ruling on a motion under FRCrP 29, "[t]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Alarcon-Simi*, 300 F.3d 1172, 1176 (9th Cir. 2002). "[A] district court must bear in mind that it is the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts." *Ibid*. "Circumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction." *United States v. Reyes-Alvarado*, 963 F.2d 1184, 1188 (9th Cir. 1992). This order finds that there was overwhelming evidence of guilt on all counts.

Defendants claim that there was insufficient evidence to sustain their conviction. Returning to their favorite theme, they say, "No evidence was ever presented at trial of a financial institution. The document custodians never discussed the standing of their institution and no documents of their standing was offered by the government . . . No proof of mailing was made only accusations by employees or recipients that something was sent or received . . . The evidence presented at trial as to an interest in property was merely county recordings, and verifications by document custodians of authentic documents. This is not evidence of a perfected claim consistent with the UCC but is only evidence of a public notice. No evidence of possession of the original promissory note was ever offered" (Br. 20–21).

This order disagrees. The government provided documented proof along each step of the Dorean Process and with respect to each loan. The most fraudulent of the corrupt steps was the filing of the reconveyance document with the county recorder's office. The reconveyance fraudulently stated that defendants had the authority to act on behalf of the lenders and that the original lender had already been paid in full. This was false — bark to core. Defendants had no such authority, nor had the lenders been paid. Furthermore, each mail-fraud count was supported by the presentment-packet mailing. The sequence of scheme documents was duplicated for each of the counts, which the government painstakingly admitted into evidence.

Contrary to defendants, the government was not required to have victims of the fraud testify. Crime victims often do testify, of course, but there is no requirement that they do so; they may be deceased, absent or afraid. Other evidence may be used to prove a crime. The government must prove the crime but it can choose its own witnesses to do so.

Viewing the evidence in a light most favorable to the prosecution, this order finds that the presentment packages and the reconveyances for each count were sufficient alone for a rational trier of fact to have found defendants guilty beyond a reasonable doubt. But the entire pattern of scheme documents has been admitted for each count, including the presentment packets, which was proven to have been mailed in each case. Proof of guilt was severely powerful.

### 5. CONSTRUCTIVE AMENDMENT.

The government dismissed all counts except the conspiracy and mail-fraud counts, and it removed language in the conspiracy count referring to bank and wire fraud. The convictions cannot stand, defendants argue, because dismissal of these counts from the original indictment amounted to an impermissible constructive amendment. The grand jury had relied on all the charges in the original indictment, and now that the government realized that it could not prove some of the charges, it "merely amended the indictment at [its] own discretion." Furthermore, "victims were switched . . . [and] [p]roperty rights were switched" (Br. 22).

Defendants are wrong. "A constructive amendment occurs where there is 'a complex of facts [presented at trial] distinctly different from those set forth in the charging instrument,' or when 'the crime charged [in the indictment] was substantially altered at trial, so that it was impossible to know whether the grand jury would have indicted for the crime actually proved.'" *United States v. Freeman*, 498 F.3d 893, 907 (9th Cir. 2007). Dismissing counts that were not proven and not relied upon by the government does not constitute a constructive amendment. *See United States v. Pang*, 362 F.3d 1187, 1194 (9th Cir. 2004) ("The failure to include in the instructions surplusage from the information was not error because only the 'essential elements' of the charge need be prove at trial"). The government had removed language that was not relied upon and would have confused the jury. Here, there was no constructive amendment because

15

defendants were *not* charged with one crime and then tried with another; rather, they were tried for fewer crimes than they were originally charged with.

Defendants object to the conspiracy count. The indictment charged them with conspiracy to commit mail fraud, *wire fraud, and bank fraud*. "[T]he redactions created an indictment . . . that left in all the elements of wire fraud and bank fraud, and overt acts that had to be proved while they instructed the jury they didn't have to consider them when referring to the indictment itself. No defense could be put on because these charges were supposedly dropped while surreptitiously presented to the jury" (Br. 23).

This order finds that there was no error in the conspiracy proof. The Supreme Court has held that a defendant was not prejudicially surprised at trial by the absence of proof concerning one of two ways in which he was alleged by the indictment to have defrauded his insurer. The variance between the indictment, which alleged two methods by which the defendant defrauded his insurer, and proof at trial, which showed only one of those two methods, did not prejudice the fairness of the defendant's trial in any other way. *United States v. Miller*, 471 U.S. 130, 135 (1985). "The Court has long recognized that an indictment alleges more crimes or other means of committing the same crime. Indeed, a number of longstanding doctrines of criminal procedure are premised on the notion that each offense whose elements are fully set out in an indictment can independently sustain a conviction." *Id.* at 136.[3]

### 6.  GRAND JURY TRANSCRIPTS.

Defendants move for an order requiring the production of grand jury transcripts. They claim that "[t]he transcripts are the only evidentiary vehicle left available to the defense to inquire upon how the grand jury was manipulated into issuing an indictment outside their jurisdiction and the scope of the statutes alleged to be violated. We believe that the transcripts will be clear and convincing evidence that the defense has been prejudiced from the very onset

---

[3] The Supreme Court in *Miller* cited the following decisions in support of this notion. *See Turner v. United States*, 396 U.S. 398, 420 (1970) ("when a jury returns a guilty verdict on an indictment charging several acts in the conjunctive, . . . the verdict stands if the evidence is sufficient with respect to any one of the acts charged"); *Crain v. United States*, 162 U.S. 625, 634–36 (1896) (indictment count that alleges in the conjunctive a number of means of committing a crime can support a conviction if any of the alleged means are proved); *Dealy v. United States*, 152 U.S. 539, 542 (1894) (prosecution's failure to prosecute certain counts of an indictment does not affect the validity of the indictment as to the other counts).

16

of this prosecution by malicious intent" (Mot. to Issue Order for Service of Subpoenas at 2). According to FRCrP 6(e)(3)(E), "[t]he court may authorize disclosure — at a time, in a manner, and subject to any other conditions that it directs — of a grand-jury matter . . . at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." But "mere 'unsubstantiated, speculative assertions of improprieties in the proceedings' do not supply the 'particular need' required to outweigh the policy of grand jury secrecy." *United States v. Ferreboeuf*, 632 F.2d 832, 835 (9th Cir. 1980).

The reason defendants want this information is misguided. They want to show that the grand jury was misled regarding financial institutions; while the government produced evidence showing fraud on homeowners, it failed to show that financial institutions were affected, defendants argue. Defendants may not, however, go behind the workings of the grand jury in this manner. What matters is the evidence at trial, which overwhelmingly proved defendants' scheme to defraud. The "motion to issue order for service of subpoenas" is therefore **DENIED**.

Although defendants have not raised the point, the Court has considered whether the government complied with the Jencks Act, 18 U.S.C. 3500. The government has assured the Court that the only witnesses who testified at the trial and before the grand jury testified as to different subjects before the grand jury. Equally important, defendants made no motion for grand jury transcripts after any witness testified. The Jencks Act specifically calls for this as a requirement for obtaining transcripts. There was no conceivable Jencks Act violation.

\* \* \*

A final word is worthwhile. Defendants have gone to considerable efforts to throw as much sand as possible into the works, treating it all as one vast practical joke. This has been a studied effort to leave the impression that they have been railroaded. Their insistence on wearing jail garb before the jury (while spurning civilian clothing) is but one example. They have also tried to leave the impression that they may be crazy. And, at almost every turn, they have abused the various resources made available for their defense, such as their using the computers and printers provided for their defense to forge orders (purportedly signed) for their release from prison. The Court is convinced — to a moral certainty — that all of this has been

part and parcel of their con. They are *not* mentally incompetent. They are and were perfectly sane. They simply have no respect for the law or our system of justice, just as they had no qualms in fleecing numerous homeowners and lenders in their Internet scam. Defendants received a fair trial, exceedingly so given the many ways in which they tried to frustrate the process. The trial was conducted justly and the verdict justly deserved.

## CONCLUSION

The motion for acquittal and motion for grand jury documents are **DENIED**.

**IT IS SO ORDERED.**

Dated: January 24, 2008.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE