United States District Court

Northern District Of California

Before The Honorable William Alsup

United States of America,      )
                               )
              Plaintiff,       )
                               )
   vs.                         )          NO. CR05-611 WHA
                               )
Dale Heineman and              )
Kurt Johnson,                  )
                               )
              Defendants.      )
_____)

                                 San Francisco, California
                                 Tuesday, June 10, 2008

**Reporter's Transcript of Proceedings**

**Appearances:**

For Plaintiff:          Joseph P. Russoniello
                        United States Attorney
                        450 Golden Gate Avenue, Box 36055
                        San Francisco, California  94102
                  By:   **Brigid S. Martin, Esquire**
                        **C. David Hall, Esquire**
                        **Assistant United States Attorneys**

For Defendant:
Dale Scott Heineman:    Dale Scott Heineman
                        #12152-081
                        FCI Dublin Correctional Facility
                        5701 8th Street,
                        Camp Parks
                        Dublin, California  94568
                        In Propria Persona

(Appearances continued on next page.)

*Reported By:*          *Sahar McVickar, RPR, CSR 12963*
                        *Official Reporter, U.S. District Court*
                        *for the Northern District of California*

<u>**Appearances, continued:**</u>

For Defendant:
Kurt F. Johnson:          Kurt F. Johnson
                          #13177-081
                          FCI Dublin Correctional Facility
                          5701 8th Street
                          Camp Parks
                          Dublin, California  94568
                          In Propria Persona

                          Law Offices of Tamor & Tamor
                          1901 Harrison Street, 9th Floor
                          Oakland, California  94612
                      By: **Richard Alan Tamor, Esquire**
                          **(Advisory Counsel)**


                          **---o0o---**

```
 1    Tuesday, June 10, 2008                              3:00 p.m.

 2                    P R O C E E D I N G S

 3             THE CLERK:  Criminal No. CR05-611, United States

 4    versus Dale Heineman and Kurt Johnson.

 5             MS. MARTIN:  Good afternoon, Your Honor.

 6             Brigid Martin and Dave Hall for the United States.

 7             THE COURT:  Welcome back.

 8             MR. HALL:  Thank you, Your Honor.  Good afternoon.

 9             THE COURT:  Good afternoon.

10             MR. TAMOR:  Good afternoon, Your Honor.

11             Richard Tamor appearing as advisory counsel.

12             THE COURT:  How are you today, Mr. Tamor?

13             THE PROBATION OFFICER:  Good afternoon, Your Honor.

14             Benjamin Flores from Probation.

15             THE COURT:  Mr. Heineman and Mr. Johnson.

16             DEFENDANT HEINEMAN:  There you are.  How are you?

17             THE COURT:  I'm fine.

18             All right, we are here on -- for a hearing to

19    determine the amount of restitution.  I did receive the

20    Government's memorandum that comes out to a dollar amount of

21    499,000 -- what is the exact amount?

22             MS. MARTIN:  Actually, I don't know if that is the

23    one that I filed.  You may have an earlier version.

24             THE COURT:  All right.

25             MS. MARTIN:  I have one I filed here.  It's the
```

```
 1    first document in the binder.  The total dollar amount is
 2    $512,911.63.
 3              THE COURT:  Okay, $512,911.63; in other words,
 4    slightly more than half a million dollars.
 5              This would be -- to be paid to a list of 20 victims,
 6    starting with Bank of America and Peggy McCay, going down to a
 7    list of others.
 8              MS. MARTIN:  And, I've also brought copies of that
 9    memorandum and the victim statements for the defendants to use
10    in court, if they would like to, for their convenience.
11              THE COURT:  All right.
12              DEFENDANT JOHNSON:  Considering we have never seen
13    that stuff, that would probably be great.
14              MS. MARTIN:  Okay.  I did mail it out on Thursday to
15    the jail.  There is a possibility that they didn't receive it.
16    I --
17              DEFENDANT HEINEMAN:  We pretty much haven't received
18    mail from the day we left here.
19              THE COURT:  Well, let me give you a moment then.
20    This is not -- despite the fact that it looks very thick, it's
21    actually not that long.  If you would like to take these copies
22    back, the marshals would let you review these.  And then, we
23    could come back and resume the hearing later in the afternoon.
24              Would you like to do that?
25              DEFENDANT JOHNSON:  I would like to take a look at
```

```
 1   it, since I haven't seen it.

 2           THE COURT:  All right.  It's now 2:15 --

 3           MS. MARTIN:  Your Honor, can I say one other thing,

 4   just to clarify?

 5           THE COURT:  Yeah, sure.

 6           MS. MARTIN:  Most of the documents that are in the

 7   binder I sent to the defendants when they were incarcerated at

 8   Stafford and Lompoc over the last few months.  So, these

 9   documents should not all be new to them.  On most of the

10   victim's statements I sent redacted versions.

11           THE COURT:  Thank you for that.

12           Basically, this is a four-page document with a lot

13   of attachments we've all seen before.  So why don't we -- can

14   you come back in 30 minutes?

15           DEFENDANT JOHNSON:  Yep.  I just would like to put

16   on the record, too, when you guys shipped us out, we have been

17   totally separated from our legal materials and mails.  So we

18   don't know shit from Shinola.  You see us coming here with no

19   paperwork; we haven't had access to nothing.

20           THE COURT:  I -- right now, I just have one motion

21   to deal with, and I want to give you the time that you need to

22   deal with this motion.  So, why don't you -- I would ask the

23   marshals to bring you back here in a half an hour.  I think, in

24   my judgment, that ought to be enough to deal with this motion.

25   All right?
```

1            **DEFENDANT JOHNSON:**  Great.

2            **MS. MARTIN:**  And, Your Honor, as for the defendants

3   saying that they haven't had a chance to get legal materials or

4   have access to the mails, I would note that there was a motion

5   filed by the defendants, or at least one of the defendants, a

6   week or two ago contesting jurisdiction.  So that seems to not

7   be the case.

8            **DEFENDANT HEINEMAN:**  That would be outgoing mail

9   from us to somewhere, not coming from you to us.  That is what

10  we are talking about, specifically.

11           **THE COURT:**  Well, on the specifics of this

12  particular motion, you each now have in your hand the same

13  material that I have. I ask you to, please. go to a quiet place

14  where the marshals will take you, and you read the materials

15  and then come back in half an hour, and we will hear the

16  motion.  All right?

17           **MS. MARTIN:**  Yes, Your Honor.

18           **THE COURT:**  Thank you.

19           Since no one is here on the Fuentez matter, we are

20  just going to take a thirty-minute recess because there is no

21  other matter on the calendar except for this one.

22                 **(Recess taken at 2:15 p.m.; proceedings**

23                 **resume at 2:57 p.m.)**

24           **THE COURT:**  Please be seated.  Thank you.

25           All right.  Everyone can be seated.

1          Why don't you come up here.

2          Everyone is back.  The defendants are back.  It's

3    now a few minutes, three minutes till 3:00; did you get a

4    chance to read the document?

5          **DEFENDANT JOHNSON:**  Yeah.

6          **THE COURT:**  Ready to go forward?

7          **DEFENDANT HEINEMAN:**  Sure.

8          **THE COURT:**  This a memorandum and motion by the

9    Government.

10          Ms. Martin you go first.  Tell us what your motion

11    is.

12          **MS. MARTIN:**  Your Honor, this is a motion addressing

13    restitution.  The Government asks that restitution be imposed

14    upon the defendants, Heineman and Johnson, jointly and

15    severally, in the amount of $512,911.63.

16          The Government, through its witness program, has

17    reached out to 585 victims in the case that we have identified,

18    and attempted to get information and -- from the victims and

19    asked the victims to identify and give supporting evidence of

20    their losses.  The 20 individuals, or 19 individuals and the

21    banks listed in this memorandum were the victims that the

22    Government was able to come up with adequate evidence to

23    support the losses.

24          This, of course, does not account for all the

25    losses, but, under the mandatory Victims' Restitution Act,

1  restitution for identified losses of victims must be provided

2  to those victims and ordered, regardless of defendant's ability

3  to pay.  And that is why these are listed here.

4         There was a community restitution portion that might

5  take into account defendants' ability to pay, so here we have

6  only included the identified losses of individuals.

7         **THE COURT:**  All right. Let's hear from Mr. Heineman.

8         **DEFENDANT HEINEMAN:**  Well, we have a problem with

9  the victims.  Actually, the victims were not identified in the

10  indictment.  None of these people are -- here -- are actually

11  in the indictment as victims.  Not sure how we make the move

12  from financial institutions, lenders, and others into these

13  people.  And we made this clear, very early on in this case, in

14  front of Judge Larson and even in front of the prosecution

15  prior to trial.  So, we have a problem with these victims.

16         **THE COURT:**  All right, Ms. -- let's pause over that

17  point.

18         Mr. Heineman is saying that the indictment called

19  out the banks as the victims, or it was at least the defrauding

20  party was the banks, but you have included Peggy Ryan and some

21  others as victims; so what is your answer to that?

22         **MS. MARTIN:**  That's correct, Your Honor.  Under the

23  mandatory Victim Restitution Act, specifically, 18 U.S.C. §

24  3663(a) subsection (a)(2), which I did put in the memorandum,

25  the definition of a victim is "a person directly and proximally

1   harmed as a result of the commission of an offense for which

2   restitution may be ordered, including in the case of an offense

3   that involves as an element, a scheme, conspiracy or pattern of

4   criminal activity, any person directly harmed by the

5   defendant's criminal conduct in the course of the scheme,

6   conspiracy or pattern."

7           Furthermore, the defendants were convicted of money

8   laundering and conspiracy to commit money laundering.  And, one

9   element of mail fraud is a scheme or artifice to defraud.  And

10  thus, under the statute, this would be a crime where any

11  victims of that scheme would be covered, even if it's not

12  specifically somebody who was affected by one of the instances

13  of mail fraud that were charged in this case.

14          There are Ninth Circuit cases that direct that --

15  *United States versus Mayes*, for example, is a Ninth Circuit

16  case that says that mail fraud and conspiracy to commit mail

17  fraud would be subject to this, this definition.

18          **THE COURT:**  All right.

19          Mr. Heineman what else would you like to say?

20          **DEFENDANT HEINEMAN:**  I'll defer to Mr. Johnson.

21          **THE COURT:**  Mr. Johnson, what would you like to say?

22          **DEFENDANT JOHNSON:**  The first thing I want to

23  address is, in our trial, you didn't define what money was, so

24  I'm wondering what definition we are going to use.

25          **THE COURT:**  Please, Mr. Johnson.

1          **DEFENDANT JOHNSON:**   Are we just going to use

2     "undefined financial obligations"?   Then, for the sake of

3     continuity, I'll refer to them as UFOs.   And the first thing

4     that I hear is that I recall in paragraph 4 that the scheme or

5     artifice was to defraud financial institutions, lenders, and

6     others.   It sounds to me, based on what he is saying, and,

7     again, I haven't had a chance to do the research, but sounds to

8     me that the nexus is the scheme or artifice in order to attach

9     to some kind of victims.   Otherwise, I guess you could just

10    throw anybody into a -- into a restitution-type situation.

11          But, I'm not sure what the nexus is to these victims

12    if we are going to make it the scheme because a same scheme is

13    clearly delineated to financial institutions, lenders, or

14    others.   If you are saying that these are the "others," that's

15    find, but that is not -- you know, I don't know how they got

16    the nexus to the scheme, so that probably a little

17    clarification on that might be good.

18          **THE COURT:**   Well, I know the answer to that, because

19    I have been with this case from day one and sat through the

20    entire trial.   And this is very clear, and the Court now finds

21    that while the indictment called out the banks as a victim of

22    the fraud for purposes of the mail fraud statute, the scheme in

23    question also depended on getting these people like Peggy McCay

24    and Peggy Ryan, and so forth, to fall for the notion that their

25    debt and mortgage could be eliminated.

1              *DEFENDANT JOHNSON:*   Sounds to me --

2              *THE COURT:*   Wait.

3          And that while they -- you had them get their

4     approval to sign off on these indictments, and by their -- I

5     mean Peggy McCay and the other individuals victims, so that you

6     could then present paperwork to the bank.

7              Now, in understanding the way this scheme worked,

8     the individuals were led to believe, by you, that this was a

9     legitimate method for eliminating their mortgage, when, in

10    fact, it was completely bogus.  It had no validity whatsoever

11    in law or in practice, and never once did it eliminate

12    anybody's mortgage.  So, these individuals were defrauded just

13    as much as the bank was defrauded.  So that's what the Court

14    finds.  And that's why all of these other individuals are

15    listed here.  They are victims, too, at least within the

16    meaning of the statute.

17             *DEFENDANT JOHNSON:*   Sounds to me like you are

18    identifying maybe a separate scheme.  But, if you are going off

19    the indictment, the scheme and artifice, and, if I understand

20    the elements of your statute, or your code, is that the scheme

21    had to be furthered through the mails.  If the scheme was to

22    defraud financial institutions and the furtherance of the mails

23    was the jurisdictional hook that you guys claim, I don't see

24    the nexus between that particular part of the element of your

25    code and these particular victims.

1          **THE COURT:**  Well, I've said it as best as I can.

2     The nexus was that in order to defraud the banks and position

3     yourself so that you could go for round two, which was the

4     refinancing, you needed to get first to defraud these

5     individuals into thinking that you had a way to eliminate their

6     mortgage.  So, it was a two-step, three-step process with fraud

7     at every turn.  So the nexus is quite clear.

8          **DEFENDANT JOHNSON:**  Okay.

9          Now, my other concern, then, is that I believe

10    Mr. Flores put $90 million as part of our -- part of our PSR

11    report, and I'm wondering this -- why this number is so low.

12         **THE COURT:**  If you want us to raise it --

13         I think the Government is basing this on what people

14    submitted, right?

15         **MS. MARTIN:**  That's correct, Your Honor, and

16    evidence that we had in our possession.

17         **THE COURT:**  So, the source of the evidence is -- and

18    what they had to work with in the two instances -- were

19    different.

20         **DEFENDANT JOHNSON:**  What's the source of this

21    90 million?

22         **THE PROBATION OFFICER:**  If I can speak to that, Your

23    Honor?

24         The number is actually 50,000,679, 547 which

25    represented the 258 clients that all four of the defendants who

1    were convicted at -- well, let me back up.

2             These two defendants obviously didn't admit; they

3    went to trial and still denied their culpability. But the face

4    value of the mortgages that were submitted, which were admitted

5    to in the Julian and in LeCompte individual plea agreements,

6    add up to that particular number.

7             The -- I'm not sure where the 90 million comes from.

8    I think one of them had restitution of about 90,000.  Maybe

9    that's what the defendant is referring to.

10            I have the pre-sentence reports here in front of me

11   for Mr. Johnson and Mr. Heineman.  I don't have Julian's or

12   LeCompte, but the offense conduct should be identical in all of

13   these.

14            **THE COURT:**  And what was the number, 50 million?

15            **THE PROBATION OFFICER:**  Yeah.  In fact, let me just

16   say -- I'll read directly from here.  It says the amount of

17   intended losses in the plea agreements for co-defendant,

18   LeCompte, Julian and Tobias was approximately 50,679,547.  So

19   that number of 50 million, which is the number that the

20   Probation Office used to establish Heineman and Johnson's

21   increase for intended loss, which is a 24 level increase, comes

22   from the face value of the mortgages related to -- excuse me,

23   related to LeCompte, Julian and Tobias.  And I can share a copy

24   of the report with the --

25            **THE COURT:**  You've already done all that in the

1    past.  But the -- so that was the method you used to come up

2    with the 50 million.

3              **THE PROBATION OFFICER:**  That is intended loss, which

4    is for purposes of Guideline computations.  The numbers

5    presented here are actual loss.

6              **THE COURT:**  Well, actual loss that was submitted by

7    individuals?

8              **MS. MARTIN:**  Correct, the actual loss.

9              **THE COURT:**  The vast majority of individuals did not

10   submit any paperwork, I'm assuming.

11             **MS. MARTIN:**  That's correct.

12             **THE COURT:**  So that counts for a difference in

13   results.

14             **DEFENDANT JOHNSON:**  I think it's the belief of this

15   Court that law and equity, having mentioned in your court a

16   long time ago -- it just doesn't seem equitable to stay at this

17   number.  If you are saying it's 50 million there and there is a

18   -- this new victim has got losses, and you're saying that there

19   is only 20 here and there is hundreds or thousands, the numbers

20   just don't add up.

21             **THE COURT:**  Well, the difference is the difference

22   between intended loss, which your scheme involving hundreds and

23   hundreds of people, was in the aggregate intended to effect

24   $50 million.  So that is one number, and that's the number that

25   was used.  What your intent was, the grand scheme of your

1    intent, was $50 million.

2           The number of people who actually have submitted

3    paperwork to show what they had lost, so we can say cut this

4    person a check for $1500, is a much smaller number.  They

5    weren't required by law, and the Government can't go out and

6    twist their arm to make them submit paperwork.  So, the people

7    who submitted paperwork comes to a much smaller number.  But

8    that, in no way takes away from the fact that your intended

9    loss, which is what we look at for purposes of sentencing, was

10   a much bigger number.

11          So there is no inconsistency.

12          *DEFENDANT JOHNSON:*  It appears to me, then, that if

13   the purpose of equity is to make a person whole and you're

14   saying 50 million here, and I don't know, let's round this up

15   $10 million, that 60 million would be more appropriate.

16          *THE COURT:*  I'm going to go with what the Government

17   has come up with here.  I wouldn't know who to give that money

18   to.  Who would I give it to?

19          *DEFENDANT JOHNSON:*  I don't know, you managed to

20   come up with 50 million here, and, I mean, we've been going

21   through this, I guess this circle jerk of who the victims are,

22   of people for years now.  And, you guys always seem to come up

23   with numbers.  And, we are actually at the point of equity, and

24   I say let's pay everybody off, you have no problem figuring

25   out, you know, who, when it comes to sentencing, who it comes

1   to giving money away, let's pay everybody off, that's what

2   equity is.

3            **THE COURT:**  Let me change the subject.

4            Is there anything you can report that you don't have

5   to reveal any confidential things, but anything you have with

6   you publicly on whether you are ever going to get any of that

7   money back from Latvia?

8            **MS. MARTIN:**  From Latvia, we are less than hopeful.

9   I think it's unlikely from Latvia.  And, we are investigating

10  the possibilities of other sources, and we are very hopeful

11  about that.

12           **THE COURT:**  Okay.

13           **DEFENDANT JOHNSON:**  What about the money you already

14  seized, the 228,000.

15           **MS. MARTIN:**  With regard to the money that the

16  Government already seized a few years ago, I believe there was

17  $178,000 from a Bank of America bank account.  That money was

18  seized pursuant to an agency seizure, and so, it's already gone

19  through the channels.  And once it's been a year or two, the

20  money is already designated and earmarked from that agency.

21  So, that was an FBI seizure.  And, unfortunately, we have done

22  everything we can to check and see if that can be applied to

23  pay restitution to these victims, and it can't.  And

24  additionally, that money under the Mandatory Victim Rights Act

25  -- the fact that the money was seized and can't now be applied

1   -- should not in any way affect the defendant's payment of this

2   amount of restitution.

3          **DEFENDANT JOHNSON:**  But, that money was seized from

4   the Dorian Group, which has been dismissed, I understand?

5          **THE COURT:**  Well, you were the Dorian Group.

6          But what is the code section that says that money

7   can't be used?

8          **MS. MARTIN:**  I think I have a case on that,

9   actually, Your Honor.  It's **United States versus John Doe**.  And

10  it's a Ninth Circuit case, 37 4 F. 3rd 851 from 2004.

11          In that case, the defendant, his home was forfeited

12  and the proceeds from that taken.  And then, he was later

13  ordered to pay restitution.  And he wanted to apply the

14  proceeds from the home to that amount of restitution and have

15  it offset, and the Court in that case said there can be no

16  offset for the amount that was already forfeited and seized.

17          **DEFENDANT JOHNSON:**  How would that apply if the

18  defendant was acquitted?  I mean, the Dorian Group has not been

19  -- you know, you had your day in court to deal with him, you

20  didn't.

21          **THE COURT:**  Look, you are the Dorian Group, that's

22  easy.

23          **DEFENDANT JOHNSON:**  I believe it was a separate

24  defendant.

25          **THE COURT:**  Well, I guess the reason they didn't go

1   after the Dorian Group is they realized that you and

2   Mr. Heineman were the Dorian Group.  That one is not hard.

3                **DEFENDANT JOHNSON:**  What about Universal Trust

4   Services?

5                **THE COURT:**  I don't remember it well enough to

6   comment on that right now.

7                **DEFENDANT JOHNSON:**  The Dorian Group is

8   identified --

9                **THE COURT:**  You two were the brains and the muscle

10  and everything else that went into this scheme.

11               **DEFENDANT JOHNSON:**  The Dorian Group is identified

12  in the document as four fictional entities; it doesn't identify

13  him and myself.  So --

14               **DEFENDANT HEINEMAN:**  Or doing business as --

15               **DEFENDANT JOHNSON:**  So, to me, it was completely

16  identified separately; it was charged separately and treated

17  separately.  It had its own arraignments.  And so, I just find

18  it interesting that it gets dismissed and it still gets its

19  money seized.

20               **THE COURT:**  All right, anything more on this motion?

21               **MS. MARTIN:**  Just finally, Your Honor, that the

22  Government wants to just restate, again, that it would like --

23  it would ask the Court to impose joint and several restitution

24  on these two defendants, but that would be separate from the

25  restitution that has already been imposed for the --

1          **THE COURT:**  What finding specifically do I need to

2     make other than what I have already made?

3          **MS. MARTIN:**  No other factual findings, Your Honor.

4          **DEFENDANT JOHNSON:**  I think it would be fair to have

5     the restitution of the other guys applied to us, too.

6          **THE COURT:**  They have their own list of people.  I

7     have checked, and they don't overlap, right?

8          **MS. MARTIN:**  That's correct.

9          **THE COURT:**  Okay.  The Court is going to grant the

10    motion.  The Court will order that the two defendants, Heineman

11    and Johnson, be jointly and severally liable for the

12    restitution in the amount of $512,912.63 to Bank of America and

13    the others listed in the list of 20 that appear at pages 3 and

14    4 of the Government's memo dated June 5, 2008.

15         **MR. HALL:**  We asked the Court, I think, to make that

16    due and payable now or immediately.

17         **THE COURT:**  Due and payable now, yes.

18         **MS. MARTIN:**  I just wanted to clarify one thing.

19    There is one overlap victim between -- I believe it's the

20    Julian or LeCompte restitution order, and here his name is

21    Albaliso Herrera, H-e-r-r-e-r-a, but that overlap is

22    purposeful.  There was another amount of money that was paid to

23    one of the other defendants in the amount of $3000, but -- and

24    that's on another defendant's restitution order, but the amount

25    here, on the defendant's restitution order, was a refinance

1    cash amount that was wired to Latvia.  So, that is why that

2    name does appear on two restitution lists.  I just wanted to

3    point that out so there wouldn't be confusion.

4            **THE COURT:**  All right.  Nonetheless, there is no

5    doubt in the Court's mind that all of these should be joint and

6    several, with these two -- as between these two defendants.

7            **DEFENDANT JOHNSON:**  And who is going to be acting as

8    fiduciary for --

9            **THE COURT:**  Fiduciary for who?

10           **DEFENDANT JOHNSON:**  For this payment.

11           **THE COURT:**  Well, doesn't the form of judgment say

12   you got to pay these people directly?  Or does it get paid to

13   the Court and then the Court pays?  How does that work?

14           **MR. HALL:**  I believe it gets paid to the Court, Your

15   Honor.

16           **THE COURT:**  All right.  So the U.S. District Court

17   Clerk will be the fiduciary to whom you pay the money, and

18   then, the Court will make sure that it gets distributed to

19   these people, per the order.

20           **DEFENDANT JOHNSON:**  Can he issue us a 1099 today,

21   then?

22           **THE COURT:**  There is no 1099 involved.  So 1099s --

23   this has nothing to do with 10999s.

24           **DEFENDANT JOHNSON:**  So, there is no certificate of

25   abandonment, or anything, that is related to this?

1              **THE COURT:**  I have no idea what you are talking

2       about.

3              **DEFENDANT JOHNSON:**  Okay.

4              **THE COURT:**  So, I guess the answer is no.

5              **DEFENDANT JOHNSON:**  So we are not going to get a

6       1099, today, for that amount?

7              **MS. MARTIN:**  No.

8              **THE COURT:**  Do you have any idea what Mr. Johnson is

9       talking about?

10             **MS. MARTIN:**  There is no documentation further than

11      what we have done today than what the Government is required to

12      give the defendants.

13             **THE COURT:**  This is going to be a plain-old order of

14      the Court.  And this, will then be part of your judgment, the

15      order of the Court.  If they were ever to discover that you had

16      some money, they would then use the order of the Court to go

17      out and garnish it or seize it.  They don't need 1099s to do

18      that.

19             **DEFENDANT JOHNSON:**  While I'm here, I would like all

20      the E-filings that have been in this case to be uploaded to the

21      hard drives that Steve has for the purposes of appeal.

22             That's a problem?

23             **THE COURT:**  That is on the jurisdiction of the U.S.

24      Court of Appeals for the Ninth Circuit.  Please direct any and

25      all requests like that to them.

1             ***DEFENDANT JOHNSON:***  Sure.

2             ***THE COURT:***  I am no longer the steward for making

3      sure that your appeal is done properly, that is up to them,

4      though I made great efforts on your behalf to give you the

5      fairest possible procedure.  I don't have jurisdiction over

6      that anymore.  And you have to ask the Ninth Circuit to assist

7      you with that, all right?

8             ***MS. MARTIN:***  Last, but not least, Your Honor, the

9      Government would like to ask that you take the binder

10     submission and file it under seal, just so there is a record of

11     what we looked at today.  But, we ask that it be under seal

12     because it does have bank account information.

13            ***THE COURT:***  I'm handing it to the clerk, who will

14     put it under seal for that purpose.

15            ***MS. MARTIN:***  And the Government will send, even

16     though it has sent these materials prior, will send one more

17     version, redacted version, to the defendants so they have a

18     copy themselves.

19            ***THE COURT:***  What happened to the copies they gave

20     them?

21            ***MS. MARTIN:***  What they are holding are not redacted,

22     so I would like to take those back and redact them.

23            ***THE COURT:***  The information will be redacted as

24     what?

25            ***MS. MARTIN:***  The bank account information and --

1          **MR. HALL:**  Home addresses.

2          **MS. MARTIN:**  Well, home addresses will be redacted

3   as well.

4          **THE COURT:**  I want to say there is certainly good

5   cause to do that because these two defendants would possibly

6   take that identifying information and perpetrate another fraud

7   of some type.

8          **DEFENDANT JOHNSON:**  You have a great imagination.

9          **THE COURT:**  Well, not as good as yours.

10         **DEFENDANT JOHNSON:**  I don't think so.

11         **THE COURT:**  That motion is granted.

12         **MS. MARTIN:**  Thank you, Your Honor.

13         **THE COURT:**  Anything more?

14         **MS. MARTIN:**  Nothing further with the Government.

15         **DEFENDANT JOHNSON:**  Are we finished with you?

16         **THE COURT:**  You are done.  You will now have the

17   opportunity to argue your points before three judges of the

18   United States Court of Appeals.

19         **DEFENDANT JOHNSON:**  Let's hope it gets better.

20              **(Proceedings adjourn at 3:22 p.m.)**

21

22                    **---o0o---**

23

24

25

### CERTIFICATE OF REPORTER

I, Sahar McVickar, Official Court Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing.  The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.


/s/ Sahar McVickar
_____
Sahar McVickar, RPR, CSR No. 12963

August 26, 2008