Volume XV

Pages 3096 - 3276

United States District Court

Northern District Of California

Before The Honorable William Alsup

United States of America,      )
                               )
            Plaintiff,         )
                               )
  vs.                          )          NO. CR 05-0611 WHA
                               )
Kurt F. Johnson and            )
Dale Scott Heineman,           )
                               )          **Jury Trial**
            Defendants.        )
_____)

                                  San Francisco, California
                                  Tuesday, November 13, 2007

**Reporter's Transcript of Proceedings**

**Appearances:**

For Plaintiff:              Scott N. Schools
                            United States Attorney
                            450 Golden Gate Avenue, Box 36055
                            San Francisco, California  94102
                      By:   **C. David Hall, Esquire**
                            **Brigid S. Martin, Esquire**
                            **Assistant United States Attorneys**


For Defendant:              Dale Scott Heineman
                            #12152-081
                            FCI Dublin Correctional Facility
                            5701 8th Street,
                            Camp Parks
                            Dublin, California  94568
                            In Propria Persona

*Reported By:*              *Sahar McVickar, RPR, CSR 12963*
                            *Official Reporter, U.S. District Court*
                            *for the Northern District of California*

                  (Computerized Transcription by Eclipse)

**<u>Appearances, continued:</u>**

```
For Defendant
Kurt F. Johnson:          Kurt F. Johnson
                          #13177-081
                          FCI Dublin Correctional Facility
                          5701 8th Street
                          Camp Parks
                          Dublin, California  94568
                          In Propria Persona


                          Law Offices of Tamor & Tamor
                          1901 Harrison Street, 9th Floor
                          Oakland, California  94612
                   By:    Richard Alan Tamor, Esquire
                          (Advisory Counsel)

Also Present:             Kathia Harp
                          Special Agent
                          Federal Bureau of Investigation
```

**---o0o---**

1                                **I N D E X**

2                                                                    **Page**

3      **Closing Arguments:**

4
       Closing Argument Mr. Hall                                     3119
5      Closing Argument by Mr. Heineman                              3150
       Closing Argument by Mr. Johnson                               3192
6      Rebuttal Closing Argument by Ms. Martin                       3232

7      Final Jury Instructions                                       3244

8

9

10

11                               ---o0o---

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   Tuesday, November 13, 2007                    7:30 a.m.
 2                      P R O C E E D I N G S
 3               (Proceedings began out of the presence of
 4               the jury at 7:38 a.m.)
 5        THE COURT:  Good morning.  Have a seat.  Thank you.
 6        Good morning, Sahar.
 7        We are here for the final closing arguments.  And,
 8   are there any issues you want to bring up with the Court?
 9        MR. HALL:  Just one, Your Honor.
10        In looking over the exhibits, we noticed that one
11   exhibit, which is 123J, should be deleted.  Basically, we don't
12   have a document in there; we don't have a document that was
13   admitted as 123J, just one of a bunch that got admitted.  And,
14   there is no substance behind it, and so we would move to --
15        THE COURT:  All right, 123J, will be --
16        MR. HALL:  Withdrawn.
17        THE COURT:  -- withdrawn as nonexistent.
18        MR. HALL:  Yes.
19        THE COURT:  Fine.
20        Anything on the defense side you want to bring up?
21        DEFENDANT JOHNSON:  I think there was a motion for
22   dismissal.
23        THE COURT:  That is granted.
24        What are those counts?
25        MR. HALL:  Sixty-four and 65.
```

1          **THE COURT:**  That motion to dismiss is granted.

2          Now, I tried to take care of that in these proposed

3   instructions; did everybody look at that?

4          **MR. HALL:**  Yes, Your Honor.

5          **THE COURT:**  Any problems with the way I proposed to

6   handle that?

7          **MR. HALL:**  None from the Government.

8          **THE COURT:**  How about the defense?

9          **DEFENDANT JOHNSON:**  I don't think we saw that.

10          **MS. MARTIN:**  The special agent actually specially

11   made a trip down to Dublin on Friday to review the

12   instructions --

13          **DEFENDANT JOHNSON:**  The instructions that we have

14   still have the contempt charges in them.

15          **THE COURT:**  No.  Did you not receive something on

16   Friday?

17          **DEFENDANT JOHNSON:**  Yeah, I've got what I received

18   on Friday, right here.

19          **THE COURT:**  Well, then, show me what you are

20   referring to.

21          **DEFENDANT JOHNSON:**  I got it from Steve.

22          **MR. MOORE:**  Your Honor, I brought the previous ones

23   to them on Friday.  The FBI was supposed to have delivered a

24   new set to them, on Friday, after I was -- they are still

25   referring to the set I brought out, which was the previous

1    sets.

2            Apparently, there was a mixup at the prison, and

3    they didn't receive the final.

4            **THE COURT:**  Well, let me get my law clerk -- unless

5    you have another copy handy.

6            Would my law clerk go run off another set of the

7    instructions?

8            Let me describe for you what we did.  The Court

9    explains that those two counts are now out of the case, and

10   have been dismissed.

11           The Court also says that the TRO and the preliminary

12   injunction cannot be considered by the jury for any purpose.

13   Now, I think that's all.  I don't remember, there may have been

14   some other small adjustment to the instructions, but that is

15   the essence of it.

16           Can the Government remember anything else?

17           **MR. HALL:**  No, Your Honor.

18           **THE COURT:**  So, we'll see where the changes are

19   made.  And, of course, the special verdict form, those two

20   counts have been deleted.

21           Anything else, though, that you would like to add or

22   bring up?

23           **MR. HALL:**  One more thing from the Government, that

24   is, that we have seen this morning, although we weren't

25   provided a copy that we could refer to right now, or a timeline

 1   that the defendants, I think, intend to use in their closing

 2   argument.  They are going to use that, I think, through the

 3   computer onto the screen; the Government would object to that

 4   because I believe it misstates the evidence in very large and

 5   significant parts.  And, perhaps the defendants can supply a

 6   copy to the Court.

 7          **DEFENDANT HEINEMAN:**  I can let you see this.  I

 8   don't have --

 9          **THE COURT:**  Let me see.

10          **DEFENDANT HEINEMAN:**  I would only state that this is

11   stuff that we have both testified to, the timeline.  And all's

12   I did was regurgitate what was already testified to.

13          **THE COURT:**  I have here a timeline that begins

14   January 2004 and runs through March of 2006.  So, give me an

15   example of what you say is incorrect.

16          **MR. HALL:**  I only had a chance to look at it for

17   about 30 seconds, Your Honor.  I know there is a specific date

18   or place in the timeline that talks about them meeting and

19   conferring with attorney, Randall Marsh, that is the one thing

20   I remember, which in my estimation or my remembrance of the

21   evidence was not testified to by anybody.

22          **DEFENDANT HEINEMAN:**  Yeah, it was.  I testified to

23   that.  He came to see us first, and we went to see him in

24   Idaho.

25          **MR. HALL:**  Part of the problem and my argument to

1   the Court is, right now, I don't have a copy of that.  I can't

2   make reference to it, but, as I looked at it, there were many

3   point that, we think, misstate the evidence.

4           **THE COURT:**  Well, have you seen a copy of this?

5           **MR. HALL:**  Just briefly.

6           **THE COURT:**  Look --

7           **MR. HALL:**  I mean, I know the Court is frustrated

8   with that, but, I think the frustration we have with the

9   defendants -- we are not even given a chance to basically take

10  note of --

11          **THE COURT:**  Well, you are going to use some kind of

12  a chart up there.

13          **DEFENDANT HEINEMAN:**  Yeah.  They just walked in with

14  that.  I mean, that is just a reference, that is all it is.

15          **MR. HALL:**  All that is, Your Honor, are dates and

16  times of presentments and full reconveyances.

17          **DEFENDANT HEINEMAN:**  And, that is date and times of

18  what we did.

19          **THE COURT:**  Let me ask you on the defense side, I

20  haven't read this entire thing, but this is fairly lengthy; who

21  is going to -- each of you have one hour.

22          **DEFENDANT HEINEMAN:**  Yeah.

23          **THE COURT:**  Are you -- I suppose if one of you wants

24  to cede some time to the other, as long as it's no more than

25  two hours, that is okay.  But, how can you get through this

```
 1   entire timeline in one hour?
 2              DEFENDANT HEINEMAN:  Very artfully.
 3              THE COURT:  All right.
 4              DEFENDANT HEINEMAN:  I'll be cognizant of the clock,
 5   too.  If I'm running out of time, and I need to get to some
 6   other things, I'll just stop.  But, I just plan on putting it
 7   up on the ELMO and referring to it.
 8              THE COURT:  Now, you know that these timelines do
 9   not go into the jury room during deliberations.
10              DEFENDANT HEINEMAN:  I'm aware of that.
11              THE COURT:  And, the same is going to be true for
12   the big chart the Government has, that will not go into the
13   jury room.
14              The only practical way for me to deal with this is
15   kind of what I said last time; I'm going to tell the jury, up
16   front, that what the lawyers and what the defendants say is not
17   evidence, I'll give my standard speech on that.  And, for the
18   record, my law clerk is handing the defendants a copy of the
19   current instructions that the Government was supposed to
20   deliver to the defendants on Friday and, I expect was delivered
21   to the prison.  Why they didn't get it, I don't know.
22              The way I think the Government ought to try to deal
23   with this is you ought to get your hands on a copy of this.
24              You have it, right?
25              MS. MARTIN:  No.
```

 1              **MR. HALL:**  No.

 2              **THE COURT:**  Let the Government have a copy.

 3              **DEFENDANT HEINEMAN:**  I was unaware that I had to

 4     make them a copy of my timeline.  Since I was doing my closing

 5     --

 6              **THE COURT:**  Well, the --

 7              **DEFENDANT HEINEMAN:**  I don't have a problem with

 8     them having it, I'm just stating that I thought closing was my

 9     own personal deal, and I didn't have to share all of my

10     intimate secrets with the other side.

11              **THE COURT:**  Mr. Moore, can you make a copy of this

12     -- actually, let my law clerk go copy this.

13              **MR. MOORE:**  We should have several, Your Honor, one

14     for yourself, also.

15              **THE COURT:**  All right, make several copies.

16              I think the way the -- I don't think the Government

17     should put the -- the defense timeline up on the screen during

18     your opening.  You can do that during your closing closing.

19     But, if there is something in the -- that you feel is just

20     definitely wrong, that you feel should be brought out in your

21     closing and say you are going to hear from the defendants,

22     we've seen a copy of their proposed timeline, we think there

23     are errors, here is at least one example, you know, that's just

24     up to you.  And then, in the closing part of your closing, you

25     can take the defense timeline and point out other errors if you

```
 1    think, that, in fact, is the case.

 2              So, but, I cannot -- unless there is something

 3    specific, I couldn't tell you for sure whether anybody

 4    testified that there was a meeting with such a lawyer or not.

 5    And, it's going to be up to the jury to sort that out.  And, if

 6    they want a read-back, they will have to ask for a read-back.

 7              All right, anything else you want to bring up?

 8         MR. HALL:  No, Your Honor.

 9         THE COURT:  How about the defense?

10         DEFENDANT JOHNSON:  No.

11         DEFENDANT HEINEMAN:  No, sir.

12         THE COURT:  Well, we'll take -- we'll get started in

13    just a few moments, then.

14              Give me a rough idea; have you got everything ready

15    on the Government's side to do your initial part of your

16    closings?

17         MR. HALL:  Yes, Your Honor.

18         THE COURT:  How long will you expect to go?

19         MR. HALL:  I expect to go no more than an hour --

20    somewhere between a half-an-hour and an hour.  That's the best

21    I can tell you.

22         THE COURT:  All right.  If you start getting up to

23    up to -- say at forty-five minutes, I will try to give you a

24    heads-up.

25         MR. HALL:  Thank you.
```

1          **THE COURT:**  And then, I'll try to do the same for

2     the defense.  So, when each of you get up to forty-five minutes

3     of your hour, I will try to give you a little heads up.

4          How about the defense, do you have any overhead

5     projector things?  You got your --

6          **DEFENDANT HEINEMAN:**  Just the timeline.

7          **THE COURT:**  That's all you are going to use?  Are

8     you going to put that on the screen?

9          **DEFENDANT HEINEMAN:**  Yeah.  So, I'll have to move

10    the poster board.

11         **THE COURT:**  Give me one copy and the Government a

12    copy, and the rest go back to the defendants.

13         Now, my deputy clerk is not here yet, but do you

14    have all the exhibits that you need from her for your closings?

15         **DEFENDANT JOHNSON:**  I don't have my --

16         **DEFENDANT HEINEMAN:**  We have to pull a couple out.

17         **THE COURT:**  By the time we get to the defense I'm

18    sure she'll be here.

19         How about the Government?

20         **MR. HALL:**  Excuse me, Your Honor?

21         **THE COURT:**  I say, how about the Government, do you

22    have all the exhibits that you need?

23         **MR. HALL:**  Yes.

24         **THE COURT:**  So, are you prepared to go right now?

25         **MR. HALL:**  Yes.

```
 1                  THE COURT:  Okay.

 2                  MR. HALL:  Except for maybe one quick stop in the

 3     restroom.

 4                  THE COURT:  All right, tell you what we'll do, we'll

 5     take five minutes.  And then, if all the jurors are here, I'll

 6     bring them in myself and we'll get started, okay?  Thank you.

 7                        (Recess taken at 7:53 a.m.)

 8                        (Proceedings resumed at 8:00 a.m. out of

 9                        the presence of the jury:)

10                  THE COURT:  Ready?

11                  MR. HALL:  Ready.

12                  THE COURT:  Okay, let's bring in our jury.  They are

13     ready to go.

14                  Wait one second.  Before that -- sorry.  Have a

15     seat.

16                  My clerk just handed me something -- the jury is not

17     present.  Handing me something called formal objection to jury

18     instruction.  It says, "The defense lodges this formal

19     objection to the jury instruction currently numbered 18" -- all

20     right so, on the version you now have, which is still 18?

21                  MR. HALL:  Yes.

22                  THE COURT:  Let's look at that.

23                  You had earlier said that you thought this was a

24     correct statement of the law, now, you are saying it's highly

25     prejudicial.  I don't understand.  How could you have such a
```

```
 1   turnaround so quickly.
 2              DEFENDANT JOHNSON:   Well, it's a correct statement
 3   of law if you remove the prejudicial factual statements that
 4   are in it.  And, it's the presumptions of facts and the
 5   misapplication of the law that is the problem.
 6              THE COURT:   Which -- I'm going to allow you a few
 7   moments to -- we went over this several times before, but tell
 8   me now, what is it that you think is so prejudicial?
 9              DEFENDANT JOHNSON:   Uses terms like when somebody
10   borrows money in paragraphs 2, paragraph 3, paragraph 3,
11   "also" --
12              THE COURT REPORTER:   Start over, please, slowly.
13              DEFENDANT JOHNSON:   Also in paragraph 3 it says,
14   "Under no circumstances can the borrower supply eliminate a
15   loan, recover the collateral, and keep the money from the
16   loan."  I agree with that as a factual statement of the law,
17   but not as -- not an application to this -- the facts in this
18   case.
19              There is no loan in this case.  There never has been
20   a loan, and that is the factual contention of our behavior.
21              And, when you continue to reiterate to the jury that
22   a loan transpired, you remove and prejudice the defense from
23   their viable defenses, which is that, in our state of mind,
24   belief, understanding, and, I even believe, factually, there
25   was no loan that transpired.
```

1          That fact is removed from the jury.  And, they have

2   to take it on -- on the face that you say there is a loan.

3   And, they are going to believe you because you are the judge.

4          And, I don't believe that the Government put on a

5   showing at all that there was a loan.  No banker came here.

6   All you got was basically custodians of the records, who don't

7   know the actual business of banking, and a couple of experts

8   that said very clearly that credit was extended.  You are using

9   the term "money" not defining money by any other instruction,

10  and that is going to confuse the jury.

11         Because, anybody knows that if you borrow money, you

12  have to pay it back.  And you know, that is a maxim pretty much

13  I think that everybody understands, so, if you give them the

14  impression that money was lent, when, factually, it may not be

15  the case, then it's going to be prejudicial.  They are going to

16  say, well, these guys might have had criminal intent based on

17  everybody having to pay back a loan of money.

18         And, you clearly do not define money.  You refuse to

19  put in a jury instruction for money.  And money and credit are

20  not the same things.  And I made that clear in my objection:

21  that credit is the postponement and payment of money, and money

22  cannot be what is being postponed.  So, you know, those are the

23  problems that we keep running into with this jury instruction.

24         Now, if you gave a proper instruction on what money

25  was from a legal point of view, and more specifically, as a

1   promissory note, money, then I think that would be curative

2   enough to fix the problems inherent in this -- in this

3   instruction.  But you make --

4           **THE COURT:**  The problem is that when -- let's say we

5   were to change this to say that when a bank extends credit, and

6   that credit is then used to purchase a home, what difference

7   would that make, Mr. Johnson?

8           **DEFENDANT JOHNSON:**  Well, it makes a big difference

9   because, then, the factual basis of whether they received

10  credit from the borrower in the transaction becomes relevant.

11          If we want to keep it to what actually happened in

12  the transaction, you had an exchange of credits.  And, it was a

13  quid pro quo even exchange.

14          And, to pretend that creditor/debtor rights come out

15  of that relationship, even to allude it, at law, as being a

16  fact at law, is a misapplication of the law, as far as I'm

17  concerned.  They have to be aware that the law is applied to a

18  certain set of facts.  And, if money was lent and benefit was

19  received, and then, certainly, it would have to be returned.

20  And, you couldn't keep the collateral, like you say, in here.

21  But, if there was an exchange, then the bank can't pretend that

22  the deposit of the asset was vapor money.

23          **THE COURT:**  Mr. Johnson -- well, first, does the

24  Government have anything you want to say?

25          **MR. HALL:**  Your Honor, again, the Government is

1  continually confused by the defendants arguments.  We don't

2  know -- I don't understand much of them, but we can say that

3  every transaction here, there are evidence of a loan.  There is

4  promissory note, there is either a deed of trust or a mortgage

5  signed, in each case, by the debtor.

6         The defendants have continually said that what they

7  are not talking about, at least in their testimony, what they

8  are not talking about is this vapor money theory that they --

9  Mr. Johnson appears to be espousing this morning, and that they

10  believe that this Court was confused when this Court used the

11  idea of vapor money as part of its original dismissal of the

12  civil suit, but, yet, here they are arguing it again.

13         This is no basis in the law for the idea that if

14  there is vapor money, so-called vapor money, that that, in any

15  way, takes away from the debtor's obligation to repay.  So, I

16  think this is a continuation of the smoke screen that the

17  defendants have used throughout this trial.

18         **THE COURT:**  All right.

19         **MR. HALL:**  And I would remind the Court that the

20  Court, when it first gave out these instructions to the

21  defendants, before we ever talked to them about it, the Court

22  had said that unless the -- either party made objections to the

23  instructions at the time of the charging conference, they would

24  be waived.  These defendants, as the Court has specifically

25  said, said they had no objection to 18, but, yet, here they are

1    today making an objection.

2           **DEFENDANT JOHNSON:**  Your Honor, first off, he

3    misstates what I'm saying.  When I used the term vapor money in

4    my last statements, I made it very clear that I was talking

5    about the other side of the ledger.  Everybody in the arguments

6    has been telling me what I think for three years now, has been

7    telling me I believe that the bank, when it issued a check or a

8    wire from the liability side of the ledger, was vapor money.  I

9    have never said that.  What I'm saying in return is you are all

10   pretending, like ostriches with your head in the sand, that the

11   other side of the ledger is vapor money, and that is what I'm

12   stating.

13          I believe that there has been no evidence put on

14   that there was a loan.  All you have is an exchange that

15   happened economically between the parties, and then you have

16   the party who is benefiting from the theft conversion of the

17   asset putting out documents that they file, called a promissory

18   note and a deed of trust or mortgage, and that is not evidence

19   of the loan, it's evidence of their intent to deceive.

20          We put the same documents on the record, and, all of

21   a sudden, they are purported this and purported that.  And,

22   quite frankly, the loan documents that these lenders put out

23   are purported to be what they are, but they are not what they

24   are.

25          **THE COURT:**  All right, this objection is overruled.

```
 1    The Court wants to say that it is most interesting that those
 2    reconveyance documents that you placed of record and the county
 3    land records stated that the proceeds of the loan had been
 4    repaid, or words to that effect.  You didn't say it was vapor
 5    money.  You didn't say it was an exchange.  You didn't say that
 6    it was something other than what the transaction purported to
 7    be.  But, for the land record purposes, you made statements
 8    that the obligation had been repaid and now the property was
 9    free and clear in your names.
10            The Court also wants to say that in -- that it has a
11    lot of familiarity with California law, and generally, in this
12    country, the law of banking and loans and credits.  And I've
13    done a lot of study on this, and, in the history of the
14    universe, as far as mankind knows it, there has never been a
15    circumstance where the law would allow someone to either borrow
16    money from a bank or take credit from a bank or in some way
17    receive the benefit of a transaction with the bank and use that
18    to buy a home and then turn around and eliminate the mortgage
19    on their house and claim that the -- they get the benefit, both
20    of the -- to keep the home, to keep the loan proceeds, or
21    however you want to characterize it, and owe nothing back to
22    the bank.
23            In the history of the universe, there has never been
24    a decision that would allow that outcome.  And you have cited
25    me to no such decision.  There is no law whatsoever to support
```

1   your theory.  If there was some law to support your theory, the

2   Court would give it to the jury.  But, to try to make up

3   something and make up something that would be phony to give to

4   this jury to say that if you find it's not a loan, or if you

5   find it's not a credit, or however you want to characterize it,

6   that there is no law to even support that outcome.  So, the

7   request is denied.  And, we are going to go with the paragraph

8   18 as it is now written.

9           **DEFENDANT JOHNSON:**  One more comment, if I could,

10  please?

11          I agree with you, in the history of the universe

12  there is no law that would even substantiate what you said,

13  but, what you're automatically doing in your conclusions of law

14  is inserting facts that don't exist in this case.

15          If it's good for the goose, it's good for the

16  gander:  If I can't take a piece of property or take the

17  benefit of loan proceeds without paying it back, neither can

18  the bank take the loan proceeds from the deposit of the

19  promissory note and pretend that it's vapor money and has no

20  value.  If it's the value that funds the liability instrument,

21  it has value, call it money, call it credit, call it a banking

22  transaction.

23          And, you cannot take the misapplication of the

24  reconveyance documents and turn those into a fact; that is not

25  the case, either.  The -- the loan was prepaid.  The bank was

1   given notice and opportunity to cure, to present their

2   arguments, to present the facts, to bring their books and

3   records, which is where this is all settled.

4          We were -- it was a discovery process done

5   administratively.  They could have proven that they have done

6   everything, and none of the actions the we would have taken

7   would have transpired.  They have chose not to prove it to us.

8   They've chose not to prove it to this Court.  Nobody wants to

9   come in and talk about the other side of the ledger, and you

10  want to give them carte blanche credit for it, and that is

11  not -- that's prejudicial.

12          **THE COURT:**  All right, your point is made.

13          We will now bring the jury in and proceed with the

14  closing arguments.

15                  **(Jury in at 8:17 a.m.)**

16          **THE COURT:**  Welcome back.  Please have a seat.

17          We all hope you had a restful, long holiday.  And

18  now, we are going back to work.

19          Let me give you a heads-up on the schedule.  We will

20  spend most of the day on closing arguments and then

21  instructions of law.  And the sequence will be as follows:

22  Each side has up to two hours.  I don't know if they will use

23  all of their time, but they are entitled to use all of their

24  time.

25          The Government has the burden of proof, as you know,

1    so the Government, by tradition, gets to open the -- open the

2    arguments and close the arguments.  By that, I mean they will

3    start, and then we will hear from the defense, and then the

4    Government gets to close.  So the Government's argument will be

5    divided into two pieces, the first part and the second part.

6    And in between, we hear the entirety of the defense arguments.

7            So, you will also, at the end, hear my closing

8    instructions, which will take about forty-five minutes.  And,

9    they will be the law that will govern this case.

10           Now, the two sides here know what I'm going to tell

11   you in the closing instructions, because I've given them a copy

12   of it.  So, it's perfectly okay if they want to refer to those

13   instructions.  You'll hear that several times, most likely, but

14   you are not required to hear it.  But, if either side wants to

15   read from one of the instructions and say here is what the

16   judge is going to tell, that's perfectly okay.  Don't -- don't

17   worry about that.  That is why I wrote it up in advance, so

18   they would be able to argue from those instructions.

19           Now, one last thing:  I've said this throughout the

20   trial, and I must say it again:  What is said in closing

21   arguments is not evidence, not evidence, not evidence.  It is

22   argument.  It is what each side thinks has been proven or not

23   proven in the case.

24           Now, because the -- both of the defendants did --

25   both defendants testified in this case, and what they said on

```
 1   the witness stand was evidence that you must consider.  But,

 2   the arguments are not under oath, and not subject to

 3   cross-examination.  What is said by both sides during the

 4   closing arguments is not evidence, it's argument.  And, it's

 5   important that you keep straight in your mind what the actual

 6   evidence in the case was, versus what is said in argument.

 7   And, this is true both for the Government and for the defense.

 8   So, I know you will remember that.

 9           Occasionally, you might hear some objection that,

10   wait a minute, that is not supported by the evidence; well, I

11   usually leave it up to you to decide whether it was supported

12   by the evidence and overrule the objection.  That is not to say

13   that I thought the evidence was or was not there, but your

14   collective memory will be better than mine at figuring out

15   whether or not the evidence supports the argument, okay?

16           All right, so, anything else that either side wants

17   me to admonish the jury about before we get started with the

18   closings?

19           MR. HALL:  No, Your Honor.

20           DEFENDANT JOHNSON:  No, Your Honor.

21           THE COURT:  Okay, Mr. Hall is going to begin.

22           Mr. Hall, the floor is yours.  Please proceed.

23           MR. HALL:  Thank you very much, Your Honor.

24           THE COURT:  All right.

25   ///
```

| | |
|---|---|
| 1 | **CLOSING ARGUMENT BY MR. HALL** |
| 2 | **MR. HALL:**  Good morning, ladies and gentlemen of the |
| 3 | jury. |
| 4 | Sometime in 2003 -- or 2002, rather, Scott Heineman, |
| 5 | a high school graduate with a couple of classes in JC, whose |
| 6 | work experience at that point was basically as a salesman, most |
| 7 | of it being self-employed selling T-shirts and cups, and so |
| 8 | forth, with promotional logos on it, started a relationship |
| 9 | with Kurt Johnson, Kurt Johnson, a man with a seventh grade |
| 10 | education who considers himself to have a genius IQ, who has |
| 11 | been told that, apparently, who has sometime in the past before |
| 12 | that had been convicted of four different crimes here in |
| 13 | California, the main one being 25541 of the California |
| 14 | Corporations Code, which is "any person who willfully employs a |
| 15 | device or scheme to defraud in connection with the sale of any |
| 16 | security," got together. |
| 17 | They got together; they started this relationship, |
| 18 | and they decided they were going to fight the banks.  And they |
| 19 | got together, and, to quote Kurt Johnson on the last day of |
| 20 | evidence, just last week, who told Heineman, "I completely |
| 21 | developed with your help," he's talking to Mr. Heineman, "I |
| 22 | completely developed the Dorean process to remedy that |
| 23 | situation." |
| 24 | We'll talk about those concepts in a little bit, but |
| 25 | first I would like to thank you on behalf of the Government. |

**Closing Argument / Hall**

 1    And, I'm sure the defendants would join me in this:  You've

 2    been here a month.  We've asked -- this Court has asked you,

 3    and you have, from our point of view, taken this very

 4    seriously, but, basically asked you to sacrifice, to do your

 5    civic duty to come here every day, spend -- we have seen you

 6    running to the phones, and that kind of thing, to complete your

 7    daily business; we know it's been a sacrifice, but yet, every

 8    day you have come in here and you have paid attention and

 9    you've listened to the evidence attentively.  And, we really

10    appreciate that, and I'm sure the Court does and the defendants

11    do, too.

12            What I'm saying to you and what the defendants will

13    say to you is not evidence, as the Court just said, but simply,

14    from my point of view, just my way of seeing if I can be of

15    some help to you in evaluating this evidence.  It is the

16    evidence as seen most favorably to the Government which, we

17    think, will show you, beyond a reasonable doubt that the

18    defendants have -- have committed and should be convicted of

19    each of the current 36 charges against them.

20            There is 36 counts left.  You started out hearing

21    about this big complex case of 65 counts, two defendants,

22    seemingly a lot of issues; what I would say to you is this case

23    has come down to one issue, one issue alone, and that is what

24    you have to decide here.  I don't think you are going to hear

25    much argument from the defendants about anything else other

**Closing Argument / Hall**

 1   than their criminal intent.  And, we'll go into that just a

 2   little bit more later.

 3          So, without having -- so much as having spoken to a

 4   lawyer or to anyone else, they completely, on their own, these

 5   two, decided that they would be able to eliminate people's

 6   mortgages, that they would be able to file documents that would

 7   allow first, Scott Heineman, and then other people, to own

 8   their house free and clear.  They used documents and resource

 9   materials that they put into evidence.  I think this is W or

10   not W, but Defendant's Exhibit triple zero -- triple O, rather,

11   which has in bold letters, "Warning:  In actual court cases, do

12   not file this lawsuit.  This is for illustration and teaching

13   purposes only.  A real judge will throw out the case if you

14   discuss things like gold and silver or the bank never loaning

15   you anything of value."  That is what they used.

16          But, they had this idea that they thought would

17   work.  Both these volumes, triple zero and -- or triple O and

18   triple P are replete with those kind of warnings, watch out,

19   but here they go.  What do they do?  They start with Scott

20   Heineman's own mortgage, and they come up with a packet that

21   they give to World Savings.  And, in this packet, they have a

22   "bond," quote, "bond," a bond that says go to the Secretary of

23   Treasury, and he'll pay you for the amount of my mortgage.

24   And, because of that and because you are fraudulent, we are

25   going to be able to take the house, and I'll own it free and

 1    clear.

 2            And they did that.  The bank didn't answer back in

 3    the way that they had requested them to answer back with this

 4    affidavit of truth that we'll see first in a smaller version in

 5    Mr. Heineman's house.  Tell us all the ways you have committed

 6    the fraud, that is basically what the affidavit of truth says.

 7    And there are probably 20 or so questions that -- tell me how

 8    you committed fraud to the bank.  And, the first one from

 9    Mr. Heineman, and eventually it's 52 questions, backed by a

10    bond.

11            They then file a document, in 2003, that purports to

12    fully -- fully reconvey the interest of World Savings back to

13    Scott Heineman.  And, who is that signed by?  Nobody at World

14    Savings, but by Scott Heineman.  But, they still will tell you

15    they thought they had the world by the tail, that they had

16    figured out something nobody else could figure out.  And that

17    is replete in the defendant's testimony and the whole way they

18    have conducted themselves here.  They think they are smarter

19    than judges.  They think they are smarter than the Government.

20    They think they are smarter than all of the people that they

21    sold this product to.  They think they are smarter than

22    everybody who was ever involved in anything like this.  They

23    came up with the solution.

24            So, what does World Savings do?  They filed a

25    foreclosure, July 2003.  But, the world didn't come crashing

 1  down on them, they figure, because, World Savings didn't go

 2  ahead and perfect that.  They didn't throw Scott Heineman out

 3  of his house for two more years.  They used that thread, that

 4  thread, even with the letters continually coming to Mr. and

 5  Mrs. Heineman that we are going to take your house, we are not

 6  paying attention to any of this stuff you gave us, and we are

 7  going to foreclose.  They used that, and they began a business,

 8  the Dorean process.

 9          What they did at that crossroads, and from there on,

10  shows their criminal intent.  They began telling people, as

11  early as January of 2004, that they had a safe, proven, legal,

12  moral, effective way to eliminate your mortgage.  Now, you will

13  remember one of their very first -- a story about one of their

14  very first clients.  They use the word "clients"; I think a

15  more realistic word is a mark, a person who is scammed as a

16  mark or a dupe, a victim.

17          Sara Magoon, a lady with a childcare business up in

18  Montana, who is six months' pregnant, got in an automobile

19  accident up in Montana, caused the early delivery of her child.

20  And, she and her child had to stay in the hospital for the next

21  three months, or so.

22          Ms. Magoon is about ready to lose her house because

23  all of her money and attention is going towards that situation.

24  She gets on the Internet.  She says, help, I'm about ready to

25  lose my house.  Who comes to her rescue?  These two.  And they

1    sold her on this safe, proven, effective way to get rid of her

2    mortgage.

3            Did they do that?  No, they didn't.  Her house was

4    foreclosed.  She became a broker for them, because, in the

5    meantime, that time between when she was sold this bill of

6    goods and her house was finally lost, she was so excited about

7    the prospect of not having lost her house, that she started

8    selling it to other people, including her aunt, who we'll talk

9    about that later.

10           The hook, the hook for this scam, that is, what the

11   -- the thing that makes it look like they're really earnest and

12   really know what they are talking about is this whole thing

13   about the bankers are bad.  Certainly, none of us probably are

14   happy to be paying a mortgage.  Certainly, all of us would

15   like, at some point, not to pay a mortgage.  And they, sitting

16   in their 6000-foot -- square-foot -- offices with law books

17   around and leather chairs -- and Mr. Johnson, you will remember

18   that video in his sport jacket, looking like he is the picture

19   of professionalism, saying those banks are committing fraud,

20   and we are here to help you.  We're whistleblowers.

21           And that's the fraud.  The fraud is not the hook;

22   the hook is simply what gets people interested in it.  The

23   fraud is -- starts with this presentment package.  Now, the

24   Court will give you instructions about what the law is.  Listen

25   to them closely.  I'm only going to paraphrase them, at this

 1    point, and it's perhaps only a little bit, but perhaps a little

 2    bit an overstatement to say that nothing the Court will say

 3    justifies in any way anything these defendants did.  They can't

 4    do what they were going to do.  They knew that from the

 5    beginning, but the Court is going to instruct you about that.

 6            So, when they send these presentment packages off

 7    with these phony bonds backed by a phony letter of credit

 8    telling a bank that they have to do something they don't have

 9    to do, that is, answer their made-up affidavit of truth, and

10    when they don't do that, the fraud continues; the scheme

11    continues that they are going to sign; they are going to sign

12    as employees, attorneys in fact, whatever, of the businesses

13    and substitute in as trustee.

14            A trustee is somebody that works under the bank's

15    instruction to perhaps foreclose a house, if it ever happens.

16    And, either at the same time or in a short time later, they

17    file another document saying, we as trustees now say -- again

18    signed by these two, primarily by Mr. Johnson or Mr. Heineman

19    -- say that loan has been fully paid off.

20            You will read every one of those satisfactions or

21    full reconveyances.  It says that loan has been paid off, and

22    we fully reconvey it back to the homeowner.  That is the

23    nutshell of the scheme.  It's that presentment package followed

24    by the recordings.

25            Now, in reference to this chart, and I'll make this

1  quick, basically this shows just a timeline of when the

2  presentment package, which is the money and the little document

3  here, go out, and when the full reconveyance, which is just a

4  bigger document with the bigger seal, is done.  And then, for

5  the several times that it happened, there is a money, a stack

6  of money, and that is the refinancing.  They were never fully

7  reconveyed.

8        But anyway, timeline, 2003, Heineman, both things

9  are done.  It's not until February 2004, and primarily all done

10 in the year 2004.  We -- our last presentment package of the

11 counts before you is in December 2004.

12       You'll notice that the first bunch of people,

13 Magoon, Swanson, Julian, LeCompte, these are people who turned

14 into brokers, in large part, or helpers, such as Mr. Swanson,

15 the CPA guy who lost his license because of this, followed by a

16 large -- I'll remember when the broker's meeting was, July of

17 '04.  No real sales in here, then a lot of sales.  And then, by

18 the end of '04, it's petered out to the fact -- to the point

19 where we don't show another presentment going out.

20       **THE COURT:**  Mr. Hall, it would be worth advising the

21 jury that charts like this used in closing arguments will not

22 be in the jury room during deliberations.  They are only here

23 during the closings.

24       The defendants also have a chart that they will be

25 showing, same thing applies.  So, if you want to take any

1    notes, fine, but that chart won't be in the jury room.

2              **MR. HALL:**  Thank you, Your Honor.

3              Brokers' meeting July of 2004, there are 16 or so of

4    these people by now.  Now, of course, as is evident from all

5    the evidence, we only show you a small portion of the people

6    who were involved in this, perhaps the people most

7    significantly affected.  But there were 3500 clients, as

8    Mr. Johnson himself said.  And by July of '06, they have 16

9    people or so who come to the broker's meeting.

10             Now, they also have at this point their first staff

11   attorney, Thomas Speilbaur, who comes to the meeting,

12   basically, as he told you, not knowing anything about anything.

13   He is 22-year veteran in criminal law as a public defender in

14   Santa Clara County, was interested in real estate law, but, as

15   he said, had no experience in it, no knowledge at all.

16             He believed that these defendants were well

17   intentioned at that point.  So, what did they do at this

18   broker's meeting with Mr. Speilbauer?  They introduce him,

19   don't have him saying anything.  If you were there as a broker,

20   the evidence would show you that Mr. Speilbauer was introduced

21   so as to say here is a lawyer, and he believes this, just as

22   they had been saying all along in their sales of this in that

23   it was a safe, proven legal way to go, when they knew.  Just as

24   they knew Mr. Speilbauer wasn't approving of anything they did,

25   they knew that they had no authority whatsoever to be

**Closing Argument / Hall**

1    proceeding in the way they did.

2            Mr. Speilbauer continued on and made a conscious

3    decision, a -- what he called a "litigative strategy" to go at

4    this thing head first.  If we think they are bad loans, let's

5    go to court and tell the judge they are bad loans.  And they

6    came right here to this Court with a lawsuit to dismiss eight

7    pending foreclosures at that point.  What happened?  It was

8    thrown out, it was dismissed.

9            Not only was it thrown out, it was thrown out with

10   emphasis.  Thomas Speilbauer was personally sanctioned $10,000

11   for making such a frivolous argument, as will be advanced to

12   you by these defendants here today.  Further, the defense and

13   Speilbauer were ordered to pay costs of $80,000 for having

14   brought this suit.  Did that slow them down?  No.  They

15   continued, as you'll see, they continued on selling this.

16           I'm going to suggest to you, quickly, I hope, that

17   there are -- the record before you is full of instances of,

18   basically, what I would refer to and what I think the evidence

19   shows to you as stop signs, just like World Savings writing

20   them a letter in 2003 and saying this isn't right; we are not

21   going to respond to you; we are going to foreclose on you.

22           There is a letter from Peggy McKay, who we'll talk

23   about in a little bit again, saying that she has been told that

24   this is a fraud.  You have a letter from the lawyers from

25   National City Mortgage, up in Montana, saying we are not going

**Closing Argument / Hall**

1    to respond to you.  This is wrong.

2            A letter from Ameriquest -- and these are all in --

3    Exhibits 121 and 122 and 120.  An e-mail from Ken Blake, one of

4    their -- one of our charged transactions, saying this is wrong.

5    A notice of default, from a court; a notice of rescission from

6    a court; fax from Greg Poppin, another one, saying that he has

7    heard there might be problem here.  Those are all in 126 and

8    128.

9            A letter from a lawyer from the National Bank of

10   South Carolina in 101, along with the complaint to the Board of

11   CPA Licensing -- the licensing board for CPAs, about

12   Mr. Swanson complaining that in their packet was this CPA,

13   quote, "CPA Report that was so bad that the licensing board

14   ought to take a look at it as conduct by the CPA.  And what

15   happens?  The CPA loses his license over that.  Does any of

16   that stop them?  Does any of that slow them down?  No,

17   absolutely not.  As they have testified themselves, they would

18   do it again today.

19           The issue that they had was making money and

20   defrauding people, not fighting the banks.  What fighting the

21   banks was was their hook, their thing, so that they could come

22   into you and say we really believe that.  And, they don't want

23   talk about the real fraud here; the real fraud is that

24   presentment package and the recordings that they have

25   absolutely no ability to justify.

**Closing Argument / Hall**

 1            The record goes on and on.  Letters from

 2     Ms. Bradshaw; a letter from Fremont Bank.  Virtually every

 3     exhibit, as you go through the exhibits, 101, 102, 103, 104,

 4     105, 111, et cetera, are full of letters from lawyers, clients,

 5     banks, government agencies, all saying, in one way or another,

 6     stop, or, at least take a long look at this, because there is

 7     problems here.

 8            Further, in 2005, they start getting specific court

 9     orders from this Court, in 2004, actually; from courts in North

10     Carolina in 2005, from South Carolina, from Texas, from Utah,

11     from California, all saying stop.  Their offices are searched

12     in February of 2005.  It's a pretty good indication that they

13     maybe they are on the wrong side here.  Stop them?  No.  No,

14     not in the least.

15            I want to draw your attention back to that little

16     part in their so-called radio interview that we played for you

17     in which Mr. Johnson and Mr. Heineman talked about the

18     Government being a dog on a leash.  We are taking them places

19     they have never been.  We want to make the entire judiciary

20     obsolete.  These guys are buffoons, in reference to the judges,

21     and it's a corrupt system.

22            The defendants think they are smarter than

23     everybody.  The defendants think that they can defraud people

24     of millions of dollars.  And, you will remember that the very

25     baseline for the amount of fraud caused here is 3-and-a-half

1  million dollars by what Mr. Johnson said himself.  And I

2  suggest the evidence is a lot more.  They had a strategy, and

3  we'll talk about that in a bit.

4          So I talked about the crimes; there are basically

5  two crimes, one charged in count 1, which is conspiracy to

6  commit mail fraud.  There are 35 other counts.  They are kind

7  of in and out because the part that is out are all the bank

8  fraud counts that are no longer there.  So, the mail fraud

9  counts that are there are counts 2 through 5, 9 through 14, 19

10  through 25, 32 through 34, and 38 through 52.  And those are

11  the references to that chart right there.

12          A conspiracy is a criminal agreement, an agreement

13  to do a crime, simple as that.  The Court will give you more

14  and a more complete -- a definition of conspiracy, along with

15  some of the things that happen if you are in a conspiracy, what

16  you are responsible for.  Basically, it comes down to a

17  conspiracy is a criminal agreement.  So, we are left with an

18  agreement to commit what crime?  The charge that we have is an

19  agreement to commit mail fraud.  And the mail fraud are the

20  other 35 charges.

21          The Court will instruct you that there are three

22  elements, two of which, as I said before, are probably not

23  going to be in play for you.  One:  The defendants devised a

24  scheme to defraud for obtaining money or property.  There is no

25  doubt the defendants devised a scheme, all by themselves, all

1    with their education and their experiences.  They devised a

2    scheme, and it did defraud people, there is no doubt about

3    that.  They won't argue that it didn't, I hope.

4           Two, is, and this is the one that is in play:  The

5    defendants acted with the intent to defraud, that is, they

6    meant to fool somebody.  They meant to have people rely on

7    things that weren't true.

8           And three:  The defendants used the mail to carry

9    out the scheme.  And, just on that point, I don't think we'll

10   have an argument about that, the primary evidence of the

11   mailings is Exhibit 28, which is from Jen Holtzer, about all

12   the things that she mailed on all of these transactions.

13          That doesn't cover everyone, but I believe in your

14   review of the evidence you will find that there is evidence

15   from either Ms. Holtzer, Julia Panibratiouk, the defendants

16   themselves, or the homeowners that there were mailings in each

17   case.

18          Now, I wanted to quote at this point about what I

19   believe the Court will tell you about the elements of the

20   crime:  "If the foregoing elements are established, then the

21   Government is not required to prove that any particular

22   statement was false.  A false impression can be made even when

23   all statements made were literally" -- "were not literally

24   false.  Nor is it necessary for the Government to prove that

25   the alleged victim or victims of a scheme to defraud received

 1    any misleading statements or received any alleged mailing."

 2              I wanted to bring that out here because, basically,

 3    what we have is the primary people who are being fooled in the

 4    scheme are the homeowners.  But the victims, as we alleged in

 5    the indictment, are the financial institutions.  And that is

 6    why that last statement is important, they don't have to be the

 7    ones who are fooled.

 8              The homeowners are fooled.  Certainly, the lenders

 9    are put at risk because the actions taken between the

10    homeowners the Dorean process is that there is something on the

11    public record now that says they don't have any interest in the

12    property they lent hundreds of thousands of dollars for.

13              "A mailing is caused when one knows that the mails

14    will be used in the ordinary course or when someone can

15    reasonably foresee such use.  It does not matter whether the

16    material mailed was itself false or deceptive so long as the

17    mail was used in part of the fraudulent scheme.  Nor does it

18    matter whether the scheme or plan was successful or that any

19    money or property was obtained."

20              Certainly, that last part is not nearly as important

21    in this case as perhaps something else; there was a lot of

22    money that was defrauded here.  But the mailings themselves

23    don't have to be what takes the money.  And I think you will

24    see from the evidence that it's the fallout from those.  Those

25    documents themselves, the presentment and the recordings,

 1    didn't have any legal effect.  They, themselves, didn't take

 2    any money away from anybody, but people relied on them.  People

 3    didn't make their house payments.  People went into

 4    foreclosure.  People refinanced and got another couple hundred

 5    thousand dollars in those few circumstances that they were then

 6    on the hook for along with their first mortgage.

 7            Each step along the way, then, the lender is put at

 8    risk because somebody is not paying their mortgage.  They have

 9    to go to foreclosure.  They have to fight with another lender

10    over who has priority over the money that was lent.

11            So then it comes down to this one point that I

12    talked about, criminal intent.  And I think virtually all of

13    what I talked about up to now shows the defendant's criminal

14    intent.  But the defendants have testified each that they had

15    no criminal intent, basically.  Why?  I think we can -- I think

16    the evidence can narrow this down to two reasons.  One is

17    because we really, really, really believe it.  What do they

18    really, really believe?  Primarily, they really, really believe

19    that the banks are bad.  But they are going to say it applies

20    to the whole thing, that they really, really believe that their

21    process is right when they have nothing to back that up.

22            And, secondly, good faith.  We relied on lawyers.

23    Lawyers told us it was okay.  Now, you'll hear -- you've heard,

24    and the evidence will show, about their first lawyer,

25    Thomas Speilbauer.  Did he ever sanction this?  Of course not.

 1    He, in fact, on his way out told them they were committing
 2    fraud.
 3              They tried to hire Walker Todd, who we brought to
 4    you who testified they didn't even tell me what their process
 5    was.  And then when I went on the Internet and found out a
 6    little bit more about it, I wrote them, being the defendant's
 7    girlfriend, an E-mail saying, watch out, you are either
 8    seriously mistaken or you are committing fraud.
 9              But the defendants came up in their testimony, with
10    their credibility at stake, with two more lawyers, and perhaps
11    more.  Perhaps they'll argue about more today, I don't know.
12    But in their testimony, they say they relied on two lawyers,
13    Bob Locke and Will Huggins.  Now, we saw Bob Locke on a video,
14    and we know that in that video he didn't say a darn thing about
15    the process.  He talked about the bad banks and how policies
16    should change, not about what the Dorean Group, what these two
17    defendants were doing.
18              We don't know much about Will Huggins.  The
19    defendants never even testified where he came from, whether he
20    comes from South Carolina, Montana, or some other place.  But
21    they said they relied on him, he told them.  But yet, did they
22    so much as pick up a phone, as they did with Mr. Bates, and
23    bring him in to talk to you about the bad banks?  Nope.  Did
24    they use the subpoena power that they have as lawyers through
25    this Court to get that person?

```
 1            As I challenged defendant Johnson, not only is your
 2   credibility at stake, this is one person that can back you up
 3   on a very important point.  But it is the central point in this
 4   case.  Don't need it, my word is good, he says, this con man
 5   says.
 6            Their credibility in this case:  Let me talk about
 7   some of the things that the Government believes you ought to
 8   consider in weighing their credibility.  First, the presentment
 9   package and the way that's made up, this affidavit of truth
10   basically asking -- they make up.  I guess the big thing about
11   the presentment package is the whole thing is made up.  They
12   didn't get that from anywhere, they made that up, they said it
13   themselves.  They didn't get it from a lawyer, they didn't get
14   it from anybody.
15            What does this affidavit of truth say?  It says to
16   the bank, tell me the ways that you have defrauded the
17   homeowner group who took a loan from you.  It's gobbledygook.
18   It's made to confuse.  It's made to smoke their real intent.
19            The bond, they put a bond in there, apparently,
20   first saying it was going to payoff, and then later, as the
21   defendant testified, to say that it was there in case they
22   messed up.  But this bond is something they made up.  They even
23   said it.  And the people that work for them, it's like a crafts
24   project.  Didn't come from a bank, it came from their little
25   work space with paper with pretty borders from Staples, or
```

```
 1   somewhere, with the pretty gold bond, such as you see on the
 2   chart -- not bond, but a gold seal.
 3          And they even have the machine that pressed down a
 4   glob of gold so that it looked like a seal with Kurt Johnson's
 5   name in the middle of the seal.  It's all made up.  It's not a
 6   negotiable instrument.  There is no evidence and, in fact, the
 7   evidence is that there is no evidence that it's negotiable.
 8   And, in fact, the evidence is that it's not negotiable.
 9          A letter of credit:  They made that up.  We showed
10   you how it was made up on their word processing system.  They
11   forgot a few things.  They forgot to put in the name of the
12   bank at the top.  They just left the shield, but it purported
13   to be something from First Mutual Trust Bank of Switzerland, or
14   some such stuff.  No such place.  The evidence does not suggest
15   that there is any such place, let alone that they backed this
16   bond, let alone that the bond would be negotiable.
17          Why was there no such place?  Because Kurt Johnson,
18   by his very own testimony, said he owed them $3 million.  But
19   where did he send it?  He sent it to a bank in Latvia, not to
20   the bank in Switzerland, but to his account controlled by his
21   co-conspirator, Doug Cameron, in Latvia.
22          There is not one piece of evidence that has anything
23   to do with the transaction between this so-called bank and
24   these defendants, no accounts, no anything except those letters
25   of credit and the bond that they, themselves, made up.
```

**Closing Argument / Hall**

1              Another thing that reflects seriously on their

2    credibility are things that we talked about, the stop signs.

3    The record is replete with the stop signs of all the places

4    that they should have been reevaluating.  And they specifically

5    say to you, we are not reevaluating.  We are right, we know it,

6    we are smarter than everybody.  We don't need to reevaluate.

7    We don't care what the judges say.  We don't care what law

8    enforcement says.  We don't care what our clients, our marks,

9    say.  Doesn't matter, we're right.

10             The way they testified is another thing about what

11   they were doing and how they were doing it.  You saw them try

12   to go left when they had to go right.  You saw them say white

13   when it was black or black when it was white.  They did not

14   want to answer any question that went specifically to the heart

15   of this case, just as their whole -- well, let's talk a little

16   bit.

17             We talked a little bit about perception, that was a

18   big thing for the defendants when they started this scam.

19   We'll get a big office, pay a lot of people to come and work

20   for us.  We'll move a lot of paper.  We'll have law books.

21   We'll have lawyers on the payroll.  We'll have CPAs who send in

22   reports.  We'll have everything that looks legitimate.  That is

23   how we are going to sell this thing to 3500 people.

24             Now, the perception, and let me warn you, the Court

25   is going to, and we have no objections to this at all, but I

```
 1   want you to put it in terms of credibility.  The fact that the
 2   defendants are representing themselves and that they are
 3   wearing jail clothes are their decisions.  And it has to do
 4   with their strategy.  Their strategy is, as they said
 5   themselves on the witness stand, we are being railroaded.
 6   Nobody will stand up to these banks, so, therefore, it's all
 7   us.  And forgive us for perhaps not officially representing
 8   ourselves.  Forgive us for asking stupid questions.  Forgive us
 9   for wearing jail clothes, but this is us being run over by the
10   system.  That is the perception they want.
11           Another thing that goes directly to credibility is
12   Mr. Johnson's priors.  We have talked about that, the fact that
13   somebody has been convicted of a felony prior, specifically
14   fraud, just like this fraud, except with a different subject,
15   not mortgages, then corporate security fraud then.
16           Let's talk about another thing that goes to the
17   heart of their credibility.  They talk about let's fight the
18   bank, let's get these poor homeowners out of this poor
19   situation they are in where they have been defrauded by the
20   banks.  What says that is a bunch of baloney?  It's the McKays
21   and Gavin Christianson.  And think about Ms. McKay,
22   Ms. Magoon's aunt up in Montana:  Been working long and hard,
23   got into a piece of property and are now situated in early 2004
24   with a nice house on ten acres of land and no encumbrances on
25   it.  No mortgages.  They had bought, sold, traded, worked hard,
```

 1   and there they were.

 2          They needed -- however, they were doing so well at

 3   their business, they needed to expand.  They needed $128,000 to

 4   make a building on their property that they could use for their

 5   business that would be a shop and an office.  They start

 6   hearing from their niece about the wonders of the Dorean

 7   process, how it was safe, proven, moral.

 8          What do they do?  They get a loan for twice that

 9   because Mr. Johnson, himself said do that.  You need to go to

10   the bank, this bank that he is claiming is the evil of all the

11   world, that he has to go and fight them to the death,

12   basically.  He says go to the bank, get a loan for 200-and

13   whatever it is, $256,000, and I'm going to take at least

14   50 percent, probably 75 percent of that money, which he did.

15          Then, all on his own, Mr. Johnson calls back to the

16   McKays and says, you know, we have been looking at the

17   property, and we think that you have, you know, there is a lot

18   more money, equity in that property.  And to take full

19   advantage of our program, you are going to need to make a

20   bigger loan.

21          And the McKays say -- you remember that phone call

22   that they had -- I'm not sure about that.  We just don't like

23   that.  Mr. Johnson's response was, you don't trust me.  This

24   isn't right, look at all I've done for you, and hangs up.

25   Again, paraphrasing, but that's substance of the conversation.

1          For a week, they stew.  We are on the hook for

2    $256,000, which we didn't want to be, and we are because these

3    guys were going to eliminate our mortgage, and they haven't

4    done that.  And now they are saying they won't do business with

5    us, basically.

6          Mr. Johnson calls back again in a week and says, oh,

7    I was having a bad day, it just -- you know, I'm sorry, we are

8    with you.  The McKays are so relieved that they now have these

9    safe, proven, legal people behind them that they go ahead and

10   agree to, what was it, 412,000 -- 400 some-odd thousand dollars

11   and give him the rest of his 75 percent, in the mean time,

12   leaving them today with house payments of approaching $4000 and

13   the prospect that it will be more next year because it's an

14   ARM, leaving them with the prospect that even today they could

15   lose their property if things don't go well, leaving the

16   bank -- having been at risk with their property, and that's all

17   we have to show.

18          THE COURT:  Mr. Hall, you wanted me to tell you when

19   forty-five minutes are up; it's just about forty-five minutes

20   now.

21          MR. HALL:  Thank you.  I actually am getting towards

22   the end.  Thank you.

23          Gavin Christianson:  Going to the credibility.  We

24   want to fight the banks, but what happens the first time or the

25   big time when they are challenged by somebody away from the

1    bank?  That is Mr. Christianson saying you didn't pay rent.

2    They say, well, our money was taken by the FBI, and it was,

3    typical landlord response.  I don't care, give me the money.

4    If you were, any of us were in -- your common sense would lead

5    you to believe that that is not an unnatural response, not an

6    evil response.  It's I don't care what your problems are, I got

7    office space, I need to rent it, I'm counting on my money, so

8    you need to pay.

9          The defendants say, okay, I'll pay a year, I'll pay

10   a year, and here you go, here is a site draft for $60,000.

11   Site draft, what is that?  That's probably something that we

12   saw them seeing from other correspondence they had with -- not

13   they had, but they had found from whatever this institution is,

14   First Mutual Trust Bank in Switzerland.

15         But they had a site draft, if you'll remember, for

16   some other people, Ng was the last name, I think.  Some other

17   last name.  Anyway, they came up with a site draft.  Looks just

18   like the one that they had seen from their records that they

19   had from whatever it was.

20         That $60,000 site draft, which apparently can be

21   negotiable, means take it to the guy, whoever says they are

22   going to pay you, and they will pay you.  Who do they put as

23   the person that should pay?  FBI agent in Concord.

24         They go out to the FBI agent in Concord, and says

25   I'm not paying for that.  Just because we ceased doing our job,

**Closing Argument / Hall**

1   we are not going to give you, the landlord, their one year's

2   rent.  So they get kicked out, the Court in Alameda County

3   issues an eviction.

4           What is their response?  Their response is to first

5   trick somebody that was working for them, Julia Panibratiouk,

6   and -- trick her into signing, she is told, for Kurt.  But what

7   it says on the document is she is signing for Hanover

8   Properties, Gavin Christianson's business that owns this

9   property.

10          They take that -- though it's actually not one, but

11  it's three grant deeds, it's not just for their rental

12  property, it's for the whole office park.  It's not for 6000

13  square feet, it's for 160,000 square feet.  They needed three

14  grant deeds because it took that much paper to write down all

15  the addresses of the amount of the property that they were

16  taking now from the landlord.

17          And they did that.  They filed it.  They actually

18  had to file eight -- they were so intent on making this

19  fraudulent contract that they had to file -- had to pay over

20  $8000 in transfer tax to get it to happen.

21          The defendants have no credibility, I submit to you

22  the evidence shows.  They are con men.  We believe -- and --

23  well, my biggest concern at this point is, and my biggest

24  warning, I should say, is keep in mind as defense gives you

25  their closing argument, who they are, where they come from.

```
 1            When they tell you a fact is a fact, please check

 2   that, as you would with our evidence, but pay special heed to

 3   the defendants when they say a fact is a fact as introduced

 4   into this case.

 5            The evidence shows beyond a reasonable doubt, and

 6   you can use the indictment that the Court will give you, which

 7   lays out each transaction.  We submit to you that for each

 8   transaction, all the necessary documents showing the

 9   presentation and the recordings are in evidence, as is evidence

10   of each mailing.

11            The evidence shows you beyond a reasonable doubt

12   that there was a scheme, that -- to defraud people, that that

13   scheme was, in fact, successful in large part, that they used

14   the mails in each of the transactions we are talking about, and

15   that the defendants, most particularly, the one issue that we

16   think it comes down to, had criminal intent, and their intent

17   was to defraud homeowners, banks and this jury.

18            THE COURT:  All right, thank you, Mr. Hall.

19            You used 50 minutes, so 1 hour and 10 minutes will

20   be deemed reserved.

21            We are going to go -- do any of you need a break

22   before we -- all right, no one is indicating you do.

23            Mr. Heineman, are you going to be next?

24            DEFENDANT HEINEMAN:  Yeah.

25            THE COURT:  Before you start, Mr. Heineman, let me
```

1   mention one thing that I probably should have mentioned at the

2   outset today, and that is count 64 and 65, which relate to the

3   allegations of contempt of court, have been dismissed on the

4   Government's motion.  So those will not be there for you to

5   decide.

6            What remains in the case for you to decide is the

7   conspiracy count, No. 1, and the various mail fraud counts,

8   which are -- which you heard about in the past and I'm not

9   going to try to itemize right now.  And that is what is on the

10  table for the jury to decide.

11           Okay, Mr. Heineman, your turn.

12           **DEFENDANT HEINEMAN:**  Okay.  I'm going to need to get

13  set up.  I need to move this easel thing out of the way.

14           Should I do that?

15           **THE COURT:**  Go ahead, please.

16           If you need more than a couple of minutes, we'll

17  take a break so that you can get yourself organized.

18           What's your preference?

19           **DEFENDANT HEINEMAN:**  I need a couple of minutes.

20           **THE COURT:**  Is that all?  All right.

21                    **(Moving screen around.)**

22           **THE COURT:**  Now, that is going to block the view of

23  the screen where you have it.

24           Can all the jurors see the screen okay now?  It's

25  important that you see it.

```
 1                    (Jurors nodding heads.)

 2              THE COURT:  If one of the members of the prosecution

 3   wants to see that, they can move around to that empty chair

 4   over there.

 5              DEFENDANT HEINEMAN:  All right.

 6              THE COURT:  If you want to get a better view, it's

 7   up to the Government how you want to view the argument.

 8              MR. HALL:  Thank you, Your Honor.

 9              DEFENDANT HEINEMAN:  How is that?

10              MR. HALL:  That's fine.

11              THE COURT:  Mr. Heineman.

12              DEFENDANT HEINEMAN:  Sir?

13              THE COURT:  How much time will you take, roughly,

14   so -- because I may want to find a -- maybe to ask the jury to

15   sit here almost two hours might be --

16              DEFENDANT HEINEMAN:  If you want to take a break,

17   that's fine.

18              THE COURT:  No, no, no, I think the thing to do is

19   to get about halfway through your closing, and you tell me when

20   we get to a good resting point; we'll take the break, and then

21   we'll come back and finish your -- after the break.

22              Would that be all right?

23              DEFENDANT HEINEMAN:  I would kind of like to just go

24   all the way through mine without a break.

25              THE COURT:  In that case, I'm going to accommodate
```

1    you.

2            We are going to take a 15-minute recess at this

3    time.  Please remember the admonition.

4            **THE CLERK:**  All rise.

5                    **(Jury out at 9:13 a.m.)**

6            **THE COURT:**  Unless you need me, I'm going to take a

7    break, too.

8            Hearing nothing, we'll take 15 minutes.

9                    **(Recess taken at 9:14 a.m.)**

10                   **(Proceedings resumed at 9:29 a.m.)**

11           **THE COURT:**  Let's resume.

12           **MR. HALL:**  Your Honor, we have had a chance to

13   further look at this document, and we would like to talk to the

14   Court about that.

15           **THE COURT:**  Go ahead.

16           **MR. HALL:**  Your Honor, perhaps if I passed up -- we

17   have circled each item, on the four pages, that we do not

18   believe are an accurate statement of the evidence at all.

19   Starting with the first corner of the first page:  "Received a

20   letter of credit intent for" -- "letter of credit intent for

21   $20 million from First Mutual Trust in December '03"; we don't

22   think there is evidence that they ever received a letter of

23   credit intent for $20 million, let alone that it was in

24   December of '03.  There is no evidence whatsoever.

25           There may be evidence that they met at some point

```
 1  with somebody named Randall Marsh, but there is no evidence

 2  that they met with his legal team and that it was to assist

 3  with us on the language of the bond.

 4            THE COURT:  Mr. Hall, let me interrupt you.

 5            MR. HALL:  Yes?

 6            THE COURT:  The Court is going to allow them to use

 7  this, but without prejudice to your making an objection.

 8            MR. HALL:  All right.

 9            THE COURT:  And during -- and you can make the

10  objection in the presence of the jury to say that that item has

11  no support in the record.  And, I'm going to say to the jury in

12  each case it's up to the jury to remember what is and is not

13  evidence, and they -- and so forth, the standard speech.

14            So, at this point, it would be just too late to ask

15  the defendants to revise their chart.  So there we are.  Sorry.

16  I agree --

17            MR. HALL:  That's fine.

18            THE COURT:  I agree, probably there are things in

19  here that are misleading and not supported by the evidence,

20  but --

21            DEFENDANT HEINEMAN:  If I may?

22            THE COURT:  Yes?

23            DEFENDANT HEINEMAN:  I actually testified to

24  everything that is on that page and supported by Mr. Johnson.

25  It's in the testimony.  If the testimony is evidence --
```

1          **THE COURT:**  Testimony, of course, is evidence.

2          **DEFENDANT HEINEMAN:**  Okay, well, we did talk about

3    that.

4          **THE COURT:**  I'm going to let you use it, but --

5          **DEFENDANT HEINEMAN:**  Well, for them to make --

6          **THE COURT:**  You should be aware, Mr. Heineman, that

7    if the jury agrees with the Government, that they may just turn

8    this against you and say this is an effort to con us.  So, if

9    you want to use something that the jury might believe is an

10   effort to defraud the jury itself, be aware of that.

11         At this point, you have invested your time and

12   effort to do this four-page thing.  And I'm going to handle it

13   in the conventional way, that it's going to be up to the jury

14   to decide whether or not the record supports what you are

15   saying, that's what I say in these situations.  I feel I have

16   no choice but to say this here.  So, your call whether you want

17   to use it.

18         **DEFENDANT HEINEMAN:**  No, I do.

19         **THE COURT:**  Then go ahead.  I'm going to let you use

20   it, but the Government is free to interrupt your closing to

21   make an objection any time you feel that there is something

22   that the record absolutely does not support.  All right.

23         **MR. HALL:**  One further thing I see here, a stack of

24   things, none of which are in evidence.

25         **THE COURT:**  If any of those are referred to and they

1   are not in evidence, then you may object at the time.

2           **MR. HALL:**  All right.

3           **THE COURT:**  All right let's bring the jury back.

4                    **(Jury in at 9:30 a.m.)**

5           **THE COURT:**  Thank you.  Welcome back.  Have a seat.

6       Mr. Heineman, you may give your closing argument.

7   You have up to one hour.

8           **DEFENDANT HEINEMAN:**  Okay.

9              **CLOSING ARGUMENT BY MR. HEINEMAN**

10          **DEFENDANT HEINEMAN:**  Good morning, ladies and

11  gentlemen.  That was quite a compelling opening or closing.

12  I'll try to keep up.

13          Now, let's just agree for a moment with Mr. Hall's

14  assessment of myself and Mr. Johnson and go on the -- go on the

15  rail of we're con men and we intended to screw everybody out of

16  their money and defraud and just take the bank's property and

17  all of that.  Let's go on that assumption.  So, what I'm going

18  to do is going over a little timeline of -- I put this together

19  -- and so you can kind have see starting in January of '04.

20  But, up in the upper corner here, we had received a letter of

21  intent from First Mutual for the first 20 million -- letter of

22  credit.

23          **MR. HALL:**  Your Honor, we would object.  This

24  misstates the evidence.  There is no evidence that they

25  received a $20 million letter of credit, let alone that it was

```
 1   in December of '03.
 2            DEFENDANT HEINEMAN:  I would state that I testified
 3   to that.  It's in evidence, and also all the bonds that are in
 4   that box in evidence have -- not all of them, but a good share
 5   of them --
 6            THE COURT:  Let me rule on the objection.
 7            It's -- so you can all see me, this happens
 8   sometimes, during closing arguments, that one side objects that
 9   a point that is being made by the opponent is not supported by
10   the evidence, and I will say to you what I say to all juries in
11   these circumstances, it is up to you to decide what the
12   evidence was and collectively to remember what the evidence
13   was.
14            If you -- it turns out that you agree with Mr. Hall,
15   that there is no evidence to the support the claim that is
16   being made now, fine.  On the other hand, if you find there is
17   some evidence to support it, that is fine, too.  And, you must
18   take the evidence into account with all the other evidence in
19   the case in making your verdict.
20            So, I am not agreeing with Mr. Hall or disagreeing
21   with Mr. Hall.  Or with Mr. Heineman; rather, I'm leaving it up
22   to your collective memory to decide what was and was not
23   presented in the evidence, all right?
24            I, too, want to remind you what Mr. Heineman says,
25   just like what Mr. Hall said, what he is saying right now, is
```

```
1   not evidence; it is argument.  And, this timeline that is on

2   the screen, that is not evidence; it's just an argument, just

3   like the chart that the Government used is an argument.  This

4   is argument, not evidence.  And, you give it such weight and

5   consideration as you think it deserves based on all the

6   evidence you have heard at the trial.

7            Anything more, Mr. Hall?

8            MR. HALL:  Yes, Your Honor, just so that I don't

9   continually interrupt Mr. Heineman, we feel that there is much,

10  in fact, most of the timeline is not supported by the evidence,

11  we would just make that objection at this point, so I --

12           THE COURT:  All right, as a courtesy to

13  Mr. Heineman, counsel is not going to continuously object, but

14  he is making the point that he feels that the evidence does not

15  support a number of the items on this timeline.  He has made

16  his point.  I give you the same admonition.  And, it's up to

17  you to decide what the evidence does and does not support.

18           With that, Mr. Heineman, please continue.

19           DEFENDANT HEINEMAN:  Thank you.

20           Okay, so I'm going to agree with Mr. Hall; we are

21  con men.  We are guys that decided that after having a

22  conversation, before putting my house through a process, that,

23  well -- Well, I'll take you back to the conversation we had,

24  that would probably be best.

25           We were having a conversation one day about banking,
```

**Closing Argument / Heineman**

1   okay?  And we were talking about mortgages, and Mr. Johnson

2   remarked to me, he says, hey, you know, I've got this kind of

3   revenge thing going, and I was put away for a while, and, you

4   know, I kind of want to get back at the banks.  And, I said I

5   guess I could coop (sic) that revenge thing with you, and, you

6   know, let's go after my house.

7          So, that is what we did, we put together this

8   package of information from gobbledygook, and just randomly

9   pulled things out of the air.  We didn't -- you know, we didn't

10  do any study, we just decided to put it all together.  And we

11  sent it to World Savings, and lo and behold, five-and-a-half

12  months later through a series of going back and forth with

13  World Savings on -- I would answer -- ask a question, and they

14  would give me an answer to a question I never got, so I

15  figured, well, we are both speaking gobbledygook, and, at some

16  point, our lives would intersect and we would all be happy.

17         Well, it did get to a point where World Savings

18  essentially quit communicating with me.  And that was -- I

19  think it was in July of '03.  I didn't receive any further

20  notices until the one I had talked about earlier on the stand,

21  the happy anniversary letter in March of '04, but when you are

22  going through the -- this is the prosecution's documents on my

23  particular file.  This is what they have offered as evidence,

24  it's -- it's okay, but, there is a body of work that is not in

25  it.

**Closing Argument / Heineman**

 1              So, when you take a look at the -- and this will go

 2    right back into evidence, but when you -- when you take a look

 3    at the documents that they have been referring to throughout

 4    the course of this trial, they have been showing you

 5    substitution of trustees and reconveyances.  Now, if you look

 6    at those on their face, I agree, they are fraudulent because

 7    you are not seeing the origin.  You are not seeing where they

 8    are coming from, you know, what were we relying on to get to

 9    that point to where those documents were retitled, or we

10    retitled the properties.

11              Now, Ms. Holtzer, here, again, going on the concept

12    that we are con men, we are having this -- Mr. Johnson and I

13    are having this conversation, and, you know, I said, hey, you

14    know -- we are at the Whipple Road address, here, by the way.

15    That is my office where I was the hat and T-shirt guy for nine

16    years, and, you know, somehow I flipped the switch from this,

17    you know, hard-working sole proprietor to con man.  It just

18    happened.  I'm not sure, but I did appropriate his revenge

19    vibe, so I've got the revenge vibe and now this new con man

20    thing going.

21              So, I said we are going to need a secretary.  We're

22    going to need somebody to handle the documents.  And let's get

23    a young girl because, of course, we want to get somebody young

24    that we can influence.  So, he calls up this friend of 20

25    years, this Rebecca Holtzer who you heard from, and Rebecca

1   says, hey, I'll offer my child to you.  And we said hey, great.

2   So, Jen comes to work for us.

3          You know, Jennifer does a pretty good job.  She is,

4   actually, as it turns out, one of my best people in the office.

5   But, you know, I didn't really feel like Jen was really getting

6   it, so we worked hard on her on this con.  We tried to say,

7   look, Jen, we need you to go along with this con thing.  She

8   said, I'll do your documents, but leave me out of the con

9   thing.  I said, okay, that's cool.

10          So, in order to propagate this thing, we had this

11   intent, from the letter of credit from First Mutual Trust, and,

12   but we didn't have a bond, we didn't have the instrument.  And

13   the World Savings things I didn't use a bond, I used a Bill of

14   Exchange, which is a little bit different than a bond.

15          And, I went into that on my testimony a little bit,

16   but the thing is, on that Bill of Exchange, the first one was a

17   mistake.  And, in fact, I think Ms. Martin brought that out

18   where one of the numbers was wrong, so, I sent another one I

19   had, and it went to World Savings as well.

20          Well, so I have this -- now I've got this secretary,

21   and we need now to take the letter of credit and turn it into

22   something that we can fool the rest of America, you know,

23   because we are going to like wildfire spread all over the

24   country.

25          So we get with this team, um -- this attorney,

 1    Randall Marsh, he actually comes to visit us first, because he

 2    is working with a company that has about, I don't know, 4- or

 3    5000 clients, they were called mortality at this time.  He was

 4    coming in to help because he had some friends that were in that

 5    program, so he was looking to help them.

 6            And, realizing that mortgage alternatives really

 7    didn't have a process, he came to us.  And we said, well, you

 8    know, I'm not sure how this is going to work, Randall, but what

 9    we need right now, is an instrument that we can fool the banks

10    with and, you know, generally just make it look like we've got

11    some kind of official package.

12            So, we went to his office, and it's actually not on

13    this timeline, but we went into -- went to his office in

14    February, that was -- that was where it says here, agreed in

15    principle, to be the sole service provider.  That was

16    essentially our trip to Idaho.  And it was sometime in

17    February, first part of February, I'm not sure what, but we

18    said, okay, look, you've got a lot of clients, we've got what

19    we think is a viable, you know, con that we can get out to the

20    American people, so let's do that.

21            Well, you know, it didn't go very well at first with

22    us and him.  He -- they were actually better cons than we were,

23    so we couldn't hang with them.  And so, we dissolved that

24    relationship, but we greed to take -- now, these guys called

25    them marks, I'm going to call them co-conspirators, because if

Closing Argument / Heineman

1   you think about it, you have clients that are saying, you know,

2   what I got this encumbrance on my property and this obligation,

3   and I want to get rid of it, and I don't care how you do it, I

4   just want to do it.

5          And I don't care if it's moral, or legal, or

6   ethical, or the God has blessed it, or what.  I don't care, I

7   just want to get out of paying.  And so, these people were

8   actually ones that were in a little bit of trouble, so we feel

9   like these marks, or we'll just call them co-conspirators, came

10  along with us for the ride.

11         Now I'll just say for clarity, can't say for the

12  record, but, for clarity, that a few of those people ended up

13  in that Francis Kenny lawsuit that got dismissed out of this

14  case, out of this Court.

15         So, in April -- oh, I go back to March, we moved to

16  this spacious 6,000 square-foot facility in -- 1st of March,

17  which was actually just kind of a shell.  It had a couple of

18  offices in it, but, we thought, you know, we are going to add

19  staff, so I'm going to need to create the aura of a legitimate

20  business, because God knows I wasn't in one before.  I have to

21  at least create an aura of a legitimate one.  And so we started

22  building in it, and all of that.

23         This -- and the landlord and I had a pretty decent

24  relationship at the time.  He didn't know I was about to con

25  the rest of America.  So we move this facility and start our

1    trek towards -- our assault on the banking system.

2            So, we've got -- April here. we start adding staff,

3    we added, I don't know, three or four people.  We didn't have a

4    whole lot of room at that point because we had some customer

5    service people and paralegals coming in around that time.  So

6    and they were kind of easy to get, because, you know, it's easy

7    to fool people when they come in and you are sitting and

8    explaining your process and they are going, yeah, yeah, I can

9    get behind this, I understand that scam, so I'm going to come

10   work for you guys, too, right?  And that's what they did.

11           So then, we began with the Internet portal thing

12   because, you know, we started to now -- our client base started

13   to grow, or should I say our co-conspirator base started to

14   grow, and we needed an opportunity for them to see how well we

15   were going to con.  So, we created this portal so they could

16   put data in.  And they could bring their friends in and con

17   their friends.  And, we could have this big conspiracy con.  So

18   we'll call this the wrath of con.  And we have this remote

19   viewing thing so they can see what is going on.

20           Now, we started to add -- with construction in June

21   we added the law library because you saw the pictures of it, it

22   was quite dandy, you know?  We really didn't have any retail

23   people coming in off the street, so I think we are just fooling

24   ourselves on that, you know?  We didn't have customers just

25   walking in and going, wow, look at this library, this is

1    wonderful.  So we want -- we also built a gym and a bathroom

2    because we wanted to keep our people in shape to sustain

3    through this as we drive across America taking people's money.

4              And here, in May, we have our first attorney

5    training.  This was great because now we have some attorneys to

6    come in.  And these are guys that already have kind of a

7    concept of debt validation and those kind of things.  These

8    weren't just guys, they were dealing in foreclosures.  They

9    needed help in foreclosures, and that kind of stuff.  So they

10   came to see us.

11             And, this really gave us credibility, these -- we

12   had them in three consecutive months, May, June, and July.  And

13   you can see there in June we started to interview brokers,

14   because the last thing we really wanted to do was to be on the

15   phone with our clients.  You know, it wasn't, we were at a

16   point, really, where we didn't want them to find out right away

17   that we were about to buffalo them, okay?

18             That is what that was about; we wanted to put a

19   barrier, if you will, between us and the client.  And that is

20   what that broker thing was intended for, because, goodness

21   knows, it's hard to remember what all your lies are.  You know,

22   my dad said if you are going to lie, you got to remember what

23   you are lying about.  You can always catch a liar because, you

24   know, he forgets what he lied about.

25             So, we -- we have this nice party, announce that the

**Closing Argument / Heineman**

1  Internet portal -- this is in July -- we actually have about 23

2  brokers at this -- at this particular training.  We -- sorry,

3  we selected 23, we only had about 16 or 17 go.  Some of them

4  couldn't make it.  And, we also announced, at that time, that

5  the Internet portal had been completed.  And then, it was going

6  to be an online training, kind of a phone thing later on.

7          And then, you see, we have the third attorney

8  training down here in July.  And just after that -- and

9  Speilbauer was at that broker meeting.  And, he is right,

10  Mr. Speilbauer did give us credibility.  Boy, it was great to

11  stand there and go us con guys, now we have an attorney on

12  staff, and he can stand there all puffed up, not knowing why he

13  is standing there all puffed up.

14          So, he starts with us, actually, in August, but he

15  is at this meeting.  All right.  And then, August of '04, we

16  first heard the FBI was investigating.  So we contacted the

17  agent and said, hey, wait a minute, we haven't -- we haven't

18  gathered enough, you know, sheep into the pen, so can you just

19  hold off a minute?  And they did.  They were pretty nice about

20  that.

21          And then we got Mr. Speilbauer to begin working on

22  this Federal complaint, which we ended up filing in the court.

23  And this was one where we said, gee, you know, they are never

24  going to expect con men to file documents in the Court, in

25  front of everybody.  And that is what we did.  So then, we end

1   up filing that complaint.

2            Now, one of the things that I should -- I should

3   bring up -- no, I'll bring it up later.

4            Well, so we filed the complaint in September.  I

5   think it was the 9th of September it was filed.  Mr. Alsup was

6   set to preside over that.  And, right around September, there

7   were too many people that were actually getting notices of

8   default and foreclosures.  And, we were kind of overwhelmed.  I

9   didn't have the staff to keep the whole thing up, so we said,

10  you know what, we need to do what I did in my particular home,

11  which is institute this administrative overpayment thing.  And

12  that is just simply a notice that went to the bank along with

13  the payment that said I'm just making this payment, it's an

14  administrative overpayment, and I'm expecting it back when we

15  get done with this process.

16           So, October was a reasonably quiet month.  We did

17  hear from one of the defendants, or the witnesses, here, that

18  Ms. Bradshaw, that she attempted -- she wanted to get out of

19  the process.  And we said, heck no, you know, we have your

20  money, we are not going to give you your house back.  But, an

21  attorney showed up, because we respect attorneys, and we gave

22  her house back.  It scared us.

23           So -- and then we get to November, where we learn

24  that a fraud investigator was looking at us.  And we contacted

25  him as well.  You know how fraudsters like to, or con men like

1   to keep quiet, but we said we don't want to do that.  We want

2   to call this guy and just have a conversation with him.

3          And we said, hey, look, whatever you got, hang on to

4   it, I'm sure you'll come up with more.  We'll send some more

5   clients, you know, into Utah, and perhaps you can get more

6   evidence against us.

7          And then, on November 2nd was our hearing here in

8   this court.  And Mr. Speilbauer was a -- it was a great day for

9   him, because he was filing in front of a judge that he

10  completely respected.  And, since he was a democrat and Mr.

11  Alsup was appointed by Mr. Clinton, he was very excited about

12  being in the court.  We use to kid him a lot about that in the

13  office because, you know, a blue blood --

14         **MR. HALL:**  Your Honor, I would object to the last I

15  don't know how many minutes.  Defendant is completely off the

16  record, completely testifying as to things that were not in

17  evidence.

18         **DEFENDANT HEINEMAN:**  That is not true; this is all

19  in evidence.

20         **THE COURT:**  I don't remember anything in the record

21  about kidding Mr. Speilbauer about being a democrat or a

22  blueblood.

23         **DEFENDANT HEINEMAN:**  You're right, I took liberties

24  on that one.  I didn't say that.

25         **THE COURT:**  You did take some liberties on that.

```
 1    And it's up to the jury to decide how many other liberties you
 2    have taken.  But, I remind the jury, once again, that evidence
 3    is evidence that is sworn to up here on the witness stand.
 4    What Mr. Heineman is doing now is argument.  If the argument is
 5    supported by the record, fine, you consider it.  If it's not
 6    supported by the record, then it should not even get to first
 7    base.
 8                 DEFENDANT HEINEMAN:  Can we get a general like
 9    objection at the end of this so --
10                 THE COURT:  Well, counsel has --
11                 DEFENDANT HEINEMAN:  He said he would --
12                 THE COURT:  -- graciously not objected to -- anymore
13    to your chart, but this is something that went beyond your
14    chart.
15                 DEFENDANT HEINEMAN:  Yeah, okay.
16                 THE COURT:  And, you should remember that the rules
17    are the rules.  You must stick to what is in the record.
18                 DEFENDANT HEINEMAN:  You guys --
19                 THE COURT:  All right, thank you.
20                 THE COURT REPORTER:  I'm going to ask you again
21    about the microphone.
22                 DEFENDANT HEINEMAN:  Yeah.
23                 THE COURT REPORTER:  When you walk past it, I can't
24    hear you.
25                 DEFENDANT HEINEMAN:  If I had the hand-held mic, I
```

1    could do a little rap thing.

2          So, on November 2nd we are in this court, and

3    Mr. Speilbauer answers this one question incorrectly.  And, I

4    was kind of angry that day at him, and I made some comments

5    towards him.  And, he actually stated those comments here

6    regarding, you know, you can always find another job or, you

7    know, your daughter could have another father, and because I

8    have a tendency to be insensitive and a little demonstrative

9    because con men need to have that quality.

10          So, you know, that whole vapor money thing, too, was

11   something that was a torpedo to us.  And, we really kind of

12   wanted to keep this con going.  But, on that hearing, or

13   actually, a couple weeks later, he was -- sorry, about a month

14   later we were back in here again.  He was sanctioned 10,000

15   bucks.  And, it was a bad day for him.  We felt really bad for

16   him, and we said, you know, just handle it yourself.

17          And, we are going to January '05:  We added this

18   thing called collateral estoppel now.  We did talk about that a

19   little bit.  Collateral estoppel is another one of those fancy

20   words we like to use like codification or codify.  And, we just

21   kind of make words up randomly because it makes us sound

22   important, and all of that.

23          So, we add that to the process.  And that is what we

24   thought was a good thing.  I mean, it was going to again go

25   back after the banks, with our co-conspirators, and address

**Closing Argument / Heineman**

1     what we think were some of the issues and defects.

2              And then Mr. Alsup issues his final civil order on

3     the case, or his order on the civil case on the 19th of

4     January.  And that is in evidence, too.  In fact, I think it's

5     -- do I have that?  I thought I had that up here.

6              I thought I had that up here for you -- oh, there it

7     is, 35, Exhibit 35.  That would be, I believe, the

8     prosecution's exhibit.  That is some great reading, people.

9     You got to read that.

10              Okay, so we get the -- we get the order from

11    Mr. Alsup, and we are very excited about it because now he can

12    finally start -- that is the decree that goes out across the

13    land for the attorneys across the country.  And now, all of a

14    sudden, we are in a battle royal, in the legal sense.

15              About, what is it, eight days after -- after

16    Mr. Alsup issues that order, Mr. Ernst appears in front of

17    Mr. Brazil, a magistrate judge, and he submits -- this is in

18    evidence, too.  This is defense, actually, I wanted this in,

19    QQQ.  This is a wonderful read.  This is what he used to come

20    into our office and grab our stuff.  And this is what I went

21    through with Mr. Ernst on the stand, just confirming that,

22    indeed, we were -- our process was permeated with fraud and

23    that we were con men.  And he verified for us, definitely.  So,

24    you have to refer to that document.

25              I should also mention, too, if you look at

 1   Mr. Ernst's application for -- this affidavit that he submitted

 2   to get the search and seizure warrants and compare it with the

 3   language from Mr. Alsup's order, you'll find the language very

 4   similar.  You'll find that it was cut and paste.  I don't know,

 5   you guys make the decision, put them together, and see if our

 6   crack investigator did some real research.

 7           Okay, now, on the 1st of February, I'm in the back

 8   area talking to one of our paralegals.  I talked about this, in

 9   particular.  And, I'm standing back there, and a door opens up,

10   and this guy sticks his head in, and he says "FBI."  And I

11   said, man, what took you guys so long?  Come on in.  I talked

12   to you about six months ago.  Let's go.  I want you to take all

13   my books and records and make sure you get my bank account.  Go

14   to my house, kick the door in; that would make it look good.

15   And, they didn't do that.  I was kind of disappointed.  And

16   make sure you take the 11 bucks out my kid's Bible, because

17   that is a real classy thing to do.

18           And then, they -- oh, yeah, by the way, don't forget

19   to corner Jennifer, get her in the back, scare the hell out of

20   her, tell her that she could go to jail for a long time, that

21   she is a co-conspirator in this thing, and do that.  And he

22   did.  He was really cool.  You saw her, that poor little girl

23   up there testifying.  So, she got her deal.

24           And then, of course, with the bank account having

25   been seized, we started bouncing checks.  And that was -- that

**Closing Argument / Heineman**

 1   really was exciting for us, too, because now we get to deal

 2   with the landlord.  And, you know, Gavin and I, we have had a

 3   long relationship.  And it was never tenuous, and I was really

 4   looking for the creating some tension between us, and just kind

 5   of part of the love that I like to share with other people.

 6           And so, I said, hey, could you do this thing?  Could

 7   you take this up to the FBI and negotiate this site draft?  And

 8   he says, no, I'm not going to do it.  So, actually, he didn't

 9   take it up to the FBI, he got a call from them.  And that kind

10   of bugged me, you know?  It's like come on guy, do it.  And he

11   says, no, I don't want to.  And I says, okay, cool.  We

12   appreciate your help.

13           And, we took the necessary remedies for that, which

14   was consistent with the rest of the way we handled our

15   business, fraudulently, and in the public, so everybody could

16   see it because, again, fraudsters hang everything out on the

17   laundry lines for everybody to see it.

18           We began filming the DVD, which you have seen some

19   of that here, which again deals with some intent to defraud.

20   And, we got an attorney on there to talk a little bit about

21   that, too.  And he was -- he was real good about the whole con

22   man thing.  He went along with the -- with it, for a minute.

23           And then, oh, yeah, of course, we have the -- of

24   course, we have the unlawful detainer over here, which we never

25   got notice of.  And they kicked us out, and I can't tell you

1    what a happy day that was, to be drug out of my property

2    because that just really kind of helped seal who and what we

3    were.  We were forcibly evicted in April, on the 26th.  As a

4    continuing show of our dishonor and bad faith, we filed a quiet

5    title action in the Hayward court against the landlord.

6            And then, one of my favorite days -- well, my second

7    favorite day, was this here, was where we delivered these

8    affidavits of felony confession.  Now, in defense of the

9    prosecution, they couldn't find those.  We asked them for it

10   and, you know, they went looking for them, and they couldn't

11   find it.  But, we did file three of them on that day.  And we

12   just said, hey, I want to take all my co-conspirators on that

13   board, along with a bunch of other ones that are not on that

14   board, and the banks and us.  And, we just need to get before

15   the Grand Jurors and to testify that we are all cheats and

16   thieves.  Let's all get together and do that.  That's what that

17   was about.

18           We tried to get before them, Grand Jury, but that

19   did not work out because an hour after having filed the

20   fugitive warrant in -- or, sorry, the affidavit of felony

21   confession in Oakland -- we became fugitives from justice from

22   the state of Utah.  Now, what were the chances of that?  I

23   wonder, what were the chances of that?  What a great day.

24           So, on my way back from Starbucks, where I'm

25   bringing home a nice warm cup of java for my ex-wife, or was my

1   wife then, my ex-wife now, I get pulled over a block from my

2   house.  And that was really kind of cool, because all the

3   neighbors got a chance to see this guy in his car and his short

4   pants and shirt, a lot like this one, and tennis shoes and

5   getting handcuffed.  And wow, I was really proud to be such a

6   show to my neighbors.  Nice.

7           And then, the 21st of July, you see, there is no

8   June in there because we were, in effect, completely out of

9   business.  Actually, I would say from the 1st of -- the end of

10  April to now we have been out of business.  But Mr. Johnson,

11  Kurt, was arrested on the 21st in a sting up in Hayward.  And

12  shortly a couple days after that, I was shipped to Utah on the

13  24th.

14          So we get to -- we are almost to the end of this,

15  guys.  I'm sorry to torture you with all this.  But, August I'm

16  sitting in Utah, and September.  And then Kurt gets to Utah by

17  private carrier, which was kind of neat.  The very guy from

18  Utah that was investigating us flew a plane down there and

19  escorted Mr. Johnson himself to Utah.  And so, apparently they

20  had a lot to talk about in the plane.

21          And then, on the 22nd there, you see, of September

22  of '05, you see the Federal indictment comes down.  Now, that

23  was a great day for me, because I was in Utah facing 13 felony

24  counts, insurance fraud, and various other things.  And funny

25  thing about that whole Utah case, I never saw any evidence of

 1   anything we ever did there.

 2           But, on the 22nd, I get served this thing while I'm

 3   in the jail in Utah.  And, you know, I'm feeling really good

 4   about myself about this time, you know, having now achieved the

 5   pinnacle of my criminal life, having now the Federal Government

 6   after me.

 7           So, we end up -- let's see, here we are in December.

 8   Nothing going on in November.  There was random court dates I

 9   understand, in Utah that were scheduled between October and

10   December.  We went once to court, and what happened -- oh, we

11   ended up in the tank.  And then, we wanted to get into the

12   courtroom because we wanted to confess to our guilt, and they

13   ushered us onto the elevator.  And we were back to the jails.

14           Now, we weren't together in Utah, we were in

15   separate units, but, interesting to note about the Utah case is

16   that I went to court actually twice, not once.  So, Mr. Johnson

17   went once.  I went to a video arraignment, and then I actually

18   was, physically, in front of the judge about a week after I was

19   in Utah.  And -- but from September until they dismissed the

20   case on December 20th, we were never in court.  We were just

21   picked up in a jail, rotting, you know?  So, I guess that's

22   what we deserved.

23           And then, when they dismissed the case, we sat for a

24   little while longer and then returned to California around the

25   9th of February '06.  And then, when we finally appeared in

1    court, and I think it was in front of Mr. Brazil, this new

2    indictment came out.  It had 68 counts.  And, boy, the

3    jubilation on that day, going from 46 to 68, boy were we

4    excited.  We were hoping for 70, but I guess we had to stop at

5    68.  And then finally, March 3rd we end up in front of before

6    Mr. Alsup.

7            Now, originally the case had been assigned to Judge

8    Jensen, and Mr. Alsup got it.  We were kind of excited about

9    that because it's like, wow, this is the guy that started out

10   this whole thing.  Let's get in front of him again, and maybe

11   we'll get our day in court.

12           **MR. HALL:**  Your Honor, I object.  This is beyond any

13   evidence currently before the jury.

14           **THE COURT:**  Sustained.

15           **MR. HALL:**  I ask that it be stricken.

16           **THE COURT:**  Sustained.  And --

17           **DEFENDANT HEINEMAN:**  Okay, then.

18           **THE COURT:**  It's irrelevant to the determinations of

19   the jury as to what judges had this case earlier or not.  So --

20           **DEFENDANT HEINEMAN:**  I think that's in the record.

21           **THE COURT:**  I don't believe that was testified to.

22           **DEFENDANT HEINEMAN:**  All right.

23           All right, guys, you know that I've been pulling

24   your leg.  I mean, we were guys that have a belief.  In fact,

25   they are talking about our intent -- can you hear me okay?

```
 1              We were talking about what our intent is.  I'm going
 2    the pull out a word here, "mens rea."  That is Latin for
 3    guilty, g-i-l-t-y (sic) mind.  Mens rea, guilty mind.  So we
 4    have a guilty mind, according to the Government.  And what I'm
 5    going to go through now is hopefully going to be able to dispel
 6    that little belief.  And, I'm going to do that.
 7              THE COURT REPORTER:  Can you just pull it towards
 8    you?
 9              DEFENDANT HEINEMAN:  Yeah.
10              I'm just trying to be hard on you, that's all.
11              All right, generally, this is our contention:  That
12    this Government has put on a trial for con men, and no con men
13    showed up.  They have been trying to fit a round peg into a
14    square hole this entire time.
15              When this indictment came down, the 48-count and the
16    later Superseding Indictment came down, it had bank fraud on
17    it.  There is now no more bank fraud; it's all conspiracy for
18    mail fraud and something else, conspiracy to commit mail fraud
19    and mail fraud.
20              We were excited about, actually, and I'm not kidding
21    now, about getting in front of bankers.  We wanted now to talk
22    to some bankers.  If our point of view is defective, then I
23    want somebody, not these guys, I want somebody to say you guys
24    are full of hot air.
25              What we have so far is presumption, accusation, no
```

 1   foundation.  And those are all the objections when we would be

 2   asking questions of the document custodians and the OCC guy and

 3   Walker Todd.  And, you know, no foundation.  Argumentative.  I

 4   mean, we just want answers.

 5              I mean, what did Dr. Bates say?  He said it's public

 6   policy to disclose, disclose, disclose, and then, disclose some

 7   more.  There has been no disclosure.  There is talk of

 8   disclosure.  There is talk of a loan; well, okay, if there is a

 9   loan, prove it.  That's all we're saying, is prove it.  If you

10   are telling me there is a loan, I have to buy that?  No.  I

11   would like you to show me, show me in front of me your books

12   and records.

13              Now, we asked the Court -- the subpoena, the

14   subpoena power was talked about of this court.  And, we said

15   this is what we want:  We want a copy of our bond, our original

16   bond, not a copy of the bond, I'm sorry, we want the original.

17   And we want -- that was one subpoena.

18              The second subpoena was we want books and records.

19   We want to see how in these particular loan transactions that

20   are in front of us how the loan was treated.

21              How was it treated?  Was a note deposited on the

22   books as an asset, like Dr. Bates and Larry Walker -- Larry

23   Walker -- Walker Todd said?  Is it consistent with Federal

24   Reserve publications?  Is it consistent with banking practices?

25   Is it consistent with the CPA report that we were relying on?

1         These are the things that we are relying on.  This

2   was the mens rea, you know?  Are we guilty of asking a

3   question?  Why are we guilty of asking a question?  I'm just

4   asking, why am I being, you know, vilified for asking a

5   question?

6         Okay, well, here is the thing, we have not gotten

7   the original bonds.  They didn't send us anything.  I think one

8   bank -- I take that back, one bank sent us a copy.

9         **MR. HALL:**  Your Honor, I would object, as this is

10  all outside the evidence before the Court.

11        **THE COURT:**  Sustained.

12        This is not part of the trial record.

13        **DEFENDANT HEINEMAN:**  Well, this was -- we discussed

14  this in our testimony.

15        **THE COURT:**  I don't believe that the process of what

16  was and was not subpoenaed, and what was produced for evidence

17  or for discovery prior to the trial beginning was part of the

18  discussion under oath before the jury.

19        **DEFENDANT HEINEMAN:**  Well --

20        **THE COURT:**  So the objection is sustained.

21        **DEFENDANT HEINEMAN:**  The Court has selective memory,

22  sir, because we talked about it with Mr. Johnson.  And, we made

23  a point of bringing it out because we have got requests for

24  documents that we never got, or we got documents that we didn't

25  request, I should say.

 1          **THE COURT:**  You can continue with your argument.

 2          **DEFENDANT HEINEMAN:**  All right.

 3          **THE COURT:**  The jury will have to keep in mind what

 4   was and was not testified to.

 5          Go ahead.

 6          **DEFENDANT HEINEMAN:**  Okay, thank you.

 7          The other thing that we asked for was -- were the

 8   original books and records, not original, give us copies of the

 9   various transactions, and what we got back was not that.  We

10   didn't get that back.  We got copies of loan documents, the

11   same things World Savings did to me, copies of loan documents,

12   a copy of a promissory note.  Mr. Heineman, you are a great

13   customer, but we can't -- we can't respond in this way.  Hey,

14   look, I'm a customer, and I'm asking you to validate the loan.

15   And I'm asking you to do it not just with what the interest

16   rates are, what the monthly payments are, and how much I have

17   left on the account.  Show me, you know?  Show me that I

18   actually took out a loan.

19          Well, I'm going to ask you to do a couple of things

20   in this trial.  This is a -- this is our closing.  This is our

21   sales pitch, you know, this fictional reality, I guess, that we

22   are stuck in.  I'm going to ask you to apply a couple of

23   things.  I'm going to ask you to apply common sense.  Common

24   sense.

25          If -- if, you know, what are you -- if you go

**Closing Argument / Heineman**

1    snorkeling, are you going to put on a deep sea diver's outfit

2    and go snorkeling?  No, you are going to put on your snorkel

3    mask and your fins, and you are going to snorkel, okay?  Just

4    common sense stuff.  You are not going to go in your shower and

5    use your hair dryer, you're just not going to do that.  Apply

6    common-sense techniques to what you see in the evidence.

7            And, if we have what provided for you that we got

8    in, and we are kind of excited about getting them in so you can

9    read some of it.  Don't take my word for it.  Whatshisname, Bob

10   Locke, said don't take my word for it.  I don't want you to.

11   Don't believe me, believe what we put in the record.  Read

12   *Modern Money Mechanics*, read the various Federal Reserve

13   publications that we relied on.

14           Go back over the documentary, what was admitted in

15   there, and re-listen to the Merklinger interview.  I talk about

16   my home going into foreclosure.  I'm not hiding that from

17   anybody.  My home went into foreclosure.  They didn't foreclose

18   on me until after I was in jail.  Every letter that came to me

19   up to July of '03 I responded to.

20           That is in the stack, here; that is not in theirs,

21   here.  That is a substantive amount of correspondence that you

22   guys have not seen, that if it wasn't for me you would only

23   think, by looking at just the reconveyances and the

24   substitutions of trustees, on its face it's fraud.  If I walk

25   into a County Recorder and retitle your house, absolutely, that

1   is fraud.  But, if there is an origin behind it that give me

2   the ability to do it and what I relied upon to do it, then --

3           **MR. HALL:**  Your Honor, I would object.  I believe

4   the defendant just made reference to a stack of documents along

5   with what looks to be a UCC or an old UCC code; none of that is

6   in evidence.

7           **DEFENDANT HEINEMAN:**  We referred to --

8           **MR. HALL:**  The defendant is, in essence, trying to

9   say that he has authority for which he has no authority.

10          **THE COURT:**  All right, the ruling is as follows:

11  It's okay for Mr. Heineman to point to a stack of things that

12  were not placed in evidence so long as you, the jury, realize

13  that this is argument.  But, I believe Government counsel is

14  correct, that the items that are in that stack are not in

15  evidence.  And so you should keep that in mind as you evaluate

16  the argument.

17          Mr. Heineman, you have used forty-five minutes of

18  your one hour.

19          **DEFENDANT HEINEMAN:**  All right.

20          All right, here is a key one for you:  All of the

21  evidence that is in their file, all of this stuff that is

22  against that wall is ours.  We created it.  We put it -- we

23  sent it to the banks.  They are required to respond; they

24  didn't respond.  We took the action.  Read the documents.

25          Do you guys recall when I went over the notice and

**Closing Argument / Heineman**

1    demand document, line by line, with Mr. Johnson?  Do you recall

2    that?  Was that unintelligible to you?  I mean, we wrote it so

3    the most basic person could understand it.  It's not written

4    Latin or Greek.  We didn't use a bunch of, you know,

5    gobbledygook words.

6              We didn't string a bunch of platitudes together.  We

7    didn't put any -- no cites from any court.  We didn't do any of

8    that.  That was intentional.  We did it so it could be

9    understood, so when people like Marlena Randall from Farmer's

10   Bank could look it and say, gee, this is interesting.  Let me

11   give it to somebody who can answer this, instead of just going

12   right of the cuff, like they did, oh, it's fraudulent.

13   Everything that we sent to these banks they said -- well, not

14   everything, because we actually got some decent responses.  But

15   the lion's share of what was sent to the banks returned the

16   same form letters unsigned that said this is quasi-political

17   argument and rhetoric.  Wow, and that is what I get?

18             The other thing I would like you to employ is

19   deductive reasoning, deductive -- d-u-c-t-i-v-e, reasoning.

20   What is that?  That is what is not there.  Pay close attention

21   to what was not presented in this case.  This is important

22   because of what is intentionally being concealed.  There are

23   things they don't want you to know.  They are talking about the

24   damaged victims and the banks out there, millions of dollars.

25   Where is the millions of dollars?  Where is the ledger?  Show

**Closing Argument / Heineman**

1   me where I've damaged somebody millions of dollars.  Haven't

2   seen it.

3            And then, finally and lastly, fair analysis.  Now,

4   this one is a hard one.  And, I admit it's a hard one, because

5   if I was sitting on your side I'd probably be going, this is

6   interesting, all right.  But, I'm going to ask you, despite any

7   beliefs that you may have had coming into this trial, this

8   thing that we are in, this proceeding about banking or loans or

9   judges or prosecutors or courts, money, set those aside, any

10  prejudices that you have against me or them, set them aside and

11  just look, through common sense and deductive reasoning what

12  you have in front of you.

13           Now, we tried to get as much into evidence as

14  possible.  Please, I'll tell you where to go.  Here are some

15  nuggets:  We are talking about a lot of stuff that is -- makes

16  us look bad, casts us in a bad light.  That's their job, okay?

17  I don't take it personally.  When they are done, at the end of

18  the day, they get to drink their coffee and do their thing out

19  there.  When I'm done, I got to go back to a jail cell, that's

20  just my choice right now.  Well, the -- where was I going with

21  that?  I hate when I do that.

22           I just had a brain fart.

23           *DEFENDANT JOHNSON:*  Bad light.

24           *DEFENDANT HEINEMAN:*  Where was I standing?

25           *DEFENDANT JOHNSON:*  Bad light.

 1              **DEFENDANT HEINEMAN:**  What did I just say?  Oh, yeah,

 2    casting us in a bad light.  Wow, that was weird.

 3              Here is where I would like you to go:  The nugget

 4    that I was talking to you about is go to the jury transcripts

 5    where we are crossing their witnesses.  Now, you can go and you

 6    can listen to what they are saying here, but go and read,

 7    because we go --

 8              **THE COURT:**  Mr. Heineman, the transcripts are not in

 9    the jury room.

10              **DEFENDANT HEINEMAN:**  They don't get to read those?

11              **THE COURT:**  They don't get to read them.  If they

12    want to hear some testimony read back, then we bring them out

13    here, we out here try to figure out what it is that they wanted

14    to hear --

15              **DEFENDANT HEINEMAN:**  Oh, I thought --

16              **THE COURT:**  -- and we will read it back.  But the

17    transcripts will not be in the jury room.

18              **DEFENDANT HEINEMAN:**  Is it inappropriate for me to

19    suggest that they come and listen to those transcripts?

20              **THE COURT:**  It's okay for you to say if they can't

21    remember the cross-examination and they want to have it re-read

22    to them --

23              **DEFENDANT HEINEMAN:**  Okay.

24              **THE COURT:**  We will try to accommodate that.  It

25    will take some time to dig it out, but will we will do our

 1  best.  And we will bring them back here, and the court reporter

 2  will read it to them.

 3              **DEFENDANT HEINEMAN:**  Okay, well, that's what I'm

 4  getting at.

 5              If your only way of getting to the transcripts is

 6  coming back out here and having them read to, you, please, do

 7  me a favor.  We are talking about a long time, for us, in this

 8  particular matter.  So we have alluded to life sentence --

 9              **MR. HALL:**  Your Honor, I would object.  I believe

10  the defendant just made reference to punishment, which I think

11  is not --

12              **THE COURT:**  That is improper.  Sustained.

13              **DEFENDANT HEINEMAN:**  Okay.

14              **THE COURT:**  The issue of punishment, if there is a

15  conviction in this case, is totally for the Court to decide.

16  It is irrelevant to what -- the jury's determination.

17              **DEFENDANT HEINEMAN:**  All right.

18              Okay, so I'm going to read here real quickly for

19  you, because I know I have a little bit of time.  Now, I have

20  noted here 9:35 is when I started.

21              **THE COURT:**  I note that you started at 9:30 exactly,

22  according to that clock up there.

23              **DEFENDANT HEINEMAN:**  With all the objections and

24  other stuff.

25              **THE COURT:**  Objections are part of the process.

```
 1   Nonetheless, the Court will give you --
 2                 DEFENDANT HEINEMAN:  All right.
 3                 THE COURT:  -- until 35 after.
 4                 DEFENDANT HEINEMAN:  All right.  You are a gentleman
 5   and a scholar.
 6                 So, throughout this proceeding, you were shown a
 7   number of purported documents that -- as I was talking to you
 8   about there.  Those would be the substitution of trustee and
 9   the full reconveyance documents.  If you were paying attention,
10   you would have noticed that, whenever the prosecution
11   referenced these documents, it was just those documents.  There
12   was not the origin from which those documents came.  Where,
13   where do they come from?  I want to know.
14                 Now, it was clear from the beginning, and even more
15   clear to us now, that there really was no substantive
16   undertaking of our documents, looking -- reviewing those
17   documents.
18                 Now, they are going to make a lot of ballyhoo, I'm
19   certain, speculating about, well, you could have brought expert
20   witnesses.  I think, in fact, Mr. Hall referenced that.  You
21   could have brought expert witness.  I'm sorry, you accused me.
22   You bring somebody that impugns my testimony.  Impeach me.  I
23   want to be impeached.  Show me, show me that you can impeach
24   me.  Bring an expert witness.
25                 Now you saw a -- well, let me just say this about
```

**Closing Argument / Heineman**

1    the documents on the screen:  It's impossible for you to draw,

2    in my mind, an informed conclusion on what is on the screen on

3    the part which is just looking at the screen with the absence

4    of the whole.  If you don't have it all, then that makes no

5    sense, and we are guilty and we should go to jail, prison,

6    whatever.  But, you can't make the decision based on just

7    looking at those documents.  It's -- it's silly, and it's

8    damaging to us.

9            Now, you saw steady stream of document custodians

10   from the various lenders.  And, again, going back to their

11   testimony, they had no idea or understanding of how the loan

12   transaction worked or how the promissory note is handled or

13   about even accounting, and moreover, contracts.  They said,

14   well, some of them, Ms. Randall, in particular, I understand

15   contracts.  And then, when you get into some of the meat of

16   issues, she doesn't understand contracts.  And, we started to

17   ask about contracts, objection.

18           So now, I'm going to go to Ms. Toboleski from Bank

19   of America.  She says whether it was -- let's see, well, I

20   should ask you, if you ever heard testimony from her, from

21   Bank of America, Ms. Toboleski, if she explained or examined

22   the presentment contract in detail in order to demonstrate how

23   we were mistaken about any of our conclusions.  Did any one of

24   them do that?  They just said it's fraud.  Fraud is a

25   conclusion, you have to do the research to get the conclusion.

**Closing Argument / Heineman**

1   It's, again, senseless.

2           Now, interesting to note, and this is regarding

3   Ms. Toboleski, she had plenty of things to say to Ms. Martin in

4   the direct, but on cross, when Mr. Johnson was asking her

5   questions, her response was I don't understand the question.

6   Can you repeat the question?  She did that 28 times.

7           The reason I counted it was because I sat over there

8   and said, man, she is saying I don't under the question a whole

9   lot.  I don't understand the question.  Can you repeat the

10  question?  And, in one case, Mr. Johnson asked if she was a

11  certified public accountant, and she responded I'm not sure I

12  understand the question.

13          And Mr. Alsup asked the same question, and she could

14  answer it.  Are you a certified public accountant, and she said

15  no.  I mean, I guess we have no horsepower in this court, but I

16  mean, it was a simple question.

17          Now, Ms. Randall, from Farmer's State Bank, said

18  that she had received the report.  In fact, Mr. Hall asked

19  Ms. Randall about the CPA report, and she stated, "In specific,

20  when it got to the CPA report and his comments, it looked very

21  fraudulent."  Okay.  And then, she goes on to say the whole

22  document that we had received, meaning Farmer's, looked very

23  fraudulent.

24          I'm confused; again, making determinations.  And

25  what evidence do you have of that being fraudulent?

**Closing Argument / Heineman**

1             In cross, Kurt asked, "Do you understand the basic

2    requisites to create a contract?"  And her answer was, "I

3    believe that I do."  Then, he later asked, "Do you understand

4    the notice provided to you by our documents?"  And she said, "I

5    don't understand your documents, no."  So "I understand,"  "I

6    don't understand"; we got a lot of that through this trial.

7             And then, just flipping on down to Mr. Johnson from

8    the Office of the Comptroller of the Currency; now, remember,

9    he was the hallmark-to-fraud guy.  I really liked him.  I think

10   he liked San Francisco.  It's a great town.

11            He would -- he said that -- well, I will just back

12   up.  He actually -- I didn't quote any comments from him, but I

13   would state that as a fraud guy, don't you think -- he has seen

14   a lot of contracts.  He is in banking, right, I mean, he should

15   have been able to spot fraud in our documents, having spent

16   thousands of hours, his testimony, in doing fraud investigation

17   or being taught and doing the investigations.

18            In fact, if I was -- if I was using him as an expert

19   witness, I probably would have said, hey, can you put a report

20   together for me so I can get it into evidence and lay out all

21   the hallmarks of fraud that these guys are perpetrating in this

22   document, and how it's not really a contract and how, you know,

23   an affidavit doesn't have to be rebutted or responded to?  Can

24   you do that for me?  No, it didn't happen.

25            Instead, you heard him state that he did his

 1    research on the Internet, at which point Mr. Alsup kind of came

 2    unglued on him.  So, you did what?

 3            And then the Federal Reserve guy, Walker Todd, who,

 4    by the way, we told him -- Mr. Todd, he was our guy.  He came

 5    to our office.  We had conversations with Mr. Todd.  And, he

 6    didn't go over the presentment contract with us.  We didn't

 7    bring him into Dorean to go over the presentment contract; we

 8    wanted him specifically for banking -- that was it -- to talk

 9    about the banking issues.

10            And, he didn't even read the CPA report.  And, he

11    didn't even know that it wasn't Todd Swanson that put his

12    report out there because he had made derogatory remarks about

13    Mr. Swanson having possibly been the guy to put his report out

14    there.  But we never asked him to review our contracts.

15            Now, the only banker that showed up was Dr. Larry

16    Bates, and he was our guy.  Again, please come in.  And Kurt

17    did the direct on that, and I read it, and it's fabulous.  It's

18    great.  It's great.  He did a great job.  He asked pointed

19    questions.  If you can listen to that and you can bear it,

20    listen to it again.  He says a lot, an absolute a lot.

21            And, in fact, he even predicted the situation that

22    the economy is in, with regards to mortgages, when he came to

23    see us.  Are you reading the newspaper?  Are you paying

24    attention, guys, to what is going on out there?  I know that

25    you weren't supposed to be on the Internet researching us or

1    banking, or any of that, but are you paying attention?

2              And then, of course, we talked about Mr. Bates

3    saying disclose, disclose, disclose, as being part of the

4    public policy.

5              Now, what you didn't get from the prosecution was a

6    bank officer, an auditor, or someone who can speak materially

7    to the loan transaction, to refute what we were saying.

8    Instead, you got opinions from what is tantamount to bank

9    tellers, not presented by the prosecution, wasn't expert on

10   contracts, or contract law.  Why not come in and pummel us with

11   you guys wrote an unconscionable contract, or you didn't have

12   all these elements in it?  Where is that?  No, instead, let's

13   throw a bunch of sand in the air and talk about Sara Jane

14   Magoon.  And it's awful what happened to Sara Jane, but I got

15   my tale of woe, too, guys.  I lost my house.  I got divorced.

16   I've been in jail for two years.  I'm not whining about it; I'm

17   doing something about it, you know?

18              I didn't do what Dewey, Tobias and Farrell LeCompte

19   and Bill Julian did; I didn't take a deal.  I could have taken

20   a deal and gotten, you know, whatever they are going to get,

21   five years, and that is it.  But, I'm here because I believe --

22              **MR. HALL:**  Objection, Your Honor.  I ask that the

23   last remarks be stricken as beyond the scope of any

24   examination.  Also, as go to punishment.

25              **THE COURT:**  Sustained.

```
 1              DEFENDANT HEINEMAN:  I'm here because I wanted
 2    somebody to come forward.  I thought we were going to get
 3    bankers.  I thought we were going to get a contract guy.  I saw
 4    their list of expert witnesses; there was a bond guy, no bond
 5    guy shows up.  We were excited about a bond guy coming in.
 6    They had four pages of expert witnesses; why would we need to
 7    bring anybody in?
 8              They had a lot of our people that worked for us.
 9    They had a lot of clients, and there were some nuggets in there
10    with those clients.  We would like to have seen more of those
11    people show up.
12              And then, getting to the -- next, what you didn't
13    see:  What you didn't see was an expert on the UCC, the Uniform
14    Commercial Code.  You have heard us quote it.  You've heard us
15    talk about the UCC.  You have heard us make reference to it.
16    You have seen it in some of the documents that we have filed.
17    In fact, on the substitution of trustee and full reconveyance,
18    you see the UCC 1201 in quotations at 37 or 39.  I mean, we
19    make reference to the UCC; why not a UCC guy?  Come on.
20              I mean, if we were really interested in the
21    conviction, let's talk about some substantive issues, not a
22    bunch of smoke in here.
23              THE COURT:  Mr. Heineman, you have two minutes.
24              DEFENDANT HEINEMAN:  Okay.
25              Finally, Matthew Ernst, who you heard from, their
```

```
 1   witness.  I got a chance to cross-examine him.  I spent quite a
 2   number -- or quite a bit of time with Mr. Ernst.  That is
 3   another transcript you need to read, if you can ask the Court
 4   to read it back to you.  It's great.
 5            I'll go -- on the flower shop investigation,
 6   Mr. Johnson is going to handle a lot of this.  But, I've talked
 7   to law enforcement guys, I know people in law enforcement,
 8   personally.  What wasn't conducted --
 9            MR. HALL:  Your Honor, I would object.  I believe
10   that he is now going to tell us about what a law enforcement
11   officer should do, which is not part of the --
12            DEFENDANT HEINEMAN:  That's not what I'm going to --
13            THE COURT:  Sustained.
14            DEFENDANT HEINEMAN:  That's not what I'm going to
15   do.
16            THE COURT:  It's not part of the evidence.  There
17   was no testimony from you under oath that you know anybody in
18   law enforcement.  That is not a proper argument, Mr. Heineman.
19            DEFENDANT HEINEMAN:  All right.
20            Well, what you didn't see from this witness, Mr.
21   Ernst, was any audio surveillance, recorded conversations,
22   wiretaps between informants and clients, informants and staff,
23   informants and Mr. Johnson or myself, anyone from the FBI
24   undercover in our office, any recordings of our public
25   speakings, any recordings of our public speakings, à la
```

**Closing Argument / Heineman**

```
 1   Marion Barry, remember that one?

 2            Video surveillance with clients, informants and

 3   staff?  What about video with the FBI or video recordings of

 4   our public speakings or meetings, where is that?  Shoddy,

 5   shoddy, shoddy investigation.

 6            Like I said, go read his affidavit, read the judge's

 7   order, and see if it's not cut and paste.  That is the extent

 8   of the investigation.  That is what led him into my office to

 9   take my stuff.

10            THE COURT:  Mr. Heineman, your time is up.

11            DEFENDANT HEINEMAN:  All right.

12            THE COURT:  Make one concluding point.

13            DEFENDANT HEINEMAN:  All right.

14            Here is the conclusion, guys:  We have been trying

15   to get at the truth for four years, from the time that I

16   started my home to now, through my home, those clients, and the

17   answer still goes -- the question still goes unanswered.  Prove

18   there was a loan.  Where is the loan, in where is the proof?

19   None.  No proof.  And I'm here because I asked the question,

20   where is the proof?  So, please, fair analysis.  Common sense,

21   deductive reasoning, fair analysis.  That's all I'm asking.

22            THE COURT:  Thank you, Mr. Heineman.

23            We'll take a ten to 15-minute break so that we can

24   set up for the next argument.  Thank you.

25            THE CLERK:  All rise.
```

```
 1              THE COURT:  Please remember the admonition:   No
 2   talking about the case.
 3                      (Jury out at 10:35 a.m.)
 4              THE COURT:  Anything the parties need the Court for?
 5              MR. HALL:  No, Your Honor.
 6              THE COURT:  How about the defense?
 7              DEFENDANT HEINEMAN:  No.
 8              THE COURT:  Mr. Johnson, you set up the courtroom as
 9   you wish.  And, when we come back, you will have one hour.
10                      (Recess taken at 10:36 a.m.)
11                      (Proceedings resumed out of the presence of
12                       the jury at 10:50 a.m.)
13              THE COURT:  Are we ready to go.
14              Where is Mr. Hall?  There he is, okay.
15              Are we ready to go, Mr. Johnson?
16              DEFENDANT JOHNSON:  I just need some exhibits from
17   Dawn.
18              THE COURT:  We'll have to get her to come in here.
19   Okay, shall we resume?
20              All set now, Mr. Johnson?
21              DEFENDANT JOHNSON:  Yes.
22              THE COURT:  Okay, let's bring back our jury.
23                      (Jury enters courtroom.)
24              THE COURT:  Welcome back.  Please have a seat.
25              Mr. Johnson, you have one hour.
```

1                 <u>CLOSING ARGUMENT BY MR. JOHNSON</u>

2            **DEFENDANT JOHNSON:**  Hello, again.  I will concur

3    with the prosecution.

4            **THE COURT:**  Please keep your voice up.  It's hard to

5    hear.

6            **DEFENDANT JOHNSON:**  I will concur with the

7    prosecution.  And, thank you for your service.

8            We have been hoping for this moment for quite some

9    time.  And, quite frankly, we have invested our lives in it.

10           I wanted to try and clear up a few things for you.

11   I think in the evidence, in the way this case has been handled,

12   there's a little bit of misstatements or a chance to be -- to

13   have some confusion.

14           I think the first thing I wanted to throw out there

15   for you, I think if you remember my opening statements, I asked

16   you to enter a guilty verdict.  I do want to explain that to

17   you, but I want to get back to that a little bit later.

18           First, I want to talk about the trial that we had,

19   that I didn't want to have.  And, my understanding of a trial

20   is that it's really kind of a fiction; it's a drama; it's

21   limited in scope.  It's authored from outside, just like a book

22   would be.

23           **MS. MARTIN:**  Objection, Your Honor.

24           I'm not sure this is proper.

25           **DEFENDANT JOHNSON:**  I think it's within argument.

1          **THE COURT:**  Well, we'll call it -- it's argument for

2    the time being.  We'll see where it leads, but, so far the

3    Court will allow Mr. Johnson to continue on.

4          **DEFENDANT JOHNSON:**  So it's a drama, a fiction, a

5    bubble, if it were, where we attempt to bring in a certain set

6    of facts to control an opinion.  The -- it's kind of like

7    Wonderland, if you could put it like that.

8          In this -- in this arena, one of the famous

9    techniques is rhetoric.  Rhetoric is a strange form of logic,

10   and it works something like this:  Chairs have legs, all chairs

11   have legs; men have legs, all men have legs; therefore, all men

12   are chairs or all chairs are men.  And, that is the kind of

13   logic that happens in a rhetorical setting.

14         What Scott asked you to deal with here is to bring

15   some common sense, bring some understanding so that you can

16   pierce through this rhetoric, so that you can come to a

17   truthful understanding of what the facts are, or why certain

18   facts weren't presented and you can reasonably deduct from that

19   area.  That is what I wanted to try to do.  And I wanted to try

20   to incorporate it into some of your forms of knowledge.

21         One of the things that I recall is we have a poker

22   player here.  And I enjoy the game of poker myself.  And,

23   people might say that the Dorean Group was quite a gamble.

24         In poker, there is a thing called tells, and tells

25   are the things that tell an opponent that you have -- that he

1   has a better hand than you.  Even though you don't want to tell

2   him, there are certain things that you do that let him know

3   that you have a better hand.

4           I believe that there was quite a few tells, that I'm

5   tell you the truth, that we do have the best hand, that we do

6   know what is going on, and that I'm not claiming to be smarter

7   than anybody else, but I'm also not claiming to be an economic

8   retard.  We do have some understanding about certain things.

9           Some of the tells that showed up for me in this

10  experience is Judge Alsup's background as a lawyer with mostly

11  banking clients.

12          **MS. MARTIN:**  Your Honor, it's not --

13          **THE COURT:**  Sustained.  That is not in the trial

14  record.

15          **DEFENDANT JOHNSON:**  Okay.

16          When we came into the civil court, we ran into a

17  situation where one of his peers, Mr. Hovis, came jumping up

18  and said the Internet is true, the Internet is true.

19          **MS. MARTIN:**  Objection, Your Honor.  It's also --

20          **THE COURT:**  This is not part of the -- there was a

21  reference to Mr. Hovis, I do remember that in the testimony,

22  but I don't remember any testimony before this the jury as to

23  what he said.  So, that objection is -- what I'll do is

24  admonish the jury to, as I did before, if that -- if your

25  memory of the evidence accords with what Mr. Johnson saying,

 1  then, fine, evaluate it accordingly.  If the evidence was not

 2  there in the first place, it doesn't get to first base, and you

 3  should disregard that argument.

 4        Go ahead, Mr. Johnson.

 5        **DEFENDANT JOHNSON:**  And, the very judge who doesn't

 6  really respect the Internet said, okay, the Internet is true.

 7  He is going to put in his order that --

 8        **MS. MARTIN:**  Objection.

 9        Improper argument again, and not in evidence.

10        **DEFENDANT HEINEMAN:**  It was discussed with

11  Mr. Speilbauer on the stand, Your Honor.

12        This is out of hand.  You can go through the

13  transcripts with Mr. Speilbauer; we talked specifically about

14  the Internet and how the order -- how our civil case and the

15  order that you will issued are just diametrically opposed.

16  And --

17        **THE COURT:**  Same ruling.  Same ruling.

18        Go ahead, Mr. Johnson.

19        **DEFENDANT JOHNSON:**  So, again, with the -- this

20  judge who gives Internet admonitions to the OCC guy accepts it

21  from Barry Hovis as a fact.  He incorporates it in his order

22  and completely states what we are thinking, even though the

23  Internet is not really that reliable.

24        Out of that comes an order on January 19th, and this

25  is where our business does change.  And, it was based on our

Closing Argument / Johnson

1   experience with this Court on November 2nd and December 2nd,

2   December 2nd, specifically, for me.  I realized that I was on a

3   railroad -- a set of railroad tracks that are being laid for

4   me.  And, it's okay that it brought me here, you have no

5   complaints from me, but it's one of the things that tells me

6   I'm right.

7           The next thing is that the FBI shows up with a

8   cut-and-paste investigation.  Now, one of the ways you can spot

9   that very, very easily is the whole flower shop thing, okay?

10  The flower shop doesn't need to be investigated.  There is

11  already a presumption in Judge Alsup's order, the Internet,

12  this FBI agent, and this prosecution, that First Mutual doesn't

13  exist.  And, in fact, they want to mislead you by telling you

14  it's a bank so that you are expecting marble pillars and a big,

15  old edifice.  It was never testified, and they brought no

16  evidence that we ever said it was a bank.  It's not on any of

17  our documents.

18          If I had said it was a bank, do you believe there

19  would be rebuttable evidence with some of the -- they would

20  have brought that -- recordings from somewhere?  These guys

21  listened to our conference calls.  So, that's another thing

22  that makes me think that we're right.

23          Now, I want to show you -- this is Exhibit No. RRR,

24  as in Robert.  That is a commercial registry that I used to

25  verify First Mutual Trust.  That is a commercial registry that

 1    anybody can go to -- a Swiss web page and find out whether the

 2    company exists.

 3              Did the FBI agent do that?  No, he had a flower

 4    shop; he didn't to have do it.  They already had the

 5    presumptions.  They keep talking about us getting a blessing

 6    from a judge or a blessing from a lawyer, a blessing to bless

 7    our process; they didn't need to do anything, they had a judge

 8    blessing their investigation.  We were found criminals before

 9    we even got investigated.

10              So, this is simple stuff.  They could go to the

11    Swiss registry.  You can find out who the officers are, how

12    many shares of stock are out.  You could find out if an

13    officer's been changed.  You can find out the addresses that

14    are used.  There is two addresses listed on this one.  There

15    was two addresses listed the bonds.  Did they go to any of the

16    other addresses?  There was three addresses on the next -- on a

17    proceeding one.

18              In fact, you can go to the Swiss registry and find

19    out that the care of address for this institution was Aviance

20    Bloomin *(phonetic)*, a flower shop.

21              Now, this is what you are supposed to get from a

22    drive-by of a Swiss officer going -- going by the flower shop.

23    Is it a stand-alone building?  Is it headquarters of a

24    franchise?  Is it in one building?  Is it by itself?  You know

25    nothing about this.

```
 1              In this world, with digital cameras, you don't get
 2    an investigation report from this Swiss officer to the FBI?
 3    You don't get a picture?  They didn't present any picture.  You
 4    know nothing about it.  The presumption is because it's a
 5    flower shop, it's not a bank.  And, you know what, it's not
 6    supposed to be a bank.  There is a difference between bank -- a
 7    bank and a financial institution.  There is a difference
 8    between the mortgage companies in here and banks.  So, not
 9    everything operates the same way.
10              You can run a bank -- nowadays, you can run a bank
11    off a server anywhere in this world.  You don't need columns
12    and marble buildings and an edifice.
13              So, more tells that we are on the right tracks,
14    except for the tracks they are trying to lay for us, is that
15    the fraud charges were dismissed.  See, it started with an
16    indictment of 68 counts, and we didn't mind.  26 those were
17    bank fraud charges.  You know why I like the bank fraud
18    charges --
19              MS. MARTIN:  Objection, Your Honor.
20              They were dismissed.  There's no testimony --
21              THE COURT:  That's sustained.
22              The fact that the bank charges were dismissed does
23    not in any way subtract from or add to the proof, one way or
24    the other, as to the mail fraud charges, even though the
25    indictment alleges that banks were the intended victim of the
```

Closing Argument / Johnson

```
 1   mail fraud charges.

 2           And, I will instruct you at the end of the case and

 3   I will instruct you now that the fact that the bank fraud

 4   charges were dismissed is irrelevant to whether or not the

 5   Government has or has not proven up the mail fraud charges.

 6           Sustained.

 7           DEFENDANT JOHNSON:  Okay.

 8           So the -- I'm using the bank fraud charges as a tell

 9   and as an argument, I'm not -- I'm putting on whatever it is,

10   and they can ferret it out.

11           But, the bank fraud charges would require them to

12   come in here and prove their books.

13           MS. MARTIN:  Objection, Your Honor.

14           THE COURT:  Sorry, what.

15           MS. MARTIN:  He is now arguing -- improper argument.

16           THE COURT:  Let's hear -- I have admonished the jury

17   on what the status is.  And we'll go ahead and hear the

18   argument out on Mr. Johnson's point.

19           Go ahead.

20           DEFENDANT JOHNSON:  Okay, my point repeated:  The

21   bank fraud charges would require the bankers to come here and

22   bring their books and records and prove it up.  I thought it

23   was great, but if I don't want to show it, then I'll dismiss

24   it, and we'll just deal with a little mail fraud charge.  So

25   that's a tell to me that we are on the right track.
```

**Closing Argument / Johnson**

```
 1              The other thing is no banker showed up.  Come on, we
 2    got a cowgirl coming from Montana that doesn't know the
 3    difference between a maker and a holder; this is a lady
 4    explaining to you, on the other side of a desk, what your
 5    mortgage contracts mean.
 6              These are not the people that come in and actually
 7    represent what is going on in the operations of a bank.  They
 8    may understand the business of a bank, but they don't know
 9    anything about the operations of a bank.
10              The other thing that appears to me as a tell is what
11    I call a magical illusion.  It's the hocus-pocus.  Over here,
12    we were picking on the Dorean Group and the two defendants.
13    Look what they did; look what they did. But, over here is where
14    all the action is happening.  We are talking about the
15    liability side of the ledger.  And, we did the "T" ledgers for
16    you, and we had some bankers talk about.  Over here, bad, bad,
17    bad, but nobody's talking about the asset side.
18              Over here, they are calling it vapor money, well,
19    the vapor money's over here.
20              THE COURT REPORTER:  I'm not getting this; you have
21    to slow down.
22              DEFENDANT JOHNSON:  Okay.  An hour goes fast.
23              So, over here they're talking about vapor, we think
24    it's vapor money.  I've never said that.  But, over here, they
25    are pretending it's vapor money because nobody wants to talk
```

1    about it.  And that's a tell to me.

2           Another thing is, there is no CPA.  They didn't

3    bring a CPA in here to debunk our CPA report.  They didn't

4    bring a CPA in here for me to -- as a qualified expert -- for

5    me to examine.  They didn't bring a contract specialist.  They

6    didn't bring their bond specialist.

7           And, instead of trying to ask questions that really

8    get to the truth, they come up with vapor theories, like

9    revenge.  You know, as a Christian man, revenge is a very

10   unique concept.  You have to love your enemy.  They don't know

11   who we are.  They don't know what we think.  They have to come

12   up with vapor theories, because they didn't bring any evidence

13   that we had any intent.  What they wanted to do is go on a

14   cut-and-paste investigation and presume facts that just weren't

15   there.

16          If you go to the opening arguments, and let me do

17   that -- now, here is the beginning of the case, the opening

18   arguments, I just want to read a paragraph to you.  This is a

19   tell to me because to me it's a misstatement, and it's not

20   really -- I think it's intended to deceive.

21          It starts out:  "Now, to get paying clients, they

22   would advertise.  And, one of these clients that they got over

23   the Internet, a particularly sad story.  Her name is

24   Sara Magoon.  Ms. Magoon had been involved in a terrible car

25   accident, and, in fact, she was pregnant at the time and it

1   caused her child to be born three months premature.  Now

2   fortunately, Ms. Magoon and her child are both fine today, but

3   at the time, her child had to spend three months in the

4   hospital before she could come home.

5            *DEFENDANT HEINEMAN:*  Pull it down.  There you go.

6                      **(Adjusting screen.)**

7            *DEFENDANT JOHNSON:*  And the Magoons didn't have

8   health insurance, so, as you can imagine, the bills were

9   staggering.  And Ms. Magoon and her husband, they couldn't pay

10  the bills and pay their mortgage, and she thought she was going

11  to lose her home.

12           So she posted an e-mail blog, a message onboard the

13  Internet and for mortgage elimination.  And, she said, I think

14  I'm going to lose my house, can someone out there help me?

15           "She got a response from the Dorean Group, and they

16  said pay us $3000, we can make all your worries go away.  We

17  can eliminate your loan.  It's proven.  We've proven it.  We

18  have done it before.  In fact, Mr. Ayem *(phonetic)* has said he

19  had done it on his own house.  It worked well" -- oh, and

20  excuse me -- "and that it worked" --

21           *DEFENDANT HEINEMAN:*  Push it up.

22                      **(Adjusting screen.)**

23           *DEFENDANT JOHNSON:*  "Well, Ms. Magoon thought that

24  this sounded like a great idea.  She was convinced by the

25  defendants, that she signed up and told her aunt and uncle,

1    Peggy and Tim McKay."

2           Now, what they didn't bring is any evidence that

3    Sara paid us anything.  She was a charity case; we did her for

4    free.  They didn't bring that out.

5           The other thing is, that is -- that is the one that

6    they want to give you a sad story about; well, our response is

7    we got to keep her in her house for two years.  We worked for

8    free.  And that was our response to that sad crisis.  Their

9    response to the compassion was let's indict her for 68 counts.

10   This is the kind of misleading stuff that shows me that we have

11   some tells going on.

12          Another tell for me is half the mortgage companies

13   that were in this indictment have gone out of business.  It

14   must be because of their honest behavior.

15          **MS. MARTIN:**  Objection, Your Honor.

16          Improper, and misstates testimony.

17          **DEFENDANT JOHNSON:**  Nobody wants to talk to us --

18          **THE COURT:**  The objection is overruled.  And, it

19   will be for the jury to decide whether the record shows that

20   half of the mortgage companies are out of business or what the

21   significance of that might be.

22          Please go ahead.

23          **DEFENDANT JOHNSON:**  Nobody wants to talk to us yet,

24   and yet everybody knows what we think.  We've been told for

25   three-and-a-half years what we think.  We have been told the

 1    things that we know are not true.  We haven't been -- we

 2    haven't been -- we haven't had any evidence to display that we

 3    are incorrect, we have just been told.

 4              Well, in Wonderland that works out.  When you've got

 5    a Mad Hatter and talking teacups, that kind of rhetoric is all

 6    you get.  But, I don't live in Wonderland.  There is some

 7    reality I brought to this mix, and my opinion is not based on

 8    what happens in this room.

 9              Another thing is, you are not going to get an

10    instruction on money.  You are not going to get a jury

11    instruction that tells you what money is.  It's going to be

12    left to your imagination.  We are going to deal a little bit in

13    Wonderland when it comes to money, and that's another tell for

14    me.

15              Now, you have a scientific background, okay, and if

16    you had done an investigation on any of your species where it

17    was a can cut-and-paste plagiarization of somebody else's work,

18    you would be fired.  But, the FBI can just take a cut-and-paste

19    and create a complete investigation to the point where they are

20    seizing our money and really doing their very best to put us

21    out of business with no investigation.

22              There is not a snapshot of this flower shop which

23    they have made big hey about.  And, it's not that big a deal.

24    It was on public notice that it happens to be the director's

25    wife's flower shop.  Who cares?  That is a care of address,

Closing Argument / Johnson

1    that is where it goes to.

2           They want make you -- they want to create a pretend

3    environment again, where I'm the one creating the letter of

4    credit and we are creating bonds.  And, they have to have this

5    fictional bank in order to sustain the illusion.  Our

6    historian, okay?  You are in Washington, D.C. studying the

7    constitution, okay?  One of the things -- you are going to get

8    a jury instruction I'll highlight here for you, but -- and I'll

9    give you some comment.  It says, "Putting one's home in a

10   family trust creates no greater right in the trustee than were

11   available to the homeowner."

12          And my response, you know, is no shit, Sherlock.  I

13   mean, that is very true.  But, let's take the constitution,

14   okay, which says that we are going to grant powers, like a

15   trust, to the Government.  First, we are going to grant it to

16   the state and grant it to the central Government called the

17   Federal Government in Washington, D.C.

18          If the Government can't have the powers that you

19   don't have to grant, okay, nowhere have you ever in your own

20   imagination believed that you could create money or counterfeit

21   money or that you could take somebody's assets or wealth

22   without just compensation.  You never had those powers.  You

23   can't grant them to the Government and, they can't assign them

24   through a Federal Reserve Act to some private bank.  It doesn't

25   exist.

1           And, there is an axiom that, I think, explains it.

2    It says, "What one cannot do as the crow flies, he may not do

3    as the fox runs."  Okay?

4           So we came -- our criminal intent, if you want to

5    put it that way, is we have studied banking, we've studied the

6    theories, we have talked to experts.  We do go out and find

7    Dr. Bates.  We do go out and find the Walker Todds.  We do have

8    CPAs.  We do read books.  We did have a law library.  Yeah, we

9    did research.  I'm not smarter than anybody else, but I'm not

10   stupid, and I'll do some work.

11          In that investigation, we came up with what we

12   believe is factual, and I haven't seen anything in this trial

13   to change my mind, is that the banks are hiding and they are

14   not disclosing the fact of how the transaction is really done.

15   And, if you look at the powers granted them through the

16   Government, they can't possibly have the powers that they are

17   pretending that they have.

18          And, I'm not sitting over here saying that the

19   Federal Reserve system is bad.  I'm not saying -- in fact, we

20   took advantage of the Federal Reserve system; we went and did

21   financing with the Peggy McKays and the refinances.  We're not

22   doing it from criminal intent; we understand, quite frankly,

23   that the transaction is very clear.  It's not hocus pocus.

24          You have one side of the ledger called an asset;

25   what happens to that?  You don't even know.  You can't even

1    find out because they won't bring evidence in here.  They

2    didn't a bring a banker in here for me to talk about.  They

3    didn't bring a CPA in here for me to talk about.

4            They didn't bring anybody who will talk about that

5    because they want to bring a cowgirl, or, worse yet, they want

6    to bring a vice president who is smart enough to shred the

7    promissory note, the original promissory note.  He is 23 years

8    in banking and he is a vice president, and he thinks he can

9    shred his interest.

10           Now, I promised you a gold watch in that original

11   thing, and that gold watch I've delivered to you.  You have

12   learned in this trial that banking is not what you thought.

13   You came in here, probably most of you, believing that your

14   deposits were used to fund loans, yet every one of you in your

15   whole experience will never find one time in your whole career

16   where your checking account or savings account was ever

17   deducted by the amount of money taken out of there and loaned

18   to somebody else.

19           Money can't be in two places at one time.  The money

20   you have in your pocket is not in my pocket.  As soon as you

21   take it out and put it in my pocket, it's not in your pocket

22   anymore.

23           Money can't be in two places at one time.  If it's

24   on the asset side of the ledger and there is a corresponding

25   liability, which was testified to as the matching principle,

**Closing Argument / Johnson**

 1    that is not your money, it's not the depositor's money.  If it
 2    didn't come out of your account and it's on the asset side of
 3    the ledger, where did it come from?  It's very simple, it came
 4    from the promissory note.
 5            Now, I understand that everybody thinks you need to
 6    pay a loan back.  I absolutely concur with that.  It's logical.
 7    My dad taught me that way.  Your dad taught you that way.  It's
 8    a family trait.  As Americans, we are kind of an honest people.
 9    That is the way we understand it.  So I say, let's not go where
10    the crow -- if I can't go where the crow flies, let's not go
11    where the fox runs.
12            If I have to pay back my loans, how come they don't
13    have to pay back their loans?  But they did pay it.  They wrote
14    a check, a draft, a wire, it doesn't matter.  The corresponding
15    liability matched the asset.  It's quid pro quo.  It's an even
16    transaction.  We didn't create a creditor/debtor relationship.
17            Now, if I go and file a deed of trust and I go and
18    file a record, I'm misstating the facts.  I'm misstating on the
19    public record that there is a transaction that happened that
20    didn't happen.  This was our belief.  This is what we
21    understood.  We bet our lives on it.
22            And we built a business.  Yeah, it was a fancy
23    business, if you want to say so, 6000 square feet.  We had a
24    staff.  We did all the things that everybody does in business.
25    It was a place that anybody would work because it was a

 1   business.

 2            And when that business started to be successful,

 3   even -- even the prosecution will say, when that business

 4   started to be successful, again, I know we were successful

 5   because of the amount of energy that attacked us, okay?  When

 6   we started to be successful, when we started to make a point

 7   with the banks, we said we are not going to just be bullied, we

 8   are going to expect you to come to the table with honesty, fair

 9   dealing, full disclosure.

10            This is the Uniform Commercial Code in its simplest

11   form.  Forget all the complex gobbledygook of the Uniform

12   Commercial Code.  Be fair, let's have a level playing field,

13   and come to the table with honesty.  Let's trade, let's bargain

14   fair, this is what you do in business.  I used to be in the

15   chip business; I understand, you can't go and just rip people

16   off and have a business very long.

17            So our business was set up as a business.  Was it to

18   show off so we can forward a con?  Come on, we kept the doors

19   locked.  We didn't want the clients.  If you have heard

20   anything in the testimony, we had a separate relationship, we

21   wanted brokers out there so we could do the work.  You have

22   plenty of evidence we did the work.

23            Now, did we get to keep all our promises?  Were

24   there breaches?  Were there problems?  Absolutely.  But, throw

25   a thousand-pound gorilla on your back called the Federal

**Closing Argument / Johnson**

```
 1   Government on a cut-and-paste investigation from the Internet,

 2   and see if it doesn't slow down your business.

 3          Now, they want to tell me that I don't respect the

 4   judges and the juries, well, I'll tell you what, I don't

 5   represent any man that will sell himself for money, I don't.  I

 6   don't care whether he puts a robe on or not.  But, they didn't

 7   prove that.

 8          And, the other thing is, litigation and law is not

 9   about everybody agreeing.  Our whole legal process is about

10   disagreement.  Nobody has got anything established.  That is

11   the purpose of what the Courts are for.  I testified that MERS,

12   which is Mortgage Electronic Registration Systems, in Florida

13   was kicked out of court, finally, 28 or so cases where they

14   were a nominee, and they provide foreclosure services for

15   lenders.  They were kicked out because they didn't have any

16   standing.

17          Now, they are in, like, 25 or 30 different states;

18   do you think it stopped them from filing foreclosure actions in

19   the other 29 states?  No.  They are just going to appeal this

20   guy, and they are not going to do foreclosures in Florida

21   anyhow.

22          Was that a stop sign?  Did they run the stop sign?

23   That is -- you know, I don't have stop signs that he is calling

24   stop signs.  What I got is baseball bats and thuggery coming

25   after me saying you can't do this.  And, I'm not going to tell
```

**Closing Argument / Johnson**

1   you why, but I want to get this across to you.  I got a

2   baseball bat; I don't have to tell you why.  I'm just going to

3   hit you until it hurts.  This is the kind of responses that we

4   were getting.

5           Now, what I found kind of disingenuous about the

6   prosecution was that they had this misleading statements.

7   First, our desperate client is Sara Jane Magoon.  They really

8   cared about her.  We spent more than half of this trial talking

9   about us being attorneys.  They gave you the impression that we

10  are running around saying we are attorneys, so much so that we

11  finally had to clarify it, what is an attorney-of-fact *(sic)*

12  and how that's different at law.

13          *THE COURT REPORTER:*  Excuse me.  You've got to slow

14  down.  Thank you.

15          *DEFENDANT JOHNSON:*  They don't know what -- the

16  legal differences and definitions?  They had the Black's Law

17  book, the Black's Law dictionary.  They are the ones bringing

18  that out.  But, they want to give you the impression we are out

19  there lying.  The -- if I had said I was an attorney anywhere,

20  you don't think, in an investigation -- this is the FBI, this

21  is the United States Government, you think they are going to

22  run out of money?  I don't care how much they are spending in

23  Iraq, if they want to know something, they can do it.

24          If this was a $100 drug bust in a Target parking

25  lot, there would be ten thousand documents created on who came

1    by, what their DMV records were, who they talked to, what was

2    recorded, the log of who was watching.  None of this -- you

3    didn't get nothing like that.  You didn't even get a picture of

4    the flower shop, no, because they want to create the situation

5    where they want you to think that we are saying things that we

6    are not saying.

7              If they had any tapes or anything where I was saying

8    I was an attorney, wouldn't they bring that up to rebut?  But,

9    no, they are going to spend half the trial just playing on the

10   confusion between attorney and attorney-in-fact.

11             They talk about our contract, again, disingenuously

12   as gobbledygook.  They read it off to you.  We think it's very

13   straightforward.  Yes, I can talk the big words.  Yes, I can

14   write the big words.  I didn't write big words in there.  I

15   wanted it to be as clear as possible, full disclosure.  And,

16   understanding is the best thing I can offer of you when I have

17   a conflict with you.

18             But, as they say, on one hand, that they have -- we

19   have indiscernible gobbledygook contracts, they bring in their

20   witnesses, and here comes Matthew Johnson from the OCC, he read

21   the contract in an hour.  He already knows what it means.  It's

22   an uninterpretable gobbledygook and -- on one hand, and an hour

23   later, it's easily understood.  And yet, if you look at his

24   testimony -- I'll read this to you.

25             The question is:  "And did you gather from that that

 1   one of underlying theories, or perhaps the underlying theory of

 2   the challenge to the bank, that is, in the presentment, is

 3   their loan was a fraud, their mortgage was a -- their loan was

 4   a fraud, the mortgage loan was a fraud, that, really, they

 5   didn't give them any money, that, really, all the loan was was

 6   nothing to consumer and an ability, and the ability by the bank

 7   to gain ten times more money than they did -- than they said

 8   they were learning" -- "loaning," excuse me.

 9               The answer was:  "Correct.

10               "That is the type of things that was in the package,

11   correct?  Ladies and gentlemen, that is not even in our

12   package.  That is a yes-man.  That is a guy who will say

13   whatever the Government wants him to say.  Why do we have

14   yes-men in here?  Why can't we get to the facts?  Why can't we

15   get to the truth?  But, he was able to even figure that out

16   within an hour.

17               They wanted to give you the impression that this

18   bond was worthless.  First, they wanted to misrepresent and

19   mis-state that it was a payment and that it was a negotiable

20   instrument, things that we never said.  But, they wanted to

21   give you the impression that it had no value.  Part of that

22   impression is that this bank in Switzerland doesn't exist.

23   Part of that impression is that we created this in our office.

24   Well, yeah, we created it; doesn't mean that the obligations

25   and the origin and the contracts behind it are irrelevant.

 1   It's a document.  You guys create documents for your business

 2   every day.

 3            They wanted to make a big deal about it being

 4   stamped with a Paymaster machine, and that it has a registered

 5   number, which was 21510A, as in Anthony, 9, that we have a gold

 6   seal that is embossed, and it's notarized.  All those things

 7   were alluded to as bad things.  A notary just represents who

 8   the signature is.  It's on all legal documents.  Doesn't make

 9   any credibility of this bond, it's just part of business.

10            But, if I don't want anybody to counterfeit this

11   document, if I want it to be as credible as possible and not

12   be, like I say, counterfeited, I'm going to put a registered

13   number in there.  Where is that registered number?  That

14   registered number is only assigned to us and that Paymaster

15   machine, it can't be duplicated.  I mean, sure a counterfeiter

16   can do whatever they want to do.

17            **MS. MARTIN:**  Objection.

18            This is outside the testimony.

19            **THE COURT:**  Sustained.  That part is outside the

20   evidentiary record.

21            Go ahead, Mr. Johnson.

22            **DEFENDANT JOHNSON:**  Okay.

23            The Paymaster machine embosses it so that it can't

24   be -- hopefully, it can be resistant to counterfeiting.

25            The seal is embossed for the purposes of the same

**Closing Argument / Johnson**

1    thing, trying to make it not counterfeitable and make it

2    authentic so that people have a reliable document to rely upon.

3            The paper itself, it's hard to copy.  It -- it's,

4    you know, colorful, artful, whatever you want to do, it's hard

5    to copy.  The purpose is to make it resistant to

6    counterfeiting.  You can't stop a good counterfeiter, but these

7    are measures that we can take at our office to make sure the

8    bond doesn't get counterfeited.

9            Now, there is the letter of credit.  Our

10   sophisticated FBI investigator, who testified that he seized

11   this from the office, and we have discovered that that wasn't

12   the case, that this was supplied by us on -- in a response to

13   the FBI raid, when I came to the office, on the desk that I was

14   sitting on, as I said, in the desk I was sitting on in the

15   commercial, right behind there was two two-drawer file

16   cabinets.  In the bottom left drawer was probably 50 or 60

17   files, one which included the letter of credit, the original

18   letter of credit, which this is a certified copy of.  All the

19   other 50 files were taken out except for one purple file with

20   this original letter of credit.

21           Now, Mr. Ernst testified that that line right there

22   is a string, that's a copy.  That could be a pencil line.  That

23   could be a string; it could be a wire.  How would he know it

24   unless he saw the original?  And, if he saw original, why

25   didn't he take it?  Why is everybody trying to hide the fact

 1   that there is a legitimate letter of credit behind this?  We

 2   try to hide it, we filed it in the court.  We filed it with the

 3   Court around February 7th.  And, I had to certify the copy,

 4   which is my certification right there.

 5          We don't have anything to hide.  This is our

 6   evidence.  You know what the Government's response to that?

 7   They want to know the truth.  They want you to know the truth.

 8   They struck it from the evidence.  You know, I had to put it in

 9   again as amicus curiae just so they wouldn't destroy it.  This

10   is the kind of evidence that I believe is relevant.  We are not

11   out there creating a con, we are trying to say prove up, show

12   that you have a legitimate interest.

13          Now, Mr. LeCompte came in, and this was his

14   testimony regarding his understanding of the bond:  "I believe

15   it was referred to as a show of good faith, that we are coming

16   to you with something to lose if we are wrong, you know, like,

17   we are so confident that we are correct, we are willing to

18   insure ourselves against harm to you."

19          Is that what he put on his web page?  No.  But that

20   was his understanding.  And, where did he get it from us, the

21   principals?  That is what we said.  That is what we said our

22   document was for.

23          Now, if Mr. LeCompte puts it on his web page and I

24   discover it, I'm going to have him take it off.  But, if I

25   don't discover it, I have an opportunity in the public to

1    disclaim it when the opportunity comes up.

2            So, I am on a conference call with his clients; does

3    the bond come up?  Does it -- do I disclaim it or I say what it

4    is?  That is when the opportunity comes up for me to disclaim

5    any false statements.

6            If I agreed with his website instead of that

7    statement, do you think you would have found the recording here

8    today?  You think they would have used it to rebut my testimony

9    as to what I said about this bond?  That is what we said.  He

10   understood it, and we have never changed our tune.  There is no

11   rebuttable evidence of what we say because we haven't changed

12   our tune.

13           Now, they had an expert witness from the OCC, a

14   fraud guy named Matthew Johnson, and what I liked about him is,

15   he came in and he talked about traditional or standard things

16   that are fraud in the industry.  And I -- rather than go over

17   all these, I would rather, you know, if you want to go over his

18   testimony, it's in the 5- to 600-- mostly, the late 5- and

19   600-range of pages.

20           But, to my recollection, he says the first thing you

21   can tell about a hallmark of fraud is upfront fee.  Did we take

22   an upfront fee?  If you want to call it that.  We took a fee

23   the barely covered our cost.  We got a thousand dollars.

24           You know that I had a cost for the irrevocable

25   letter of credit, okay?  I said it was 2 to 3 percent, and I'll

## Closing Argument / Johnson

1  explain that to you.  It was 3 percent for the $20 million one

2  that one that started, and it was 2 percent for the

3  $150 million one.  I got a better deal as I got a higher

4  expense.  But, that is an expense to me.

5        If you want to do the math, it's $600,000 for the

6  $20 million letter of credit, and it's $3 million for the

7  $150 million letter of credit, which is what we ended up with.

8  It was a progression in our business of increasing the letters

9  of credit to increase the liability to match the liability that

10  was increasing by the size of our business.

11        The thing he said, some more in that upfront fees, I

12  had a royalty to pay to Universal Trust Services to Chuck

13  Gibson, okay?  That is included.  We paid for the fees to do

14  all the recording.  We are not going back to the clients and

15  ask for money.

16        We had a staff.  It's proven; we have had a big

17  staff.  We had big buildings; we had big expenses.  We didn't

18  use that for trips around the world and entertaining ourselves.

19  We worked, and we used the money to work, okay?  If you want to

20  call that forwarding a scheme, I say we were doing business.

21        And, that is what you are going to have to ferret

22  out, because I invested in a business for the purpose of

23  business.  And, I invested in what I believed to be absolutely

24  true.  And, quite frankly, the opinions of this Court aren't

25  going to change it.  I've done the homework.  I'm not trapped

1    in Wonderland.  My reality, I know how banking works.  I've

2    been to Russia doing banking.  I know how banking works.  I am

3    not your average idiot.  I -- I've been around the block.  So

4    does it make me smarter than anybody else?  No.  I'm a seventh

5    grader with a genius-level IQ, and I do the work.

6            The other thing that came up is that we take -- the

7    second hallmark of fraud is desperate clients.  Now we see how

8    I responded to the desperation of Sara Jane Magoon.  It was a

9    charity case, I'll help you.  I kept her in her house two

10   years.  We worked; we didn't charge her anything.  She

11   eventually worked and became an agent.  And she was a good

12   agent as far as representing.  She believed in our process.

13   But, that is one of the ones that had they use.

14           Now, the Francis Kenny and the other 14 or 15 that

15   we brought to the Court, not as a display of our process, but

16   we brought to slow down the foreclosures so that we could do

17   things in our process outside of the Court and we could use the

18   power of the Court to get the discovery to assist us in our

19   process, those clients were in foreclosure when they came to

20   us.  Most of them came out of our relationship with Mortgage

21   Alternative.  They were desperate, but we -- and they had

22   already paid money to Mortgage Alternatives.

23           We didn't change our price.  We didn't take

24   advantage of their desperation.  And we spent way more money on

25   each one of those clients than we ever got from them.  They

1   were all a losing proposition, okay?

2          It was compassion.  I wanted to see if we could do

3   something.  We were working hard.  We were trying to do things.

4   We brought in a complete legal staff, including Speilbauer, not

5   to support our process, to support our clients.  We wanted to

6   slow down the bank's bad behavior, and we wanted to do it and

7   help them the best we could.  We thought if we defer the cost

8   over a large group and we attack in such a way not to get a

9   settlement out of the banks, which is what has been alluded by

10  this Court, I want to get the information from the banks.  Just

11  give me the books and records.

12         You know, there is a thousand court cases where the

13  books and records are brought in to validate a bank's standing

14  and the benefits and everything retained, you won't find it in

15  this case.  That is all I want to see.  I want to talk to the

16  guy who understands it materially from for the bank, so that we

17  can deal with it.  So those were a couple of things in the

18  hallmarks of fraud.

19         But, when it all came down to it, the next one was,

20  I believe, the -- there is a lot of -- there is a lot of

21  promises, there is a lot of information upfront, but then it

22  starts to dissipate.  How did our information dissipate?  We

23  started with the information.  We continued to perfect our

24  process.  We gave the clients access to the Internet.  We

25  created educational DVDs.  We are trying to develop television

1    commercials.  We are speaking on the radio, on television.  We

2    are speaking on their conference calls.  How are we dissipating

3    our information?  We are not even changing our story.  If we

4    are changing our story, they would have that evidence here for

5    you today.

6              Then the last thing he really brought it down to is

7    greed.  If I have the desperate clients and I had the success

8    of my business and, certainly, there was plenty of people who

9    believed that, why don't I raise my price?  Why don't I pack up

10   and go to Latvia with all the cash?  Why do I sit around and

11   continue to do business and not raise my price?  Why do I take

12   advantage of desperation?

13             I will tell you what, you think my cost didn't

14   increase when this Government started attacking me?  They are

15   scaring my employees.  They are running my lawyers off.  They

16   adding to my litigation costs.  They are creating confidence

17   all across the country with every little Joe Blow attorney who

18   is going to slap his name onto a mortgage situation.  He is not

19   going to bring the books and records.  He is not going to prove

20   their standing.  He is going to get a judgment, and he's going

21   to get it by default because they are going to throw us in

22   jail, and we can't even continue to do our business.

23             For two years they can't foreclose on Scott's house

24   because they are too embarrassed because they are not telling

25   the truth.  Try and bring that to a court.  But you get Scott

**Closing Argument / Johnson**

 1    out of the picture, you take him to jail oh, no problem.  You

 2    think Lori was going to defend the house?  She doesn't even

 3    understand anything.  So, this is the kind of stuff they do to

 4    us; they create the damages, and then they turn around and

 5    blame it on us.

 6              We were working very, very hard doing a diligent

 7    effort, and all of a sudden, slam, a cut-and-paste

 8    investigation from the Internet displays through Mr. Hovis to

 9    Judge Alsup to the FBI, and voilà.  And, it's all the way come

10    down to three-and-a-half, four years later, we are standing

11    here right in front of you, and we haven't gotten the question

12    answered yet, show me the money.  Show me where you got the

13    money because if my client, what he called the co-conspirator,

14    or the alleged borrower, if he is the funding source for your

15    check, you did not create a loan.  Now you are not disclosing,

16    you are the one committing fraud upon the record, and you're

17    not coming here to prove your case.

18              We are -- he is high school, I'm seventh grade, we

19    are nobody, and you won't even come here -- you have these

20    fancy letters from lawyers saying I don't have to listen to

21    you, it's gobbledygook.  We are not going to answer your

22    questions.  I'm going to stand on my rights.  Okay, here we

23    are.  We are standing.  We are standing in our jail clothes.

24    We are standing right here.  That little seat right there, any

25    of them could have showed up, and they could have come and

**Closing Argument / Johnson**

1    said, okay, here is the books and records, you guys are so

2    mistaken, and we would have thrown up the white flag and said,

3    wow, we were really mistaken.  But we don't have to do that,

4    because I know why they won't do it.

5              These books here are written by a CPA, okay?  These

6    are some of the things we relied on.  We don't agree with

7    everything he says in this book, but I can tell you one thing,

8    he is right about the banking.  Now, he didn't get disbarred.

9    He didn't lose his license.

10             *MS. MARTIN:*  Objection.

11             *DEFENDANT JOHNSON:*  He didn't back up our process.

12             *MS. MARTIN:*  Misstates any --

13             *THE COURT:*  We don't know whether he lost his

14   license or not, that is not part of evidentiary record.

15             Sustained.

16             *DEFENDANT JOHNSON:*  It says on his books that he

17   trained CPAs, and he did it for quite some time.  There has to

18   be some CPAs out there that the Government could bring who are

19   willing to say you guys are knuckleheads.  You guys are full of

20   crap.

21             The accounting makes it very clear, economically,

22   that we are in Wonderland.  Everybody is going to pretend that

23   half the ledgers tells the whole truth, and that is something

24   that makes me think that we are right.

25             In the end -- how much time do I have left?

1          **DEFENDANT HEINEMAN:**  Fifteen.

2          **THE COURT:**  You have about 15 minutes.

3          **DEFENDANT JOHNSON:**  This is actually the longest

4     argument I've had in my whole life; to stretch it out much

5     further, I don't know that I have to do that.

6          Scott and I are not smarter than anybody else, but

7     we are not ignorant.  We are intelligent enough to invest our

8     energy and study.  We have also come to the conclusion, to the

9     point where we would invest our time, our life and our energy

10    on something we really believe true.  Do I have a criminal

11    background?  Absolutely I do, okay?  I was involved in a

12    business with my father that turned out to be a violation of

13    securities statutes in the State of California.  It started as

14    a Federal case that they dropped for mail fraud, believe it or

15    not.

16         **MS. MARTIN:**  Objection.

17         **THE COURT:**  Sustained.  None of this is -- at least

18    some of this is not in the record.

19         **DEFENDANT JOHNSON:**  Okay.

20         So, anyway, these -- the case revolved around a

21    promissory note, this case revolves around a promissory note.

22    I found what I learned, not from a revenge point of view, who

23    would I get revenge on?  I wasn't involved with bankers at that

24    time.  I didn't have an issue with the bankers, okay?  And the

25    State of California is not my revenge on the Federal

 1   Government, or anything else.  It's a nice theory.  It's a

 2   vapor theory.  It makes for good filler when you don't have the

 3   bricks to build the substance, but I fully disclosed that to

 4   all the potential clients.  I didn't hide that.

 5        We haven't hid anything.  You don't have any

 6   rebuttable evidence that we are out there hiding things.  We

 7   believe in what we did.  We have acted accordingly in our

 8   beliefs.  We documented it accordingly to our beliefs.  And we

 9   believe, like any good poker player, that we have the winning

10   hand, and that they are going to do all they can to bluff us

11   out of it.

12        So, let me end -- well, I'll say another thing, too.

13   They give you the impression that we tricked Julia, that we are

14   deceptive, and, really, that whole Gavin Christianson thing,

15   why it's in this case I have no idea because it's a completely

16   set of different set of facts.

17        The landlord and us had a dispute. It's not over

18   money; it's over principles.  And, he is as much a part of the

19   dispute as we are.  We didn't want to go there.  I think, quite

20   frankly, that he had an advantage and benefit to conspire with

21   the FBI.  I think it was part of putting us out of business.

22   It was effective.  It was damaging.  It was very tough on our

23   business to be evicted.

24        Why did we not get served the eviction notice?  I

25   get a three-day notice to get out of the building, that is the

**Closing Argument / Johnson**

1    first time I even know of an eviction, of what they call an

2    unlawful detainer action.  I go into the court, and I don't

3    know if there has been ex parte communication with this judge

4    and the FBI, or anybody else, but he says too late, so sad, you

5    can't do anything about it.

6            I put a $25,000 trust account with a lawyer.  At

7    that time now we only owe about $11,000 worth of rent, so it's

8    more than twice what we owe him because we have February and

9    March, I file with the Court and say give me an opportunity to

10   be heard.  I'm not damaging this guy.  There is no risk to him.

11   Let me talk.  And, you know, basically piss off.  And then, we

12   get these actions.  Why is everybody trying to put us out of

13   business?  I think because we are right.

14           You guys are smart enough your in your deductive

15   reasoning to know that the Government is not always on the side

16   of people.  The Government has lobbies and money that it

17   participates in.  And, we are up against it, no doubt about it,

18   two little guys, but we don't quit.  We do believe we are

19   whistleblowers.  We do believe this will change.  And, there is

20   a lot bigger picture here than just mortgages because it's

21   reflective of the whole system.

22           So, I can appreciate them wanting to defend it, but

23   I don't believe that any rights were granted to this Government

24   that did not already come with the people.  And, you don't have

25   the right to be a con man anymore than I have the right to be a

 1   con man.  And, you can't legislate that right or grant the

 2   right to a Government so that they can legislate it into

 3   existence for somebody else.

 4          You can't take my asset, keep it to yourself, and

 5   pretend that it's yours.  You can do it if you want to give me

 6   just compensation.  Where is the bill of sale?  Where is the

 7   sale transaction?  Did I gift it to you?  Where is the

 8   understanding, knowledgeable informed consent, where did it

 9   come from?  If I'm not disclosing how this transaction works,

10   you are not going to give me informed consent.

11          These are the problems we attempted to address, and

12   we thought we did a very good job at it.  And I agree with the

13   prosecution, we were successful until, until the bankers

14   decided to bring out their big bat and beat us up.  But, here

15   we are; we are still standing.  And, I hope you give us the

16   opportunity to keep standing.

17          Now, the impression is we are trying to trick our

18   landlord and we are trying to trick Julia Panibratiouk, and

19   that she is a Russian immigrant and doesn't understand

20   anything, but the truth of matter is, we had a good

21   relationship with Julia.  Her signing of that document was

22   completely irrelevant to her understanding it.  She understood

23   that she was doing us a service.

24          The contract between -- and, again, this goes back

25   to origin and substance -- the contract between Gavin and

1    ourselves was based on if he is going to keep the damages, if
2    he says it's okay for me to reach in your pocket and pull out
3    the damages when he is not at risk of anything and we have
4    showed good faith, then these are the terms and conditions I'm
5    willing to accept that type of behavior.
6           One of those terms and conditions was that Julia
7    could sign or anybody could sign as our agents, as agents for
8    Gavin Christianson.  Why do we do that?  Did we do it to
9    deceive?  No.  Let me tell you what's going on.  Just about
10   with -- with Judge Alsup's order and all the Internet and
11   everything and the county recorder's talking all over the
12   place, the county recorder up in Alameda, I think it's in
13   Oakland, you go there, they know us on a first-name basis.
14   Anything that we have in our name they are going to scrutinize,
15   and they are going to, a lot of times, deny it being recorded.
16          Now, you get the impression from them that I'm
17   hiding because I have Julia.  Julia goes and gets the
18   information necessary, I'm the one who goes and files it and
19   write a $9600 check and pays the tax the next day.  So what are
20   we hiding?
21          And then, when I file it, you know what happens?
22   The very top guy comes out, talks to me, wants to scrutinize
23   the documents, get up and calls, I don't know if he calls the
24   FBI, I don't know if he calls whatever, but he calls somebody
25   on the phone and --

1          **MS. MARTIN:**  Objection.  Outside --

2          **THE COURT:**  I believe that this part is outside the

3    scope of the actual trial evidence.

4          **DEFENDANT JOHNSON:**  Okay.

5          And with that, Scott and I, you can see we had an

6    agreement.  You can see the we mailed documents, it's not going

7    to be a dispute.  What I don't think you'll find is that we had

8    a criminal agreement.  I think you'll find we had a

9    whistleblower good-faith belief that we validated with lawyers,

10   we validated with CPAs, we validated with bankers, and we did

11   validate with our research.  And, we went out and did something

12   to make a difference.

13         At this point, I would say we are buddies, we are

14   friends, and we are equals, but here is the thing, and I want

15   to bring back to you the very beginning of our first

16   conversation:  This little fiction Wonderland is not going to

17   change my understanding of banking.  I promised you a gold

18   watch, and you guys have discovered more about banking than a

19   vice president in 23 years who thinks he can shred his

20   interest -- and it's going to change your life because you are

21   going to go out and do some homework, and you will find out

22   there is a lot more truth here that you can even imagine.

23         Why did I want you to enter a guilty verdict for us?

24   I didn't want to do this trial.  I thought this trial was a

25   farce.  I thought this trial was --

 1            **MS. MARTIN:**  Objection, Your Honor.

 2            **THE COURT:**  Mr. Johnson, this is not a proper

 3     argument.

 4            **DEFENDANT JOHNSON:**  Okay.

 5            I'll get to, then -- here is the thing, I don't want

 6     to prove how banking works in this court, I could care less.  I

 7     want to prove it on this Court.  And in order to do that, if

 8     this trial, if -- and I know that you guys are conscientious, I

 9     watched you take your notes.  And I know that you are sincere,

10     and I really appreciate that.  And I don't want to tamper with

11     that in any way, you guys do what you have to do.

12            But even if you should find that we are innocent of

13     these charges and that we were sincere about our business and

14     we didn't have the criminal intent and that is what you come up

15     to, separate Scott and I here now, and I say for me, please,

16     enter a guilty verdict.  Because I want to prove on this Court

17     how banking works.  I don't want to prove it in this court, I

18     know how the banking works in this Court.

19            And so, that is what I'm willing to do, not as a

20     martyr, but as a champion.  I want to prove to the American

21     people that I am not full of crap, that I know what is going

22     on.  And there is a lot of energy to stop to truth from getting

23     out.  And I just want to have the opportunity to be the

24     champion.

25            That is why I told you that; I didn't want to have

1    this trial.  It doesn't mean that the trial is irrelevant; it

2    doesn't mean that the trial wasn't important; it doesn't mean

3    that it's supposed to happen in history.  I thank God that it

4    did happen, okay?  But for me, I want the truth, and I'll do it

5    at any expense.

6              And that is my closing.  Thank you.

7              **THE COURT:**  Thank you, Mr. Johnson.

8              I want to say to the jury that it's the Government's

9    responsibility to prove guilt.  And even despite what

10   Mr. Johnson said, they are at the end -- you cannot find

11   Mr. Johnson guilty of anything unless the Government has proven

12   it or the trial evidence as a whole has proven it.  And so it

13   would be your responsibility to sort that out when you get into

14   deliberations.

15             We still have an hour and 10 minutes to go of the

16   Government's last word.  I think the best thing to do is take

17   about a ten-minute short recess to let you stretch your legs,

18   and come back and do the Government's closing.  And then I will

19   let you go for about a 40-minute lunch where -- I hope I can

20   get the marshals to escort you to the lunch room -- and then,

21   you will come back and hear the closing instructions.

22             The closing instructions will put you into the

23   mid-afternoon, and then you will start to deliberate.  And all

24   of you are supposed to make yourselves available for

25   deliberation this afternoon, with the exception of our two

**Closing Argument / Martin**

 1   alternates, who will, after the reading of the instructions,

 2   will then go their separate ways, but still under the

 3   admonition.

 4          Now, please don't talk about the case at all; you

 5   have not heard all the arguments, nor the instructions of law.

 6          And, to our two alternates, of course, please do not

 7   in any way attempt to signal to the other 12 how you feel about

 8   the case.  I know you wouldn't even try that.  All 12 of you

 9   will have the duty to talk, talk, talk in short order, but not

10   yet.  So please hold your horses.

11          Okay, we are going to take a ten-minute recess.

12   Thank you.

13              *THE CLERK:*  All rise.

14                    **(Recess taken at 11:53 a.m.)**

15                    **(Proceedings resumed at 12:03 p.m.)**

16          *MS. MARTIN:*  Thank you, Your Honor.

17          Good afternoon, ladies and gentlemen of the jury.

18          *THE COURT:*  Keep your voice up.

19          *MS. MARTIN:*  I think I need to stand closer to the

20   microphone.

21              **REBUTTAL CLOSING ARGUMENT BY MS. MARTIN**

22          *MS. MARTIN:*  Members of the jury, you have just

23   heard from Mr. Heineman and Mr. Johnson, and the issue boils

24   down to one of intent in the case.  This is not about their

25   good faith.  This is not about Mr. Johnson and Mr. Heineman

**Closing Argument / Martin**

 1  really thinking that they should just come along and sign an

 2  entire piece of property, a piece of real estate over to

 3  themselves.  This is a con that is continuing even here today.

 4          They have taken it so far, why not one step further?

 5  Why not try to put one over on you as well?  They think they

 6  are smarter than the judge, that they've called a baboon or a

 7  buffoon.  They think they are smarter than everybody out there,

 8  all the bankers, all the lawyers, everybody.

 9          Now, this is a definition of good faith, and it's

10  part of the law, and the judge will instruct you on that.  And

11  I'm going to show you what that is right now.  And it's No. 33

12  in the jury instructions that the judge will give you.  And

13  that he will tell you that an issue for you to decide is

14  intent.

15          "In this regard, it is not fraud to make a

16  misstatement based upon an innocent and good faith mistake.

17  Under the law, however, fraudulent intent is shown if a

18  representation were made knowing it is untrue or even if it

19  were not known to be false, it was made with reckless disregard

20  as to its truth or falsity."

21          Now, members of the jury, the defendants did

22  everything in their Dorean process with at least reckless

23  disregard.  And they mentioned a little bit earlier that where

24  is the UCC guy.  Where is our contract guy?  Well, as the judge

25  has instructed you throughout this case, any time anyone has

**Closing Argument / Martin**

 1   made a statement of law or a conclusion about what the law is,

 2   he has told you, he is going to tell you what the law is.

 3           And he is going to tell you what the law is, and

 4   that is going to be in these instructions.  And that law

 5   existed when the defendant started their process.  It exists

 6   now.

 7           And they put the UCC you up here and a whole stack

 8   of papers and made some general statement that they had all

 9   this law to rely on; members of the jury, it's not the case.

10   No one, and they didn't even stand here and tell you in their

11   argument today, no lawyer ever told them that you could come

12   along and file a substitution of trustee and full reconveyance

13   and reconvey the property and a piece of real estate to someone

14   else.  They never even claimed today that anyone told them they

15   could do that because no one did, because that is not the law.

16           Sure, they have said that people talked about

17   wanting to reform the banking system.  And maybe they wanted to

18   do things a little bit differently in banking, but that doesn't

19   mean that the defendants can come along and take the law into

20   their own hands and change what it really is and change the

21   law.

22           Now, the judge is going to give you a lot of

23   instructions to substantive law in this case underlying.  And

24   that is mostly at Jury Instruction No. 18.  And one of the

25   things here is the last sentence of one of the first paragraphs

 1   on page 10:  "Under no circumstances can the borrower simply

 2   eliminate the loan, recover the collateral, and keep the money

 3   from the loan."  And he is going to go over each basis of the

 4   law and what governs here, but that is what it all boils down

 5   to.  And it's probably what you are thinking in the first

 6   place.  How can that be true?  How can anyone ever think that

 7   that's true?

 8          Well, part of a con is confidence, and the

 9   defendants are very confident, here, what they are telling you

10   today, here, when they testified on the stand, and, of course,

11   you better believe it when they were trying to get clients,

12   people to pay, to put their property in the scheme.

13          Now, Mr. Heineman somewhat sarcastically calls their

14   clients his co-conspirators, and certainly, these people might

15   have been out for a free lunch in most circumstances.  And

16   maybe they don't have the cleanest hands, but these people were

17   used by the defendants, they were used by the Dorean Group

18   process.  They said, hey, pay us money, we'll eliminate your

19   loan.  Pay us money that you would otherwise use to pay your

20   mortgage payments.  Don't pay the banks.  We don't want the

21   money to go to the banks, we want the money to go in our

22   pockets.

23          That is what this was, it was a money-making scheme.

24   And the defendants say, oh, but why did we have an office?  And

25   why did we have a big business?  And why are we still here

**Closing Argument / Martin**

1    fighting?  Well, members of the jury, the defendants got

2    caught.  And, as I said before, the con is continuing.  And

3    their whole con was about appearances.  It's about running this

4    legitimate-looking business.  It's about having these bonds,

5    which they made with the seals and the borders, that look like

6    they might be worth something.  It's all about appearances.

7            And, in fact, it's the appearance here today that

8    the defendants say we were successful when, in reality, they

9    were never successful.  In fact, their process was a failure.

10   No one ever got their home free and clear.

11           Mr. Heineman took the stand and told -- took an oath

12   to tell the truth.  He is a defendant in this case, and yet he

13   still couldn't help himself to be tricky and to say that a

14   white piece of paper was black.  That is not good faith, that

15   is trying to be clever, trying to be tricky, and trying to

16   manipulate reality.

17           And with stop signs, there was some talk about

18   different things that happened in this case being stop signs;

19   every time a client communicated to the defendants that their

20   house was getting foreclosed on or that there was a DA

21   investigating the case or that they have gotten notices to pay,

22   even though they already had a full reconveyance filed on the

23   county record, well, every time the defendants ignored those

24   and blew through those stop signs.

25           If you are driving down the street and you go

1    through a stop sign and you don't see it because it's blocked

2    by a tree, that might be good faith.  But if you are driving

3    down a street and you say, oh, there is not a stop sign there,

4    and you keep driving and blow through a hundred stop signs,

5    that certainly is not good faith.

6          These guys knew what they were doing.  They knew

7    there was no law that supported them.  And to this moment in

8    time, we have not heard one statement of the law that can

9    support what the defendants are doing.

10          What the defendants say and what the defendants do

11   are two completely different things, as we have seen.  The

12   defendants say that they support clients, that they provided

13   client support, that they wanted to help people, but when

14   people's homes were in foreclosure, did the defendants go and

15   appear in court for those clients?  No.  Did the defendants

16   take their phone calls?  No.  Did the defendants pay them their

17   money back?  No.  The money is going to a bank account in

18   Latvia that now to try to explain what this is all about, the

19   defendants say, oh, that is us trying the pay our Swiss letter

20   of credit.  It just doesn't make sense.  It's not good faith,

21   it's not the law, and it's not what happened.

22          Now, there are a few other things in addition to the

23   ones that I've already mentioned that show that the defendants

24   were not acting in good faith, and one of those is those full

25   reconveyances, and let's take a look at one of those.  Take a

1    look at 104T, Gayle Bradshaw's property, full reconveyance.

2            Now, if you notice on this full reconveyance, it

3    says on the third line that, "All sums secure by said deed of

4    trust have been fully paid."  Well, now, that is something a

5    little bit different than what Mr. Heineman just said to you a

6    little while ago and what Mr. Johnson said, because now they

7    are saying, well, there was no loan, and that was their good

8    faith belief, and that was why they could do this.  Well, they

9    don't say in the full reconveyance that we are able to do this

10   because there was no loan.  They say that sums have been fully

11   paid, that is not true.  The stories just don't add up.

12           And all the talk about the flower shop and the Swiss

13   trust; well, first it's a bank, now it's not a bank, now it's

14   the flower shop of the wife of a director of the trust.  That

15   doesn't add up.  The FBI not only had someone drive by that

16   flower shop, but also searched -- there were no assets for

17   First Mutual Trust of Switzerland.  Didn't exist.

18           And what Mr. Johnson brings up and says there is a

19   Swiss registry of businesses, it's a document.  It's in German.

20   And how do we know that is a Swiss registry of businesses?

21   Because Mr. Heineman says so?

22           Now, the fact that the Dorean Group and the

23   defendants also had people go out and get new loans where they

24   didn't even have loans to begin with, like, for instance, with

25   the McKays, well, if there was no loan to begin with and their

**Closing Argument / Martin**

1    whole purpose is showing that the loans were fraudulent, then

2    having someone go out and get a loan, well, that doesn't make

3    sense.  That doesn't fit their story of why they were doing

4    this, why it was good faith.

5              It also doesn't fit that they had people go out,

6    after they supposedly eliminated the loans, and get new loans.

7    If they were trying to get an additional loan that, quote,

8    "didn't exist" under what they are arguing now, then why did

9    all that money come into their pockets?  And what was that

10   money that they were wiring over to Latvia?  That was certainly

11   money from the loan, the loan proceeds.

12             So for them to argue and say that we thought no loan

13   was made, well, I guess they have to ignore the fact that they

14   were actually collecting money directly from those loans that

15   were made.  And Mr. Heineman up on the stand, he told you

16   himself that, yeah, he understood that when he got his loan on

17   his house that money went to pay the person that owned the

18   house before.

19             So, again, the defendants are choosing when to pay

20   attention to stop signs and when to ignore them.  If they see

21   something that they think will help them, then they will see

22   it, they will own it, they will hold it up in front of you and

23   they'll tell you all about it.  But if it's something that

24   doesn't help them, then it does exist.

25             And, in fact, when they even talk about some of

**Closing Argument / Martin**

 1    these things that we are referring to as stop signs,

 2    Mr. Johnson says that they made him think that this was working

 3    somehow, that stop was really go.  It's just them trying to

 4    pretend like there is some alternate reality.

 5              I mean, Mr. Johnson said his opinion is not governed

 6    by what goes on in this courtroom; well, the law goes on in

 7    this courtroom, and the judge is going to instruct you on the

 8    law.  And if someone decides to look the other way or to say, I

 9    am invisible now, and I can't see you, that is a choice, that

10    is not good faith.

11              Now, you've also heard about how there were bank

12    fraud counts that were dismissed; well, as I told you at the

13    beginning of this trial, and I'll say it once again to remind

14    you, not all the lenders in this case that made loans to people

15    were banks.  A bank, as I told you earlier, is a specific type

16    of financial institution.  But in this case we have a number of

17    different lenders who are not all banks.  Just something to

18    keep in mind.

19              And as far as evidence of the loans, there are

20    copies of promissory notes signed by the people who took out

21    the loans.  We have Mr. Heineman's loans here, his signature on

22    there.  What more evidence do they want that there is a loan?

23              If they have a problem with one of the terms and

24    conditions in that loan agreement, that is something to deal

25    with, that is something to ask the bank about or the lender

**Closing Argument / Martin**

 1    about.   In no case do they do that.   They sent the same packet

 2    over and over to every lender alleging some incomprehensible

 3    theory about why the lender was wrong about something, and that

 4    because that lender was wrong about something that they should

 5    not only lose their interest in the property, but that they

 6    should lose their interest in each of those properties.

 7            So the bank is not only now out the loan, but now

 8    out the house, as well, because they supposedly made some kind

 9    mistake or error or something that was not even specific to

10    each property.   But members of the jury, the judge will tell

11    you that the law is the lenders don't have to respond to that,

12    and let me show you.

13            The last paragraph on page 10:   "You have also heard

14    evidence regarding, quote, 'presentments' made to lenders.   Of

15    course, a borrower or his agent or his trustee may send a

16    letter to a lender complaining about aspects of a loan.   The

17    lender, however, is not legally obligated to respond to such a

18    letter, at least with respect to any circumstances relative to

19    this case.   Rather, the lender is free to ignore the letters

20    and to stand on its rights under the loan documents."

21            The law completely supports how the lenders reacted

22    to the gobbledygook they got.   They didn't have to do anything.

23    And that makes sense, too; I mean, if there is no specific

24    problem alleged or clause that they are saying is wrong on

25    these loans, how is the lender supposed to respond?

**Closing Argument / Martin**

```
 1          The defendants may not have known the law, may not
 2   have cared what the law was, but they definitely didn't have
 3   any basis in the law to base a good faith belief that that was
 4   what they could do, that they could simply file substitutions
 5   of trustee and reconveyances to take a lender's property away.
 6          Now, we have a great system here in the United
 7   States where the defendants can get up and they can have their
 8   day in court, and they have gotten that.  This is week five.
 9   And one of the things you have to remember, though, is that
10   when they get up here and they argue to you, that is not
11   evidence.  But what they say on the stand under oath, consider
12   that, and consider whether or not there are things that are
13   different that they said then and different that they said
14   today in their argument.
15          Are the facts changing?  Suddenly today in closing
16   argument, Mr. Johnson has an answer for why there was a two- to
17   three-percent variation in the amount that he was supposed to
18   pay the trust -- the First Mutual Trust of Switzerland.
19   Mr. Johnson has some different explanation for where the money
20   was going that he got from clients and the different ways that
21   he was spending money to help the clients.  These weren't
22   things that he said on the stand when he testified under oath,
23   they are new things that are coming out now.
24          Now, even when the defendants, they have gotten
25   their day in court, and this is a process where all the
```

**Closing Argument / Martin**

1  evidence is presented, but you decide, you, the jury.  The

2  Government asks that you return a verdict of guilty on each of

3  the 36 counts presented to you in this case of conspiracy to

4  commit fraud, and mail fraud.

5          Thank you.

6          **THE COURT:**  Thank you, Ms. Martin.

7          Excuse me one moment.

8          Dawn, is our person here to take the jury?

9          **THE CLERK:**  I don't see them here yet.

10         **THE COURT:**  The -- there is going to be a slight

11  change in plans because Ms. Martin didn't take all of her time

12  and the marshal is not present to take you to lunch.

13         So at this time, I'm going to go ahead and read the

14  instructions to you, unless somebody over there needs to use

15  the facility.  If so, raise your hand.

16              **(No hands raised.)**

17         **THE COURT:**  Okay, good.

18         I want to say to anyone else out there who plans on

19  leaving during the reading of the instructions, now is a good

20  time to go so you won't distract the jury as you leave.  You

21  are free to stay, of course, but I would like for you, if you

22  are going to leave, to leave now.

23              **(Members of the audience exit courtroom.)**

24  ///

25  ///

1 <u>**FINAL JURY INSTRUCTIONS**</u>

2      ***THE COURT:*** "Members of the jury, it is now my duty

3 to tell you the law that applies to this case.  A copy of these

4 instructions will be available in the jury room for you to

5 consult as necessary.

6      "These instructions fall into three parts.  The

7 first part will address guidelines for evaluating the evidence,

8 the burden of proof and related matters.  It is your duty to

9 find the facts from all the evidence in the case.  To those

10 facts, you must apply the law as I give it to you.  You must

11 follow the law and my instructions, whether you agree with the

12 law or not.  You must not be influenced by any personal likes

13 or dislikes, opinions, prejudices or sympathy.  That means you

14 must decide the case fairly on the evidence and the law.  You

15 will recall that you took an oath promising to do so at the

16 beginning of the case.

17      "You must follow all of the instructions and not

18 single out some and ignore others, they are all equally

19 important.  You must not read into these instructions or into

20 anything the Court may have said or done as suggesting what

21 verdict you should return.  That is a matter entirely up to

22 you.

23      "Defendants have voluntarily and knowingly elected

24 to represent themselves and to waive the right to counsel, as

25 is their constitutional right, and have voluntarily elected to

**Final Jury Instructions**

1    appear in jail clothes here in court, even though civilian

2    clothes have been made available for them.  You should in no

3    way allow these circumstances to influence your verdict.  You

4    should not hold these circumstances against defendants in any

5    way, nor should you be influenced by any sympathy.  The fact

6    that defendants were arrested and are in custody in no way may

7    be held against defendants by you.  The issue always is whether

8    the evidence presented here in court proves the offenses

9    charged beyond a reasonable doubt.

10           "Richard Tamor is an attorney and has been assigned

11   by the Court to be a resource to answer procedural questions by

12   defendants.  He is not, however, acting as trial counsel for

13   defendants; therefore, although he has been here at the trial

14   most of the time, he has not been required to be here full

15   time.

16           "Steve Moore is a paralegal assigned by the Court to

17   assist defendants and organize the documents in the case.

18   Mr. Moore is not acting as trial counsel.

19           "Again, you may not draw any adverse inference

20   against defendants on account of their choice to represent

21   themselves.  The fundamental issue remains whether the

22   Government has carried its burden of proof as to each count."

23           Excuse me one moment.

24           Dawn?

25                    **(Court and clerk confer.)**

**Final Jury Instructions**

1      **THE COURT:**  "The charges against defendants are set

2   forth in the indictment, a copy of which shall be sent into the

3   jury room during your deliberations.  The indictment is not

4   evidence.  A separate crime is charged against the defendants

5   in each count.  You must decide each count separately.  Your

6   verdict on one count should not control your verdict on any

7   other count.

8          "Defendants have pleaded not guilty to the charges.

9   Defendant are presumed to be innocent and do not have to

10   testify or present any evidence to prove innocence.  The

11   Government has the burden of proving every element of charge

12   here beyond a reasonable doubt.

13          "Any time I say in these instructions that the

14   Government has the burden of proof, it means proof beyond a

15   reasonable doubt.  Proof beyond a reasonable doubt is proof

16   that leaves you firmly convinced that an accused is guilty.  It

17   is not required, however, that the Government prove guilt

18   beyond all possible doubt.

19          "A reasonable doubt is doubt based upon reason and

20   common sense and is not based purely on speculation.  It may

21   arise from a careful and impartial consideration of all the

22   evidence or from lack of evidence.  If after a careful and

23   impartial consideration of all the evidence you are not

24   convinced beyond a reasonable doubt that an accused is guilty

25   as charged, it is your duty to find that defendant not guilty.

1   On the other hand, if after a careful and impartial

2   consideration of all the evidence you are convinced beyond a

3   reasonable doubt that an accused is guilty as charged, it is

4   your duty to find that defendant guilty.

5           "The evidence from which you are to decide what the

6   facts are consist of; one, the sworn testimony of witnesses on

7   both direct and cross-examination, regardless of who called the

8   witness; two, the exhibits which have been received into

9   evidence.  In reaching your verdict, you may consider only the

10  types of evidence I have described.  Certain things are not

11  evidence, and you may not consider them in deciding what the

12  facts are.  I will list them for you.

13          "One:  Arguments and statements by lawyers are not

14  evidence.  They are not witnesses.  What they have said in

15  their opening statements, closing arguments, and at other times

16  is intended to help you interpret the evidence, but it is not

17  evidence.  If the facts as you remember them differ from the

18  way the lawyers have stated them, your memory of them controls.

19          "Two:  A suggestion and a question to a witness is

20  not evidence unless it is adopted by the answer.  A question by

21  itself is not evidence.  Consider it only to extent it is

22  adopted by the answer.

23          "Three:  Objections to questions are not evidence.

24  Lawyers have a duty to their clients to consider objecting when

25  they believe a question is improper under the Rules of

1   Evidence.  You should not be influenced by any questions,

2   objections, or the Court's ruling on it.

3          "In this case, defendants are representing

4   themselves.  Anything that they have said in that role is

5   subject to the same cautions I have given you for lawyers.

6   Their questions, arguments, statements and objections are not

7   evidence.  Testimony or exhibits that have been excluded or

8   stricken or that you have been instructed to disregard are not

9   evidence and must not be considered.  In addition, some

10  testimony and exhibits have been received only for a limited

11  purpose.  Where I have given a limiting instruction, you must

12  follow it.  Anything you may have seen or heard when the Court

13  was not in session is not evidence.  You are to decide the case

14  solely on the evidence received at the trial.

15         "Now, evidence may be direct or circumstantial.

16  Direct evidence is direct proof of a fact, such as the

17  testimony by a witness about what that witness personally saw

18  or heard or did.  Circumstantial evidence is proof of one or

19  more facts from which you could find another fact.  By way of

20  example, if you wake up in the morning and see that the

21  sidewalk is wet, you may find from that fact that it rained

22  during the night.  Other evidence, however, such as a turned-on

23  garden hose, may explain the presence of water on the sidewalk.

24  Therefore, before you decide that a fact has been proven by

25  circumstantial evidence, you must consider all the evidence in

**Final Jury Instructions**

 1  light of reason, experience and common sense.

 2          "In this case, if the circumstantial evidence

 3  permits two reasonable interpretations, one of which points to

 4  a defendant's guilt and the other to his innocence, you must

 5  adopt that interpretation the points to that defendant's

 6  innocence and reject that interpretation that points to his

 7  guilt.

 8          "If, on the other hand, one interpretation of this

 9  evidence appears to you to be reasonable and the other

10  interpretation to be unreasonable, you must accept the

11  reasonable interpretation and reject the unreasonable.  You

12  should consider both direct and circumstantial evidence.  The

13  law permits you to give equal weight to both, but it is for you

14  to decide how much weight to give any evidence.

15          "A summary of alleged mailings, Exhibit 28, has been

16  received into evidence.  Charts and summaries are only as good

17  as the underlying supporting material.  You should, therefore,

18  give them only such weight as you think the underlying material

19  deserves.

20          "In deciding the facts in this case, you may have to

21  decide which testimony to believe and which testimony not to

22  believe.  You may believe everything a witness says or part of

23  it or none of it.  In considering the testimony of any witness,

24  you may take into account; one, the opportunity and ability of

25  witness to see or hear or know the things testified to; two,

**Final Jury Instructions**

1    the witness' memory; three, the witness' manner while

2    testifying; four, the witness' interest in the outcome of the

3    case and any bias or prejudice; five, whether other evidence

4    contradicted the witness' testimony; six, the reasonableness of

5    the witness' testimony in light of all the evidence; and,

6    seven, any other factors that bear on believability.

7          "The weight of the evidence as to a fact does not

8    necessarily depend on the number of witnesses who testify nor

9    does it depend on which side called witnesses or produced

10   evidence.  You should base your decision on all of the evidence

11   regardless of which party presented it.

12         "You have heard testimony from witnesses referred to

13   as expert witnesses.  These are persons who, because of

14   education or experience, are permitted to state opinions and

15   the reasons for their opinions.  Opinion testimony should be

16   judged just like any other testimony; you may accept it or

17   reject it and give it as much weight as you think it deserves,

18   considering the witness' education and experience, the reasons

19   given for the opinion, and all the other evidence in the case.

20         "If an expert witness was not present at the

21   evidents in question, his or her opinion is necessarily based

22   on an assumed set of circumstances.  In evaluating the opinion

23   during the trial, you should take into account the extent to

24   which you do agree or do not agree with the circumstances

25   assumed by the expert witness.

**Final Jury Instructions**

 1          "You have heard evidence that the FBI raided the

 2    office of the Dorean Group and that defendants were arrested,

 3    this information may not be used by you to infer that any crime

 4    was committed.

 5          "During the testimony of attorney Thomas Speilbaur,

 6    among others, you heard about a civil action filed by

 7    Mr. Speilbauer as counsel on behalf of defendants and about

 8    certain rulings in the civil action; as I indicated earlier,

 9    any and all evidence concerning these rulings may be considered

10    by you only and exclusively on the issue of defendants' intent,

11    and more specifically, the extent to which such rulings

12    provided information to defendants concerning the validity or

13    invalidity of the debt elimination program.  I remind you also

14    that the standard of proof in a civil case is significantly

15    lower than in a criminal case.  Proof beyond a reasonable doubt

16    is required in a criminal case.

17          "You have also heard evidence about two other

18    orders.  More specifically, you have heard that the Government

19    filed its own civil action seeking to enjoin the defendants'

20    debt elimination business, and that this Court issued two

21    injunctions in 2005 prohibiting certain operations.  Those

22    injunctions were a temporary restraining order and a

23    preliminary injunction, and are in evidence as trial Exhibit 22

24    and 24.  These two exhibits were introduced exclusively on

25    counts 64 and 65, which alleged that defendants had violated

**Final Jury Instructions**

1   those orders; however, those two counts have been dismissed at

2   that the close of the evidence.  Therefore, you may not

3   consider Exhibits 22 and 24 for any purpose."

4           I'm going to add here that we will withdraw them

5   from evidence, so those two exhibits will not be in the jury

6   room.

7           "You should ignore the fact that the judge who

8   happened to make any ruling or order was myself rather than

9   some other judge.  That fact is irrelevant and should in no way

10  influence your verdict.  Nothing that I have said or done, I

11  reiterate, should influence your verdict.  That is a matter

12  entirely up to you.

13          "You have heard that certain counts involving bank

14  fraud have been dismissed by the Government; this has nothing

15  to do with whether the counts that are on trial have or have

16  not been proven.  Even if the Government has chosen to forego

17  trying to prove violations of the bank fraud statute, the

18  Government is free to try to prove violations of the mail fraud

19  statute, even though banks may be involved in some of those

20  counts.  That the bank fraud counts have been dismissed

21  voluntarily does not mean that the banks were not defrauded,

22  nor does it mean that they were.  It is simply irrelevant to

23  your decision.

24          "You have heard testimony from Farrell LeCompte and

25  Jennifer Holtzer, witnesses who are alleged to have been

**Final Jury Instructions**

1   involved in the crime charged and who pleaded guilty or no

2   contest to a crime arising out of the same events for which the

3   defendants are on trial.  Their pleas are not evidence against

4   defendants, and you must consider them only in determining

5   those witnesses' believability.  For those reasons, in

6   evaluating Mr. LeCompte and Ms. Holtzer's testimony, you should

7   consider the extent to which or whether their testimony may

8   have been influenced by any of these factors.  In addition, you

9   should examine their testimony with greater caution than that

10  of other witnesses.

11          "You are here only to determine whether each of the

12  defendants is guilty or not guilty of the crimes charged in

13  this case.  Your determination must be made only from the

14  evidence received at trial.  Defendants are not on trial for

15  any conduct or offense not charged in this case.  Even if you

16  believe a defendant is guilty of some other crime, you should

17  focus your attention solely to crimes charged in this case.

18  You should consider evidence about the acts, statements and

19  intentions of others or evidence about the" -- "or evidence

20  about other actions of defendants only as they relate to the

21  charges in the indictment.

22          "You have heard about a" -- "you have heard about

23  prior convictions of Mr. Johnson; you may consider this only

24  for purposes of evaluating his credibility as a witness and not

25  as proof of guilt in this case.  You have heard that both

**Final Jury Instructions**

1   defendants have been arrested in connection with another matter

2   in Utah; you may not consider those arrests as proof of any

3   guilt in this case.

4          "Although the defendants are being tried together,

5   you must give separate consideration to each defendant.  And in

6   doing so, you must determine which evidence applies to each

7   defendant, disregarding any evidence admitted solely against

8   the other defendant.  The fact that you may find one of the

9   defendants guilty or not guilty should not control your verdict

10  as to the other defendant.

11         "You are free to deliberate over the counts in any

12  order you think most effective.  You may possibly determine

13  that certain counts ought to be considered out of strict

14  numerical sequence.  To repeat, you are not required to address

15  the counts in strict numerical sequence so long as you decide

16  all of the counts eventually.

17         "This concludes the first part of my instructions.

18  The second part of my instructions concerns the substantive law

19  that bears on this case.  This statement of the law pertains to

20  all time periods relevant to this case.

21         "Although you have heard and seen evidence

22  concerning legal points, you must take my instructions as

23  supreme on the matters of law and an accurate and controlling

24  statement of the law to be applied in reaching your verdict.

25         "In a moment I will explain the elements of the

**Final Jury Instructions**

1    specific Federal offenses charged, but, first, here is an

2    explanation of the basic law relating to notes, deeds of trusts

3    and the rights and duties of borrowers and lenders.

4            "When someone borrows money using his or her home as

5    collateral, the borrower typically signs a note and deed of

6    trust.  The note is a promise to repay the loan, usually in

7    monthly installments.  A deed of trust transfers the home to a

8    trustee to hold for the benefit of the lender in the event that

9    the borrower defaults on the loan payments.  If and when the

10   note is paid off, the deed of trust is reconveyed to the

11   borrower, at which point title is then free and clear in the

12   name of the borrower.

13           "Rather than a deed of trust, some states allow the

14   use of a mortgage.  For purposes of this case, a mortgage and a

15   deed of trust are the same.

16           "When someone borrows money and signs a note, the

17   borrower is obligated to make the payment on the note in

18   accordance with its terms.  If a provision in any note or deed

19   of trust happens to violate some law, it is possible that the

20   particular provision might be unenforceable, such as, for

21   example, a prepayment penalty might be subject to a limitation

22   in a particular state.

23           "For some violations, the borrower might possibly

24   even have the right to rescind the loan, meaning to undo the

25   entire transaction.  But in undoing a loan, the borrower would

1    then have to give the loan money back.  Under no circumstances

2    can the borrower simply eliminate the loan, recover the

3    collateral, and keep the money from the loan.

4              "Within regulatory reserve requirements, banks are

5    allowed to receive deposits from customers and then to use

6    those deposits to make loans to borrowers.  Banks are also

7    allowed to borrow money from the Federal Reserve Bank and then

8    to use those funds to make loans to borrowers.  And banks are

9    free to use their own equity to make loans to borrowers.  A

10   borrower's duty to repay a loan is not affected by any

11   infringement of regulatory reserve requirements.

12             "You have heard evidence that various homeowners

13   involved in our case placed their homes into a family trust

14   with defendants as trustees.  Although the word 'trust' is

15   used, a family trust is different from a deed of trust that

16   typically accompanies a home loan.  As I said, a deed of trust

17   is a way to provide collateral for a loan.  A family trust,

18   however, is a convenient vehicle for families to hold their

19   property, usually for estate planning purposes.  In this

20   regard, placing one's home in a family trust allows the

21   trustees in charge of the family trust to exercise the same

22   rights as the homeowners.  Doing so, however, does not

23   eliminate any debt owed by the homeowner, and the home still

24   remains collateral for the loan to the same extent as before

25   the trust.  Putting one's home in a family trust creates no

**Final Jury Instructions**

1   greater rights in the trustee than were available to the

2   homeowner.

3           "You have also heard evidence regarding presentments

4   made to lenders.  Of course, a borrower or his agent or his

5   trustee may send a letter to a lender complaining about aspects

6   of a loan; the lender, however, is not legally obligated to

7   respond to such a letter, at least with respect to any

8   circumstances relevant to this case.  Rather, the lender is

9   free to ignore the letters and to stand on its rights under the

10  loan documents.

11          "If the lender then seeks to enforce the loan

12  documents, a court will then have to hear out both sides and

13  resolve any disputed cause or issue.  If the lender loses, for

14  example, one or more of the particular clauses may be found

15  unenforceable.  Under no circumstances, however, can the loan

16  and collateral obligations simply be eliminated with the

17  borrower allowed to keep the loan money.  Even if a court

18  allowed rescission so that the loan was undone, the borrower

19  would have to return the loan proceeds.

20          "Use of the word 'presentment' makes no difference.

21  A lender is placed under no greater duty when it receives

22  something called a presentment than when it receives an

23  ordinary letter.

24          "You have heard evidence that the presentments

25  included a notice that defendants would be appointed as agents

1   or attorneys in fact for the lender in the event that the

2   lender failed to respond within a stated period of time; in

3   this regard, I instruct you that a letter or notice to a lender

4   stating that if the lender does not respond within a stated

5   period of time it will be deemed to have appointed the sender

6   as its agent or attorney in fact may be ignored by the lender.

7           "The lender is under no obligation to respond.  The

8   lender is free to stand on its contract rights with the

9   borrower.  Ignoring such a letter or notice cannot have the

10   effect of lawfully appointing anyone as the lender's agent or

11   attorney in fact.  In turn, any reconveyance signed by any such

12   purported attorney in fact or purposed agent would be

13   unauthorized and invalid.

14           "Even if such a reconveyance were recorded in the

15   county land records and/or notarized, it would still be

16   unauthorized and invalid.  There is nothing in the law of

17   estoppel or laches or estoppel by laches that is different from

18   the law as I have described it in these instructions.

19           "To appoint an agent or attorney in fact, the lender

20   would have to do so expressly and affirmatively, not simply by

21   ignoring a letter.  If, however, a lender expressly appoints

22   someone as its agent or attorney in fact for a stated purpose,

23   then, of course, that person could lawfully sign for the lender

24   within the scope of the agency.

25           "You have also heard reference to a subrogation and

**Final Jury Instructions**

1    security bond; under the law, no borrower has the unilateral

2    right to substitute someone else's promise to pay for his or

3    her own promise to pay, nor can a borrower unilaterally

4    substitute a bond for his original collateral under the loan.

5    If a lender receives such a bond or proposed substitution in

6    the mail, the lender is free to ignore it, to remain silent and

7    to stand on its original contract rights with the borrower.

8           "You have seen evidence that some documents were

9    notarized; a notarized document is a statement by the notary

10   that the signature on the document was made by the person

11   indicated; that is, the notarization serves as a degree of

12   proof that the signature is authentic.  It does not mean,

13   however" -- "it does not mean, however, that the document is

14   otherwise legally valid or invalid.

15          "You have seen evidence that some documents were

16   filed with various county land records; the fact that a

17   document appears in the county land records does not mean that

18   it is valid or that the County Recorder has approved the

19   document.  Put differently, the fact of recording does not add

20   or subtract from its validity or invalidity, it only relates to

21   when the form of the document is in the proper form for

22   recording.

23          "You have heard evidence that lenders sold various

24   notes to subsequent holders; unless the original loan documents

25   provided otherwise, the original lender has the right to sell

**Final Jury Instructions**

1   the notes and thereafter upon notice the borrower must make

2   payment as directed by the new owner of the loan.  If the

3   lender sells the note, it remains secured by the deed of trust.

4   Neither the deed of trust nor the debt obligation is eliminated

5   by reason of a sale of the note.

6            "The items called presentments and other letters and

7   materials received into evidence referred to various statutes

8   and legal authorities.  Nothing cited therein and no provision

9   of law contradicts the law as I have stated it to you in these

10  instructions.

11           "In this connection, you have heard reference to the

12  Uniform Commercial Code, which is sometimes called the UCC.

13  This is a code adopted as law in all 50 states.  There is

14  nothing in the UCC that would alter the lender/borrower law

15  described in these instructions.  So, too, with the Federal

16  Reserve system; there is nothing in the Federal Reserve system

17  or any other banking laws that affects the rights and duties of

18  lenders and borrowers as I state them to you in these

19  instructions.  Nor is there anything in generally accepted

20  accounting principles that would modify the laws as I stated to

21  you in these instructions.

22           "I will now turn to the specific counts charged and

23  the law you must apply in determining whether they have been

24  proven.  Defendants are charged in count 1 of the indictment

25  with conspiring to commit mail fraud in violation of Section

**Final Jury Instructions**

1   1349 of Title 18 of the U.S. Code.  They are also charged with

2   multiple counts of mail fraud in violation of Section 1341 of

3   Title 18 of the U.S. Code.

4           "You will have in the jury room a copy of the

5   indictment.  The copy will be redacted to block out various

6   counts and matters no longer in this case, leaving only the

7   counts and matters you must consider and decide.  That is why

8   you will see blank spaces and gaps in the paragraph numbers,

9   skipping, for example, from paragraph 21 to 26.  Again, the

10  indictment is not evidence in any way.  It must be used by you

11  only to keep straight the various counts and what is alleged as

12  to each count.

13          "Turning to count 1, it alleges that from

14  approximately February 2004 until approximately July 6, 2005,

15  defendants knowingly conspired between themselves and with

16  other various brokers to devise a scheme to defraud lenders

17  with loans secured by real property; to obtain money by means

18  of materially false statements and promises; and to knowingly

19  cause the United States mails to be used to further the alleged

20  scheme in violation of the mail fraud statute, which is Section

21  1341 of Title 18 of the U.S. Code.  Count 1 alleges various

22  attempts to eliminate mortgages pursuant to the alleged

23  conspiracy.

24          "Under Section 1341, the mail fraud statute, it is a

25  Federal offense to use the U.S. mails to further a fraud

**Final Jury Instructions**

1  scheme.  I will explain the details and requirements of Section

2  1341 in a moment in connection with the individual transactions

3  at issue in this case.  Count 1, however, alleges an offense

4  that is separate and apart from mail fraud, namely, a

5  conspiracy to violate the mail fraud statute.

6          "Section 1349 of Title 18 of the U.S. Code makes it

7  a separate stand-alone offense to conspire to violate the mail

8  fraud statute; in other words, the indictment covers two

9  different but related alleged offenses:  Allegations of mail

10  fraud pertaining to various individual loans, and separately,

11  an allegation of an overarching conspiracy to commit mail

12  fraud.

13          "Count 1 is the conspiracy count.  In order to find

14  defendants or either of them guilty of count 1, you must find

15  that the Government has proven beyond a reasonable doubt that

16  the accused knowingly conspired with one or more of the alleged

17  conspirators to commit a scheme to defraud, as alleged in count

18  1, knowing that the alleged scheme would be furthered by the

19  use of mailings through our postal system.

20          "A conspiracy is a kind of criminal partnership, an

21  agreement of two or more persons to commit one or more crimes.

22  A crime of conspiracy is an agreement to do something unlawful.

23  It does not matter whether the crime agreed upon was committed.

24          "For a conspiracy to have existed, it is not

25  necessary that the conspirators made a formal agreement or that

**Final Jury Instructions**

1  they agree on every detail of the conspiracy.  It is not

2  enough, however, that they simply met and discussed matters of

3  common interest, acted in similar ways, or perhaps helped one

4  another.  You must find that there was a plan to commit at

5  least one of the crimes alleged as an object of the conspiracy

6  with all of you agreeing as to the particular crime which the

7  conspirators agreed to commit.

8          "One becomes a member of a conspiracy by willfully

9  participating in the unlawful plan with the intent to advance

10  or further some object or purpose of the conspiracy, even

11  though the person does not have full knowledge of all the

12  details of the conspiracy.  On the other hand, one who has no

13  knowledge of a conspiracy but happens to act in a way which

14  furthers some object or purpose of the conspiracy does not

15  thereby become a conspirator.  Similarly, a person does not

16  become a conspirator merely by associating with one or more

17  persons who are conspirators, nor by merely knowing that a

18  conspiracy exists.

19          "You will see in the indictment that count 1 is

20  lengthy and detailed in its allegations.  The Government is not

21  required to prove every word of the details alleged.  Although

22  count 1 list various so-called 'overt acts,' for example, it is

23  not necessary for the Government to prove any overt act to

24  prove a violation of Section 1349.

25          "Likewise, although count 1 alleges at least six

**Final Jury Instructions**

1  members of the conspiracy, it is not necessary to prove that

2  each and every person named was a member of the alleged

3  conspiracy.  To convict either or both of the defendants,

4  however, the Government must prove that the" -- "the accused

5  conspired with at least one of the alleged co-conspirators to

6  carry out the purported scheme to defraud through the use of

7  the U.S. mails.

8           "Turning now to the multiple counts of alleged mail

9  fraud, those are found in counts 2 through 5, 9 through 14, 19

10 through 25, 33 through 34, and 38 through 52.  Each count

11 alleges mail fraud in connection with a single parcel of real

12 estate.  Each count alleges that the defendants devised a

13 scheme to defraud a lender who made a loan secured by the

14 borrower's home.

15          "Each count alleges various steps in an alleged

16 mortgage elimination process leading up to a filing in the

17 county land records of a full reconveyance, falsely claiming

18 that the loans secured by the property had been fully

19 repaid" -- "fully paid, when, in fact, the loan had allegedly

20 not been fully paid, the alleged effect of which was to falsely

21 eliminate the lender's secured collateral" -- "or the loan.

22          "Each count then identifies a specific mailing, such

23 as, for example, a mailing of a presentment package to the

24 lender on the alleged loan.  For example, count 2 pertains to a

25 loan made by National Bank of South Carolina and a presentment

1    package allegedly mailed on or about March 30, 2004, followed

2    by county land recordings on May 11, 2004.  Count 3 pertains to

3    a loan made by Countrywide Home Loans, Inc., and a presentment

4    package mailed on or about May 12, 2004, followed by a county

5    land recording on July 19th, 2004.

6            "Although the various mail fraud counts are similar,

7    they are grouped in the indictment according to which broker

8    was allegedly involved and according to whether or not the

9    alleged transaction included a refinancing.  For example, count

10   2 involved an alleged broker named William Julian and an

11   alleged presentment package and involved a first alleged

12   lender.  Count 14 involved Farrell LeCompte as the alleged

13   broker and an alleged refinancing.

14           "You must read the indictment" -- "you must read the

15   indictment during your deliberation and determine whether the

16   specific mailings and circumstances alleged in each count have

17   been proven.  The five counts that involve an alleged

18   refinancing with second lenders are counts 14, 24, 25, 51 and

19   52.

20           "I will now turn to the law that governs the mail

21   fraud counts.  Section 1341 makes it a Federal offense to use

22   the mails to further a scheme to defraud.  In order to convict

23   either defendant or both of them on any count alleging a

24   violation of Section 1341, the Government must prove the

25   following elements beyond a reasonable doubt:

**Final Jury Instructions**

1      "First, the accused devised a scheme to defraud for

2  obtaining money or property; second, the accused acted with the

3  intent to defraud; and third, the accused used or caused to be

4  used the United States mails to carry out or to attempt to

5  carry out an essential part of the scheme.

6      "In this connection, as before, the indictment goes

7  into more detail in its allegations than must be proven.  What

8  must be proven and proven beyond a reasonable doubt are the

9  three elements I have just described as alleged in the various

10  counts.  If the foregoing elements are established therein, the

11  Government is not required to prove that any particular

12  statement was false.  A false impression can be made, even when

13  all the statements were not literally false.  Nor is it

14  necessary for the Government to prove that the alleged victim

15  or victims of a scheme to defraud received any misleading

16  statements or received any alleged mailing."

17      I want to add here this statement:  "It is

18  necessary, however, for the Government to prove the specific

19  mailing alleged in the count.  A mailing is caused when one

20  knows that the mailings will be used in the ordinary course of

21  business or when one can reasonably foresee such use.  It does

22  not matter whether the material mailed was itself false or

23  deceptive so long as the mail was used as part of the

24  fraudulent scheme.  Nor does it matter whether the scheme or

25  plan was successful or that any money or property was obtained.

**Final Jury Instructions**

1    "Each member of a scheme to defraud is responsible

2    for the" -- "for other co-schemer's actions during the course

3    of and in furtherance of the scheme.  If you decide that one or

4    both defendants was a member of a scheme to defraud and that

5    such defendant had the intent to defraud, that defendant is

6    responsible for what other co-schemers said or did to carry out

7    the scheme, even if the defendant did not know what they said

8    or did.

9         "For a defendant to be guilty of an offense

10   committed by a co-schemer as part or in furtherance of the

11   scheme, the offense must be one that could be reasonably

12   foreseen as a necessary and natural consequence of the scheme

13   to defraud.

14        "One issue for you to decide is intent.  In this

15   regard, it is not fraud to make a misstatement based upon an

16   innocent or in good-faith mistake.  Under the law, however,

17   fraudulent intent shown if a representation were made, knowing

18   it is untrue, or even if it were not known to be false if it

19   was made with reckless disregard as to its truth or falsity.

20   It is for you, the jury, to determine whether or not the

21   Government has proven that defendants intended to defraud.

22        "Similarly, evidence that a defendant in good faith

23   followed the advice of counsel would be inconsistent with such

24   an unlawful intent.  Unlawful intent has not been proved if a

25   defendant, before acting, made full disclosure of all material

1   facts to an attorney, received the attorney's advice as to the

2   specific course of conduct that was followed, and reasonably

3   relied on that advice in good faith.

4           "You have heard questioning concerning whether

5   various homeowners had ethical or moral reservations in trying

6   to eliminate their debt; I instruct you that if the Government

7   proves beyond a reasonable doubt each of the required elements

8   of an offense charged against defendant, then the intent and

9   motive of the homeowners makes no differences.  As I have told

10  you, counts 64 and 65 have been dismissed and are no longer in

11  the case.

12          "The punishment provided by law for the alleged

13  crimes is for the Court to decide.  You may not consider

14  punishment in deciding whether the Government has proven its

15  case against defendants beyond a reasonable doubt.  Nor may you

16  consider any issue of compensation for the allegedly defrauded

17  investors; that is an entirely separate matter not relevant

18  here and on which you should not speculate or base your

19  decision in any way."

20          Now I'm going to turn to the last part of the

21  instructions.

22          "When you begin your deliberations, you should elect

23  one member of the jury as your foreperson.  That person will

24  preside over the deliberations and speak for you here in court.

25  You will then discuss the case with your fellow jurors to reach

**Final Jury Instructions**

 1  agreement, if you can do so.  Your verdict as to each claim and

 2  as to" -- "your verdict as to each count, if any, must be

 3  unanimous.  Each of you must decide the case for yourself, but

 4  you should do so only after you have considered all the

 5  evidence, discussed it fully with the other jurors, and

 6  listened to the views of your fellow jurors.  Do not be afraid

 7  to change your opinion if the discussion persuades you that you

 8  should.

 9          "Do not come to a decision simply because other

10  jurors think it is right.  It is important that you attempt to

11  reach a unanimous verdict, but, of course, only if each of you

12  can do so after having made your own conscientious decision.

13  Do not change an honest belief about the weight and effect of

14  the evidence simply to reach a verdict.

15          "I will give you a special verdict form to guide

16  your deliberations; however, you do not need to address the

17  questions in the precise order listed.

18          "Some of you have taken notes during the trial;

19  whether or not you took notes, you should rely on your own

20  memory of what was said.  Notes are only to assist your memory.

21  You should not be overly influenced by the notes.

22          "When you go into the jury room, the clerk will

23  bring in to you the trial exhibits received into evidence to be

24  available during your deliberations.

25          "As I noted before the trial began, when you retire

**Final Jury Instructions**

1    to the jury room to deliberate, you will have with you the

2    following things:  One, a copy of the indictment redacted,

3    meaning blocked out, as I have described; two, all of the

4    exhibits received into evidence; three, a work copy of these

5    jury instructions for each of you; four, a work copy of the

6    verdict form for each of you; five, an official verdict form;

7    six, a booklet of photographs of all nonparty trial witnesses

8    to help refresh your memory as to the various witnesses.

9    Remember that none of these items are evidence except the

10   exhibits.

11          "When you recess at the end of the day, please place

12   your work materials in the brown envelope provided and cover up

13   any easels with your work notes so that if my staff needs to go

14   into the jury room they will not even inadvertently see any of

15   your work in progress.

16          "A United States Marshal will be outside the jury

17   room door during your deliberations.  If it becomes necessary

18   during your deliberations to communicate with me, you may send

19   a note through the marshal signed by your foreperson or by one

20   or more members of the jury.

21          "No member of the jury should ever attempt to

22   communicate with me except by signed writing via the marshal.

23   I will respond to the jury concerning the case only in writing

24   or here in open court.  If you send out a question, I will

25   consult with the lawyers and the parties" -- "with the parties

**Final Jury Instructions**

 1    before answering it, which may take some time.

 2              "You may continue your deliberations while waiting

 3    for the answer to any question.  Remember that you are not to

 4    tell anyone, including me, how the jury stands, numerically or

 5    otherwise, until after you have reached a unanimous verdict or

 6    have been discharged.  Do not disclose any vote count in any

 7    note to the Court.

 8              "You have been required to be here each day only

 9    from 7:45 to 1:00 p.m.; now that you are going to begin your

10    deliberations, however, you are free to modify this schedule

11    within reason.  For example, if you wish to continue

12    deliberating in the afternoons after a reasonable lunch break,

13    that is fine.  The Court does recommend, however, that you

14    continue to start your deliberations by 8:00 a.m.  If you do

15    not reach a verdict by the end of today, then you will resume

16    your deliberations tomorrow and thereafter.

17              "It is very important that you let the clerk know

18    via the marshal in advance what hours you will be deliberating

19    so that the lawyers and parties may be present in the

20    courthouse at any time the jury is deliberating."

21              Again, I stress that:  Let us know what your

22    schedule is going to be so we can plan our -- our whereabouts

23    to be of most assistance to you.

24              "You may only deliberate when all 12 of you are

25    together.  This means, for instance, that in the mornings

**Final Jury Instructions**

1    before everyone has arrived or when someone steps out of the

2    jury room to go to the restroom you may not discuss the case.

3    As well, the admonition that you are not to speak to anyone

4    outside the jury room about the case still applies during your

5    deliberations.

6              "Now a word to our alternate jurors.  You will not

7    be deliberating with the rest of the jury at the outset.  You

8    are free to leave once the jury begins its deliberations.  You

9    may be called in to replace one of the jurors; therefore, your

10   responsibilities as an alternate remain in effect.  This means

11   that you are not to discuss this case with anyone until you

12   join the regular jury in deliberations or until a verdict is

13   returned and I expressly release you from service.

14             "If it becomes necessary to have you replace a

15   juror, you will be asked to return to the court.  You will then

16   be sworn in to the main jury, and you and the rest of the jury

17   will begin deliberations anew.  If you will not be needed, you

18   will be notified as soon as the Court itself makes that

19   determination."

20             We'll pause, now, for a moment to allow our

21   alternates to be escorted out with our thanks.  And you are

22   free to go at this time.  Please remember to take all of your

23   materials.

24             Dawn, would you escort them out to the jury room and

25   return right away.

1       While Dawn is doing that, is our marshal here?

2                    **(Marshal raises his hand.)**

3       *THE COURT:*  Would you please come forward and be

4  ready to take the marshal's oath.  Thank you.

5       Bear with us one more moment.

6                    **(Proceedings paused while waiting for the**

7                    **marshal.)**

8       *THE COURT:*  All right, my last paragraph.

9       "After all 12 of you have reached a unanimous

10  agreement on a verdict, your foreperson will fill in, date and

11  sign the verdict form and advise the Court through the marshal

12  that you have reached a verdict.  The foreperson should hold

13  onto the filled-in verdict form and bring it into the courtroom

14  when the jury returns the verdict.

15       "Thank you for your careful attention.  The case is

16  now in your hands.  You may now retire to the jury room and

17  begin your deliberations."

18                    *THE CLERK:*  All rise.

19                    **(Jury out at 1:15 p.m.)**

20       *THE COURT:*  State your name.

21       *THE MARSHAL:*  Frederick A. Brooks.

22       *THE COURT:*  Dawn, would you administer the oath.

23                    **(Marshall sworn.)**

24       *THE COURT:*  All right, thank you, sir.  You may

25  attend to your duties.

1          All right, the jury is now gone.  I plan to make

2    very minor adjustments to these instructions, have them

3    finalized, signed, and they will go into the jury room.

4          Are the exhibits ready to go into the jury room?

5          **MS. MARTIN:**  I just removed 22 and 24.

6          **THE COURT:**  How about the witness notebook?  The

7    photograph notebook; is that ready?

8          **THE CLERK:**  It's ready.  The defendants haven't had

9    a chance to see it.

10          **THE COURT:**  Well, they should look at it because

11    it's going to go in very promptly.

12          Anything anyone else want to raise?

13                **(Defendant Johnson raises his hand.)**

14          **THE COURT:**  Yes, Mr. Johnson?

15          **DEFENDANT JOHNSON:**  After you're finished, I

16    wondered are you going to provide an instruction in case they

17    don't come up with a unanimous verdict?

18          **THE COURT:**  Well, if they -- if we get to that

19    problem, we will then deal with how we instruct them.  But it's

20    premature to assume that they are not going to reach a verdict.

21          We normally wouldn't -- in fact, we always assume

22    they are going to reach a unanimous verdict, but if they tell

23    us they are deadlocked, then there are ways to deal with that.

24          **DEFENDANT JOHNSON:**  Okay, thanks.

25          **THE COURT:**  Okay.

1          All right, as soon as we know the schedule, we will

2     let you know.

3          The marshals should keep our defendants here as long

4     as the jury is deliberating and have them available to come

5     back on very short notice in case there is a note of some sort.

6     I will ask the -- anything else you want to raise with me right

7     now?

8                    **(No response.)**

9          ***THE COURT:***  Okay.  Stand by, and we'll let you know

10    what the jury's schedule will be as soon as we know ourselves.

11         ***MR. HALL:***  Thank you.

12                   **(Proceedings adjourn for jury deliberation**

13                   **at 1:18 p.m.)**

14

15                        ---o0o---

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF REPORTER

       I, Sahar McVickar, Official Court Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing.  The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.

**/s/ Sahar McVickar**

**Sahar McVickar, RPR, CSR No. 12963**

**October 22, 2008**